| | | |
|---|---|---|
| **RICHARD TRUSZ,** | : | **CIVIL ACTION NO.** |
| **Plaintiff** | : | |
| | : | **3:09-CV-268 (JBA)** |
| **v.** | : | |
| | : | |
| **UBS REALTY INVESTORS LLC,** | : | |
| **and UBS AG,** | : | |
| **Defendants** | : | **MAY 22, 2009** |
| | : | |

## THIRD AMENDED COMPLAINT

## INTRODUCTION

1.    This is an action arising out of illegal actions by senior executives at Defendant UBS

AG, including John Fraser, Chairman and CEO of Global Asset Management, and Mario Cueni,

General Counsel and Chief Risk Officer of Global Asset Management, and at one of its

subsidiaries, Defendant UBS Realty Investors LLC, including Matthew Lynch, Head of Global

Real Estate – US and President and CEO, and Thomas O'Shea, General Counsel.  Defendants

UBS AG and UBS Realty Investors LLC concealed the truth concerning overvalued real estate

investments from clients and favored large corporate clients over other investors, such as state

pension funds.  When Plaintiff Richard Trusz, a former Managing Director, opposed actions

taken by Defendants in violation of their fiduciary duties to investors, Defendants retaliated

against Plaintiff.  In contrast to the high praise that they had previously bestowed upon Plaintiff

for his accomplishments, Defendants began treating him as though he were a problem, isolated

him, undermined his authority, and terminated his employment.  In order to avoid liability,

Defendants then fabricated more lies to cover-up the truth regarding their unlawful conduct and

violations of state and federal law, including, but not limited to, the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A (hereinafter "SOX").

**PARTIES**

2.  Plaintiff, Richard Trusz, is the Plaintiff named herein.  Plaintiff resides at 89 Weir Street, Glastonbury, CT 06033.  Plaintiff commenced his employment with Defendant UBS Realty's predecessor in 1984.  Defendants UBS Realty Investors and UBS AG became his employer in 1999 pursuant to an acquisition.  Plaintiff possesses the professional "MAI" designation from the Appraisal Institute.  Plaintiff is licensed as a Certified General Appraiser by the State of Connecticut.  Plaintiff represented UBS on the NCREIF valuation committee. Commencing in 1989, Plaintiff served as the head of the valuation unit for Defendant UBS Realty and its predecessors.  Until the termination of his employment, Plaintiff also served for years as a voting member on Defendant UBS Realty's Investment Committee representing the firm's valuation function.  In 2005, Plaintiff was named Managing Director.

3.  Defendant, UBS Realty Investors LLC ("UBS Realty"), is a limited liability company whose principal place of business is 242 Trumbull Street, Hartford, CT 06103.  Defendant UBS Realty provides real estate investment management services to clients, such as pension funds, public employee retirement systems, foundations, and private investors.  Defendant UBS Realty is a subsidiary of UBS AG.  Defendant UBS Realty is an agent of Defendant UBS AG within the meaning of 18 U.S.C. § 1514A(a).  In addition, Defendant UBS Realty and Defendant UBS AG constitute an integrated employer.  Defendant UBS Realty was Plaintiff's employer, and is subject to the provisions of 18 U.S.C. § 1514A, Conn. Gen. Stat. §§ 31-51q, 31-51m, and 33-1336.

4.   Defendant, UBS AG, is a corporation that has offices at 677 Washington Boulevard, Stamford, CT 06901.  Defendant UBS AG's stock is publicly traded on the New York Stock Exchange.  Defendant UBS AG is a company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l), or that is required to file reports under Section 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(d).  Defendant UBS AG was Plaintiff's employer, and is subject to the provisions of 18 U.S.C. § 1514A, Conn. Gen. Stat. §§ 31-51q, 31-51m, and 33-1336.  Defendant UBS Realty and Defendant UBS AG constitute an integrated employer.

## JURISDICTION

5.   This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it presents a federal question under 18 U.S.C. § 1514A, 42 U.S.C. § 12203, and Conn. Gen. Stat. § 31-51q.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

6.   Plaintiff has satisfied all procedural and administrative requirements under 18 U.S.C. § 1514A, as Plaintiff previously filed a complaint with the U.S. Department of Labor, OSHA ("OSHA"), and notified OSHA of his intent to file this action more than 15 days ago, and after his complaint had been pending for more than 180 days.

7.   Plaintiff filed his complaint with OSHA on April 10, 2008.  On September 3, 2008, Plaintiff amended his complaint to include additional allegations of retaliation that transpired after April 10, 2008.  Defendants filed Position Statements and supporting documents with OSHA on May 13, 2008, and September 30, 2008, and provided additional information to OSHA in October 2008.  An OSHA Investigator reviewed the filings by Plaintiff and Defendants, and interviewed witnesses.  On October 28, 2008, an OSHA Investigator interviewed three of

Defendants' company representatives: Matthew Lynch, Head of Global Real Estate – US, and President and CEO of Defendant UBS Realty; Thomas O'Shea, General Counsel of Defendant UBS Realty; and Christine Sailer, Human Resources Manager. The OSHA Investigator also prepared an investigative report concerning the claims made by Plaintiff in his SOX Complaint, as amended.

8. On November 21, 2008, Plaintiff notified OSHA that he intended to pursue his claims under the Sarbanes Oxley Act of 2002, 18 U.S.C. § 1514A in court, since his claims had been pending for more than 180 days and no final decision had been issued.

9. Accordingly, on November 26, 2008, OSHA issued a letter to Plaintiff acknowledging that "over 180 days have passed since you filed your complaint" and that OSHA had not issued a final decision. The November 26, 2008 letter also stated that since Plaintiff intended to pursue his claims under the Sarbanes Oxley Act in Federal Court, OSHA was concluding the administrative process. Plaintiff received said letter on December 4, 2008.

10. On December 2, 2008, after receiving notice of Plaintiff's intent to pursue his SOX claim in federal court, Defendants' Counsel, David Ritter, wrote to the OSHA Investigator on behalf of Defendants UBS Realty and UBS AG. In that correspondence, Attorney Ritter wrote that "[i]t is my understanding that you have completed your investigation and that your written findings only require a supervisor's signature. OSHA and the parties have spent a significant amount of time and effort investigating this matter."

**BACKGROUND**

### UBS's Integrated "One-Firm" Approach

11. Plaintiff was formerly employed by both Defendants UBS Realty and UBS AG. Defendants UBS AG and UBS Realty jointly employed Plaintiff as an integrated employer based

on interrelationship of operations, common management, centralized control of labor relations, and common ownership. Senior executives of UBS AG were involved in the management of UBS Realty Investors. Senior management from UBS Realty regularly conferred with, and attended meetings with, officials of UBS AG.

12. Defendant UBS Realty Investors is a subsidiary of UBS AG, and is a part of Defendant UBS AG's Global Asset Management Group.

13. In its 2008 Form 20-F/A filed with the U.S. Securities Exchange Commission, Defendant UBS AG repeatedly emphasized the fact that its various business groups and subsidiaries constitute a single, integrated firm.

14. For instance, in a Letter to Shareholders, dated March 25, 2008, Marcel Ospel, Chairman, and Marcel Rohner, Chief Executive Officer, wrote that "Growth of all our businesses, across all countries in which they operate, improves when they work together as a unified firm, as opposed to operating independently of one another."

15. The Strategy and Development Section of the 2008 Form 20-F/A states that UBS is "Three businesses - - Global Wealth Management & Business Banking, Global Asset Management, and the Investment Bank - - operating as one firm." Under the heading of "UBS's Commitment," the Form 20-F/A describes UBS's "one firm approach" and states, "'**One firm' approach:** the synergies between UBS's businesses create additional sustainable opportunities, on top of their individual growth rates. To UBS, the 'one firm' approach means meeting client needs without expecting clients to worry about internal organizational structures."

16. The Strategy and Structure Section of the 2008 Form 20-F/A also proclaims that, "UBS is a global firm, working with corporate, institutional and private clients. Its strategy to concentrate on three global core businesses - - wealth management, asset management, and

investment banking and securities trading. . . All three businesses are built to benefit from the same underlying fundamental trend - - the growth of wealth. UBS operates as one firm and aims to delivery valuable advice, products and services to its clients while creating high quality sustainable earnings streams."

17. The UBS 2008 Form 20-F/A repeats the theme of its "one firm approach" throughout, and asserts that its clients receive advantages from a streamlined organizational structure. For instance, the Form 20-F/A states that "Another advantage of the 'one firm' approach is that it helps UBS to create synergies on cost and funding, which the firm estimates saves it around CHR 1 billion per year. UBS shares infrastructure and services between parts of its business, eliminating redundant structures, management and control functions and providing it with more purchasing power. All the businesses operate under one brand, increasing the efficiency of brand building efforts."

18. The management and structure of UBS is based on two separate boards: the Board of Directors and the Group Executive Board. The Board of Directors is the more senior body, with ultimate responsibility for the strategy and management of the company, as well as the supervision of the executive management. The Group Executive Board, on the other hand, assumes overall responsibility for the daily management of UBS, the implementation of strategy, and the Group's business results. The Group Executive Board is responsible for developing UBS Strategies.

19. UBS 2008 Form 20-F/A states that the Group Executive Board "is responsible for the implementation and results of the firm's business strategies, for the alignment of the business groups to UBS's integrated business model and for the exploitation of synergies across the firm. . . . The Group Executive Board plays a key role in defining the human resources policy and the

compensation principles of the Group.  It also fosters an entrepreneurial spirit throughout the firm."

20. In addition to the Group Executive Board, the senior leadership of UBS includes the members of the Group Management Board.  The members of the Group Managing Board are drawn from the management teams of the business groups and the Corporate Center.  According to the 2008 UBS Form 20-F/A, the Group Managing Board plays a crucial role in achieving UBS's one-firm vision and promoting the UBS agenda.  Its role is to understand, challenge and contribute to further developing the firm's direction, values and principles and to promote and communicate its culture."

21. Despite the separate boards, and three business groups, UBS is careful to emphasize in its 2008 Form 20-F/A that "While UBS is structured into three business groups and a Corporate Center, it is managed as an integrated firm.  Each business group is led by a member of the Group Executive Board."

22. John Fraser, Chairman and Chief Executive Officer for UBS's Global Asset Management Group, is the member of the UBS AG Group Executive Board that leads the Global Asset Management Group, of which Defendant UBS Realty Investors is a part.

23. Paul Marcuse, Head of Global Real Estate for UBS's Global Asset Management Group, and Mario Cueni, General Counsel and Chief Risk Officer for UBS's Global Asset Management Group, are members of the UBS AG Group Management Board.

24. Senior Executives of Defendant UBS Realty report directly to Paul Marcuse and to Mario Cueni.  Matthew Lynch, the Head of Global Real Estate – US, is the head of Defendant UBS Realty, and he reports directly to Paul Marcuse.  Thomas O'Shea, General Counsel for

Defendant UBS Realty, the individual who directly supervised Plaintiff, reports directly to Mario Cueni.

25. The UBS 2008 Form 20-F/A has a separate section entitled "UBS employees." That section calculates the number of UBS employees as 83,560, and describes the strategies through which UBS invests in its employees to recruit, retain, and promote qualified personnel, and achieve greater "human capital return on investment." In this section of the 2008 Form 20-F/A, UBS stresses its global reach and the internal mobility of its employees across businesses and geographic regions, claiming that such exchange of knowledge and experience among its employees allows "UBS to better implement and benefit from its integrated 'one-firm' approach."

26. The UBS 2008 Form 20-F/A also boasts that the firm implemented a program called the "New Joiner Experience," a "new service for all new employees, both graduates and professional hires . . . to allow new employees to gain an overview of UBS's global organization and culture and to settle quickly into their role."

27. The UBS 2008 Form 20-F/A also has a section concerning "Employee Retention." That section lists factors that influence employee retention, such as "compensation, and incentives, performance management and learning and development opportunities," and it states, "UBS manages these elements at all levels and offers targeted career development opportunities to talented employees across the company."

28. The UBS 2008 Form 20-F/A also states that firm tracks the retention of key staff, such that "Among the Group Executive Board (GEB), Group Managing Board (GMB) and managing director populations, 87% have been with the firm three years or more, 26% have worked at UBS between five and ten years, 34% between 11 and 20 years, and 19% have been

with the firm for 21 years or more.  128 of the 188 managing directors hired in 2004 or 2005 were still employed at the end of 2007."  (Before Defendants terminated his employment, Plaintiff was part of the "managing director population" described in the 2007 UBS Annual Report.)

29. The UBS 2008 Form 20-F/A also details the human resources strategies concerning performance management, compensation and incentives, employee share ownership, leadership development, business training, corporate values, and employee assistance that it implements for employees across all of the UBS business groups, and their subsidiaries.

30. The UBS 2008 Form 20-F/A also details a Corporate Responsibility process and structure that is managed by the Group Executive Board, and implemented throughout all of UBS's business groups.  The UBS 2008 Form 20-F/A also describes the UBS "Code of Business Conduct and Ethics, which sets forth the policies and practices UBS expects all its employees to follow. . .  It is the basis for all UBS policies."

31. With respect to the Global Asset Management Group, of which Defendant UBS Realty Investors is a part, the UBS 2008 Form 20-F/A states that it employs 3,600 employees, and one of its main offices is located in Hartford, Connecticut.

32. In the Global Asset Management Group, "Distribution is integrated but regionally organized" into three geographic areas, Americas, Asia Pacific, and Europe, Middle East, Africa. Within each geographic area, UBS provides services that are "delivered by globally coordinated business areas," including "Global Real Estate."

33. However, UBS AG provides "global functions" in support of each of its business groups in each geographic region throughout the firm.  These "global functions include "IT, Operations, Human Resources, Legal Compliance and Risk Control, Financial Control, Strategic

Planning, and Communications."  Importantly, Plaintiff's position was classified under the "Legal, Compliance, and Risk Control" function, which meant that he reported globally to Mario Cueni, the General Counsel and Chief Risk Officer for the Global Asset Management Group, through Thomas O'Shea, the General Counsel for Defendant UBS Realty.  Human Resources is another centralized "global function" that UBS AG provides in support of all its business groups across all geographic regions.

34. The UBS 2008 Form 20-F/A also describes the UBS "Corporate Center," which "partners with the business groups to ensure that UBS operates as an effective and integrated firm, according to a common vision and set of values.  The functions of the Corporate Center encompass risk, financial control, treasury, communication, legal and compliance, human resources, strategy, offshoring and technology. . . underpinning the bank's commitment to the 'one-firm' approach."

35. The Corporate Center "strives to maintain an appropriate balance between risk and return while establishing and controlling UBS's corporate governance processes, including compliance with relevant regulations.  Each functional head in the Corporate Center has authority across UBS's businesses for his or her area of responsibility, including the authority to issue Group-wide policies for that area, and is directly reported to by their business group counterpart."

36. Consistent with the integrated "one-firm" approach described by UBS in its 2008 Form 20-F/A, senior executives of Defendant UBS AG had the authority to make decisions, and did in fact make decisions, affecting Plaintiff's employment, including but not limited to, terms and conditions of employment, staffing, headcount and compensation.

37. Defendant UBS AG's policies and procedures, including but not limited to, personnel policies and procedures, human resources policies and procedures, compensation policies and procedures, employment benefits, and corporate code of conduct, applied to Plaintiff's employment. For instance, senior executives of UBS AG signed letters setting forth Plaintiff's compensation.

38. The operations of Defendant UBS Realty Investors and Defendant UBS AG were interrelated, such that UBS AG officials were involved in, and made decisions concerning, UBS Realty Investors LLC.

39. The Sarbanes Oxley reporting and compliance procedures for UBS Realty Investors LLC were a part of the Sarbanes Oxley reporting and compliance procedures for UBS AG. Defendants have adopted corporate governance guidelines and a Code of Business Conduct and Ethics that, according to Defendants, "satisfies the corporate governance standards of the New York Stock Exchange and the US Sarbanes-Oxley Act, as those standards apply to UBS." However, Defendants clearly failed to adhere to the standards set forth in the Code, such as those concerning "Ethical Behavior and Business Integrity", "Fiduciary Obligations," "Compliance with Laws, Rules and Regulations," "Disclosure and Public Communications," "Client Relationships," and "Interactions Between Employees."

40. On Defendants' website, UBS characterizes the business performed by Defendant UBS Realty as a part of the UBS Global Asset Management Group, and labels it "Global Real Estate – US." Matthew Lynch's title is listed as "Head of Global Real Estate – US," - - not the head of UBS Realty Investors LLC. In addition, the e-mail accounts for employees of UBS Realty Investors and UBS AG were all part of the same system, and shared the same "@ubs.com" extension.

41. Defendant UBS AG exercised control over personnel and human resources matters. Consistent with its classification as a "global function," human resources for employees throughout all of UBS's business groups is handled through a global reporting structure. As a result, the human resources managers with responsibility for Defendant UBS Realty, such as Christine Sailer and Anna Ibis Seebrath, did not just report internally within UBS Realty; rather, they operated under a global reporting structure.

42. As another example of UBS AG's involvement with, and control over, human resources matters, senior executives of Defendant UBS AG, such as Mario Cueni, the General Counsel and Chief Risk Officer for UBS's Global Asset Management Group; Paul Marcuse, the Head of Global Real Estate for UBS's Global Asset Management Group; and John Fraser, the Chairman and Chief Executive Officer of UBS's Global Asset Management Group, were involved in the response to Plaintiff's complaints referenced herein, and senior executives of Defendant UBS AG were involved in the process that led to the termination of Plaintiff's employment.

43. The interrelation of operations, common management, and control over personnel matters is also evident from Plaintiff's reporting structure. During his tenure, Plaintiff reported directly to Thomas O'Shea, the General Counsel for Defendant UBS Realty, who reported directly to Mario Cueni, the General Counsel and Chief Risk Officer for UBS's Global Asset Management Group. Plaintiff operated under even more of a global reporting structure than other employees at Defendant UBS Realty because his position was classified as part of "Legal, Compliance, and Risk Control," one of the "global functions" supporting all business groups across geographic regions.

44. Consistent with the statements made in UBS's 2008 Form 20-F/A, Defendants sought to present themselves as one firm through local marketing and branding. For instance, Plaintiff's business card contained the global symbol for UBS at the top, besides the words "UBS Global Asset Management." The sign for "UBS Global Asset Management" is also largely displayed between elevators in the lobby of the building at which Plaintiff worked at 242 Trumbull Street in Hartford, Connecticut. The glass doors through which people enter the offices at which Plaintiff worked also display the words "UBS Global Asset Management."

**Defendants Consistently Praised Plaintiff Before His Protected Conduct**

45. Before the events that culminated in the termination of his employment, Plaintiff consistently received ratings of "exceeds profile" or "greatly exceeds profile" in his formal performance evaluations, which were prepared by Thomas O'Shea, General Counsel of Defendant UBS Realty.

46. For instance, in 2004, Thomas O'Shea stated that "Rich's performance as head of the valuation unit has been outstanding. . . . Rich is viewed inside and outside of UBS Realty as a true asset to the firm. I think his credibility in the valuation area and his leadership on industry issues gives UBS Realty a competitive advantage in the market."

47. In 2005, O'Shea stated that "Once again, Rich's performance was excellent. Rich is dedicated, hard-working and conscientious. He is a true leader in his field and brings great credibility to our valuation function . . . Rich led the best practices project for the valuation function and his efforts in this regard were exemplary. He was an excellent champion of the need to adhere to 'best of industry' practices and I think the other regions found his insights invaluable."

48. In 2006, O'Shea stated that "I have found Rich to be very diligent, conscientious and hard-working. He leads a group that is under constant pressure to deliver timely results – with the same staff level having to deal with an increasing number of complex assets. . . . Rich is an excellent resource for the Company and represents us well at a number of industry events. Rich is truly one of the leaders of our Company, whether it be as a member of investment committee, as a head of an important business function, as a representative of our Company to the outside world (clients, consultants, industry activities, etc.) or, more generally, as one of the most respected senior members of management."

49. In 2007, O'Shea wrote that "Rich continues to be a leader among senior management in the Company. He is well respected throughout all levels of the organization. He is quite dedicated and hard-working and leads his team by example. . . . Rich's unit is well respected throughout the company and the industry. This is, in no small part, due to Rich's leadership."

50. As the foregoing illustrates, Plaintiff was recognized for his stellar performance across a wide range of important and significant responsibilities. Consistent with those ratings and evaluations, Plaintiff was rewarded with significant increases in incentive bonus compensation each year.

51. Defendant UBS Realty actively manages several real estate investment funds, the value of which is based on numerous commercial, residential, retail, industrial, and office property independent, and internal appraisals.

52. The valuation unit that Plaintiff was responsible for overseeing is responsible for determining the market value of all the real estate and mortgage investments in accounts managed by Defendant UBS Realty, based on an analysis of the information contained in independent appraisals completed on each property.

53. On a quarterly basis, the valuation unit updates and/or reviews the market value for each investment, in each account.

54. As the head of the valuation unit, Plaintiff's primary responsibility was to manage the valuation process to assure the integrity of the appraisals and the consistency of the valuation policies and procedures.

55. The unit values for several of the funds managed by UBS Realty (i.e., the price at which investors trade in and out of the funds) are established based on the appraisals and valuations produced by the valuation unit.

**As Assets Increased, Defendants Recklessly Ignored Plaintiff's Warnings**

56. Over the years, the amount of assets managed by Defendant UBS Realty grew considerably (growth in appraised assets estimated at approximately 68 percent since the last new temporary employee was hired in the valuation unit in 2005), but the valuation unit was not afforded additional staffing commensurate with that growth.

57. On or about July 18, 2006, Plaintiff sent an e-mail to Thomas O'Shea, General Counsel, and Dean Lindquist, Chief Financial Officer. In that communication, Plaintiff stated that "[i]t has become increasingly apparent that the valuation unit will need to expand staffing to meet the growing volume of assets under management expected through year-end 2006 and into 2007." Plaintiff further explained in that communication that each member of the valuation unit had to work weekends/holidays to complete the valuations for the quarter, and that "[t]his has become the norm for the past several quarters, impacting not only those in the valuation unit but also those that rely on timely market values for client reporting purposes (i.e. accounting, portfolio management)." Plaintiff's communication warned that the additional staffing was

necessary in order "to meet necessary reporting deadlines and **reduce the risk of appraisal error** (possible return and unit value restatement)." (emphasis added.)

58. Defendants denied Plaintiff's request, and refused to authorize additional staffing, even as the assets under management continued to grow, and Plaintiff and other employees in the valuation unit continued to work unreasonable nights and weekends to attempt to complete their work. Moreover, Defendants took no action to address the concerns Plaintiff raised about acting to protect against the risk of valuation error.

59. Plaintiff's requests for additional staffing continued through 2007.

60. During the first quarter of 2007, one of the members of the valuation unit underwent quadruple bypass surgery and was out of work for an extended period of time. In the second quarter of 2007, another member of the valuation unit went out on maternity leave, then missing all of the Third Quarter of 2007.

61. On several occasions in 2007, the General Counsel, Thomas O'Shea, approached Plaintiff and pressured him to accelerate the reporting of appraisal results. Plaintiff would always respond to Mr. O'Shea that he had asked for more staff, and he and others in the valuation unit are already working extreme nights and weekends, and staff members are out on maternity and/or medical leave. Plaintiff would tell Mr. O'Shea that "somebody is going to drop" and he asked him "what do you want us to do?"

62. Thomas O'Shea, General Counsel, only responded by saying "we need to do better."

63. In 2007, Plaintiff again requested additional staff, but his request was denied.

**Plaintiff Reported Appraisal Errors to Defendants, But Defendants Disclosed Nothing While Pushing Investors to Consent to Fund Conversion**

64. During a Valuation Review Committee meeting on or about October 2, 2007, Plaintiff informed Matt Lynch, Head of Global Real Estate – US and President and CEO of Defendant

UBS Realty, and Thomas O'Shea, General Counsel, that the value for a property named "3200 Windy Hill Road" in Defendant UBS Realty's RESA account was overstated in the Second Quarter of 2007. The value of the property was overstated by approximately $**3.0 Million**. As a result of this overstated value, Defendants collected excess management fees, and clients traded in and out of the account at incorrect unit values.

65. Approximately one week later, in October 2007, Plaintiff advised Thomas O'Shea, General Counsel, that the value for a property named "Crown Colony" in Defendant UBS Realty's ARMB account was overstated in the Second Quarter of 2007. The value of that property was overstated by approximately $**1.7 Million**. The overstatement represented approximately 16 percent of the total ARMB appreciation for the Second Quarter 2007. In the Third Quarter of 2007, Thomas O'Shea was informed by Plaintiff that the overstatement was responsible for the client's write-down in the Third Quarter of 2007.

66. On or around November 30, 2007, Plaintiff met with Matt Lynch, Head of Global Real Estate – US and President and CEO of UBS Realty, and Thomas O'Shea, the General Counsel, and again reiterated concerns and requested changes in the workplace, including additional staffing.

67. At that meeting, Plaintiff reiterated to Lynch and O'Shea that the valuation unit had a very heavy workload, growth was expected to continue in the rest of 2007 and 2008, and the firm would be processing more complicated deals. Plaintiff reiterated that the members of the valuation team were continuing to work extreme nights and weekends in order to accomplish the work they currently had. Plaintiff reiterated that one of the members of the valuation unit had recently undergone quadruple bypass surgery. Additionally, both men knew that Plaintiff

suffered from heart disease.  Plaintiff stated that he and others in the valuation unit were "at a breaking point" and that he was worried that somebody was going to "collapse."

68. At that meeting, Plaintiff also expressed concern that without the changes he was requesting, there was a significant risk that reporting errors would occur, which would damage clients and UBS credibility and compound the already stressful situation.

69. In that meeting, Plaintiff identified problems that could result in a lack of accuracy. For instance, Plaintiff expressed the concern that "Most 2008 budget forecasts [which fall under the responsibility of another department] will be missing from the 4Q07 appraisal consideration. Variances likely as to expenses and planned capital expenditures for 2008.  Will understate capital unless new data and revisions are pursued, again deferring closure."  The approved 2008 budgets are requested by all appraisers to assist in their analysis of property performance and to capture management's planned capital expenditures in 2008.  Therefore, the virtual absence of approved 2008 budgets expectedly would have an impact on the market value of the December 31, 2007 valuations.

70. Plaintiff also advised that at the existing staffing levels, the valuation unit was "[c]urrently operating with minimal layer of supervisory review at the property level.  Review all of Joe, Ron, and Amy's caseloads, virtually none for Chris and Tom, **risk of error or under/overstated values increases as investment portfolio expands**."  (emphasis added.)

71. In conclusion, Plaintiff wrote:  "To meet the earlier reporting schedule with a growing investment portfolio and current staffing, expect to shorten review time per property, pursue fewer revisions for new lease/market activity, data lag will increase, and/or may need to further reduce supervisory oversight.  **Probability of valuation reporting error increases with these cited conditions**."  (emphasis added.)

72. In response to Plaintiff's concerns, Matt Lynch, Head of Global Real Estate - US, concluded the meeting with the following statement: "We are going to grow this portfolio. We are going to do more complicated deals like the CenterPoint investment, and you are not getting any additional staff, period."

73. Following that November 30th meeting, Defendants took no action to address the concerns Plaintiff raised about lack of internal controls to protect against the risk of valuation error.

74. During that same time, Defendant UBS Realty was focused on finalizing the conversion of its two largest accounts, RESA, and PMSA, from "life separate" accounts to private real estate investment trusts, or REITs. As part of that process, however, Defendant UBS Realty needed clients to sign consent agreements assenting to the conversion. If a client did not consent to the conversion, then they could not remain an investor in the newly structured fund. During this time, many investors did not consent, and divested from their investments with Defendants. Defendants had to make representations and promises to certain clients in order to obtain their consent to the conversion. The deadline for clients to sign the consent agreements was December 31, 2007, but the actual conversion was not scheduled to proceed until February 29, 2008.

75. On or about mid-December 2007, Plaintiff informed Jeff Maguire, portfolio manager, that the value of a property called "Folsom Corporate Center" in Defendant UBS Realty's IPERS account was overstated in the Second Quarter of 2007, and the Third Quarter of 2007, primarily due to incorrect expense stops in the appraiser's cashflow forecast. On January 8, 2008, Plaintiff communicated the estimated error associated with the June 2007 valuation at approximately **$1.5 Million** to Matt Lynch and Thomas O'Shea. Plaintiff subsequently communicated to Thomas

O'Shea, and Christine Sailer and Anna Ibis Seebrath of Human Resources, that the estimated error actually approximated **$3.0 Million**, finding an additional significant error in the June 2007 appraisal. This estimated overstatement represented approximately 15 percent of the total appreciation for the IPERS account for the Second Quarter of 2007.

76. Following that meeting with Lynch and O'Shea, the members of the valuation team, including Plaintiff, were forced to continue working extreme nights and weekends to complete the appraisals before the end of the Fourth Quarter in December 2007.

77. On December 21, 2007, Thomas O'Shea, General Counsel, commented that the employee in the valuation department who had recently undergone quadruple bypass surgery "looked tired today." Plaintiff responded by telling O'Shea "he's not alone."

78. Despite knowledge of the errors, Defendants closed the Fourth Quarter of 2007 without further addressing or requesting details on the errors disclosed by the Plaintiff, without correcting all the errors Plaintiff already disclosed, without disclosing the errors to clients, and, to the best of Plaintiff's knowledge, without returning the excess management fees collected. Moreover, Defendants took no action to address the concerns Plaintiff raised about lack of internal controls to protect against the risk of valuation error.

79. Furthermore, Defendants failed to notify clients of the appraisal errors that Plaintiff reported, even as Defendants knew that clients were deciding whether or not to consent to the conversion of the account to the private REIT structure. If the errors could make a difference to a client who had to decide whether to sign a consent agreement, then they should have been disclosed.

80. By January 2008, Plaintiff concluded that he could no longer continue under the existing working environment.

81. On January 8, 2008, Plaintiff met with Matt Lynch, and Thomas O'Shea. At that meeting, Plaintiff identified errors to Lynch and O'Shea that had a direct impact on the unit values for various client funds, which were a direct consequence of inadequate staffing and the failure to properly address the concerns already communicated. Some of the errors discussed at that meeting had already been communicated previously to O'Shea, Lynch, and/or the respective portfolio managers, but others were disclosed for the first time to Lynch and O'Shea.

82. At that January 8, 2008, meeting, Plaintiff talked again about the aforementioned errors on the "3200 Windy Hill Road" property in the RESA account, the "Crown Colony" property in the ARMB account, and the "Folsom Corporate Center" property in the IPERS account that had already been disclosed to Lynch and/or O'Shea.

83. In addition to those errors already disclosed, Plaintiff informed Matt Lynch, and Thomas O'Shea, of more errors that had recently been identified.

84. Plaintiff informed Lynch and O'Shea that the value of the property called "The Source" in Defendant UBS Realty's RESA account was overstated in the First Quarter of 2007, the Second Quarter of 2007, and the Third Quarter of 2007. The value of that property was overstated by approximately **$3.0 Million**. As a result of this overstated value, Defendants collected excess management fees, and clients traded in and out of the account at incorrect unit values.

85. Plaintiff informed Matt Lynch and Thomas O'Shea that the value of the property called "Waterfront Marriott" in Defendant's RESA account, and the property called "Happy Valley Phase II" in Defendant's RESA account, were not correct for the Fourth Quarter of 2007.

86. Plaintiff informed Matt Lynch and Thomas O'Shea that the value of the property called "Columbia Center" in Defendant's RESA account was overstated in the Second Quarter of

2007 and the Third Quarter of 2007. The value of that property was overstated by approximately **$6.0 Million**. As a result of this overstated value, Defendants collected excess management fees, and clients traded in and out of the account at incorrect unit values.

87. At that same January 8, 2008 meeting, Plaintiff also told Matt Lynch and Thomas O'Shea that he could no longer exceed his physical limits and that he was at a breaking point.

88. Following the January 8, 2008 meeting, Defendants took no action to address the concerns Plaintiff raised about lack of internal controls to protect against the risk of valuation error, and made no disclosures to clients.

89. On or about January 24, 2008, Plaintiff met again with Thomas O'Shea. Plaintiff reminded O'Shea of overstated values that were discovered in the Fourth Quarter of 2007 on that date. Plaintiff estimated at the time, based on the errors identified and previously disclosed, that (1) the value of properties in the RESA account was overstated by approximately **$12.0 Million** in the Second Quarter of 2007; (2) the value of a property in the ARMB account was overstated by approximately **$1.7 Million** in the Second Quarter of 2007; (3) the value of a property in the IPERS account was overstated by approximately **$1.5 Million** in the Second Quarter of 2007 (later revised to approximately $3.0 Million) - - resulting in a total overvaluation of properties equaling approximately **$15.2 Million** in the Second Quarter of 2007. In addition to the errors, Plaintiff explained to O'Shea that he could not continue under the existing working conditions because of his heart conditions, and that he "was near physical collapse."

90. Following that January 24, 2008 meeting, Defendants took no action to address the concerns Plaintiff raised about lack of internal controls to protect against the risk of valuation error, and made no disclosures to clients.

91. On February 6, 2008, Plaintiff met with Thomas O'Shea, and Christine Sailer of Human Resources participated by tele-conference. At that meeting, Plaintiff discussed yet again the valuation errors caused by inadequate staffing and a failure to properly address the concerns that he previously communicated, which had a direct impact on the unit values for various client funds and resulted in excess fees charged by UBS for applicable accounts. Plaintiff expressed his opinion that the errors had to be rectified, full disclosure had to be made to clients, and any excess fees recovered by UBS should be returned.

92. Based on the information available to Plaintiff at the time, he explained that (1) the properties in the RESA account had overstated values of approximately **$12.0 Million** in the Second Quarter of 2007; (2) the properties in the RESA account had overstated values of approximately **$9.0 Million** in the Third Quarter of 2007; (3) a property in the IPERS account had an overstated value of approximately **$1.5 Million** in the Second Quarter of 2007 (later revised to approximately $3.0 Million); (4) a property in the IPERS account had an overstated value of approximately **$1.5 Million** in the Third Quarter of 2007 (later revised to approximately $3.0 Million); (5) a property in the ARMB account had an overstated value of approximately **$1.7 Million** in the Second Quarter of 2007; (6) a property ("PacifiCenter Anaheim Office") in the AVT account had an overstated value of approximately **$.3 Million** in the Third Quarter of 2007; and (7) a property ("PacifiCenter Anaheim Office") in the AVT account had an overstated value of approximately **$.3 Million** in the Fourth Quarter of 2007.

93. At that time, Plaintiff expressed the opinion that the valuation errors already identified had to be disclosed to clients and corrected, and that UBS needed to refund the excess management fees that it collected as a result of the overstated values.

94. At that time, Plaintiff also expressed concerns about the idea of making changes to the valuation business model which were inconsistent with promises made to clients in order to obtain T2 consent agreements, and the fact that secret T2 side letter deals were entered into for the benefit of select clients, which was a questionable ethical practice.

95. At that meeting, Plaintiff also provided additional information about his heart conditions, and he explained why he felt that he had been subjected to illegal discrimination on the basis of disability. The valuation errors, lack of internal controls to protect against appraisal error, failure to make disclosures to clients, and Plaintiff's concerns regarding the T2 conversion were causing additional stress. Plaintiff explained that he could not continue working under the existing conditions because he was unwilling to subject himself to another heart attack. At one point, Plaintiff stated, "this job is literally killing me."

96. Despite Plaintiff's request for a proposal, UBS did not offer any solutions to address his concerns at that time.

97. At the close of the meeting, Christine Sailer of Human Resources advised Plaintiff that he may have rights under the Family Medical Leave Act because of his heart conditions, and Plaintiff was instructed that he should not return to work without medical authorization. Consequently, Plaintiff went out on a disability leave of absence under the Family Medical Leave Act.

98. On February 12, 2008, Ms. Sailer sent Plaintiff a letter acknowledging some of the things that he had discussed during the February 6th meeting, and advised Plaintiff that he was not allowed to return to work without clearance from a doctor.

99. Near the close of her letter, she wrote "we must also address the unethical business practice allegations noted by you in our discussions last week (i.e. your claims that clients have

been overcharged due to an overstatement of the values of the properties managed by the Company)." Interestingly, even though Plaintiff had disclosed the overstated values on several previous occasions to both Matt Lynch and Thomas O'Shea, Sailer wrote that "[w]e were stunned to hear of these allegations against the Company . . . ."

100.    On February 21, 2008, Plaintiff attended a meeting with Thomas O'Shea, and Christine Sailer and Anna Ibis Seebrath of Human Resources, as well as Defendants' outside counsel. At this meeting, Plaintiff provided Defendants with additional information about the valuation errors, his proposals to establish additional internal controls to protect against additional valuation errors (including establishing another layer of supervisory review), his concerns about maintaining trust and credibility with clients, as well as his health conditions, his claims of discrimination, and the denial of reasonable accommodations. Plaintiff identified a total of eight (8) valuation errors on February 21, 2008 (of which seven had already been disclosed to Lynch and O'Shea). Plaintiff explained that this volume of errors demonstrates a clear and apparent pattern of errors, due to, among other things, inadequate staffing and lack of internal controls.

101.    Since recent experience showed that most errors were not identified until one or two quarters after they occurred, and the Fourth Quarter of 2007 may have been the busiest and most stressful quarter to date, Plaintiff also expressed concerns about the reliability of fourth quarter valuations, and stated the opinion that there might be additional embedded errors in the Fourth Quarter of 2007 that had not yet been discovered. Consequently, Plaintiff suggested that Defendants open up the books and retain an independent consultant to revalidate the reported values from the fourth quarter of 2007, given the inadequate staffing, the clear pattern of errors already disclosed, and the virtual absence of approved 2008 property budgets normally

incorporated into the appraisers' analysis (potential to overstate values with lack of 2008 planned capital).

102.    On February 21, 2008, Plaintiff also explained why it was critical to establish accurate valuations from the Fourth Quarter of 2007 before the completion of the approaching T2 conversion.  On February 29, 2008, Defendant UBS Realty planned to proceed with the T2 conversion pursuant to which the RESA and PMSA accounts would change to REIT-based funds (Real Estate Investment Trust), and their names would change to "UBS Trumbull Property Fund" and "UBS Trumbull Property Income Fund," respectively.  Then, after the conversion, the valuations from the Fourth Quarter of 2007 would be incorporated in establishing the new market value base at which clients would trade in and out of the newly named funds. Accordingly, since there was reason to question the reliability of the valuations from the Fourth Quarter of 2007, Plaintiff advocated for UBS to retain an independent consultant to revalidate the reported values from the Fourth Quarter of 2007.

103.    Defendants proceeded with the T2 conversion anyway, and did not adopt any of the additional internal controls Plaintiff proposed.  Defendants not only failed to take measures to confirm the reliability of the valuations from the Fourth Quarter of 2007 that would serve as the basis for the funds following the T2 conversion, but they failed to disclose the errors to clients who had signed consent agreements allowing the T2 conversion to proceed.  Defendants certainly had a duty to make disclosures to clients who were asked to sign consent agreements as part of the T2 conversion process.  Despite that duty, Defendants remained silent - - and represented to clients that nothing had changed in its management or processes.

104.    In addition to the errors already disclosed to Thomas O'Shea and Matt Lynch relating to 2007 valuations, an additional four valuation errors relating to the First Quarter of

2008 were reported to Defendant and its compliance department. These errors included a **$2.5 Million** error on 1670 Broadway, an office building in Denver, Colorado; a **$2.0 Million** error on Becknell Properties Portfolio, a multi-state industrial portfolio; **$2.4 Million** of aggregate capital holdback errors spread amount four individual accounts; and a **$1.05 Million** error on the 9 90 office development in Framingham, MA. These errors represented a continuation of the pattern of errors already disclosed to Defendants, demonstrating Plaintiff's assertion that Defendants' clients are continuing to be subjected to an increased risk of valuation errors going forward due to identified deficiencies in internal controls and inadequate staffing in the valuation unit.

105.    To the best of Plaintiff's knowledge, Defendants closed the First Quarter of 2008 without disclosing any aspect of the pattern of errors to clients, correcting the errors already identified, or refunding any excess fees collected.

106.    Plaintiff's aforementioned conduct constitutes protected activity under Section 806 of the Sarbanes Oxley Act of 2002, Conn. Gen. Stat. § 33-1336, and Conn. Gen. Stat. § 31-51q.

107.    Plaintiff provided information regarding conduct that he reasonably believed constitutes a violation of the requirements imposed by rules or regulations of the Securities and Exchange Commission, or laws relating to fraud against shareholders.

108.    The aforementioned acts and omissions by Defendants (i.e., the failure to increase the internal controls and properly disclose and correct the overstatements in value) could be construed as conduct which further perpetuates a fraud against individuals and groups paying overstated management fees and trading in and out of the funds.

**Defendants Retaliated Against Plaintiff and Failed to Make Disclosures to Clients**

109. Following Plaintiff's protected conduct, Defendants engaged in illegal retaliation against him.

110. On March 5, 2008, Plaintiff advised Defendants that he was planning on returning to work on March 10, 2008, and hoped to attend a meeting scheduled to occur on March 11, 2008, with a consultant named Kim Metta, from Russell Investments, one of the top real estate consulting firms in the country, who had specifically requested that Plaintiff attend the meeting with her.

111. On the very next day, March 6, 2008, Defendant UBS Realty instructed Plaintiff, in a letter signed by its counsel, that he was prohibited from attending the meeting with Kim Metta, and he was not allowed to communicate directly with clients and consultants "until these issues are resolved." In addition, the letter contained false accusations against Plaintiff and threatened disciplinary action. Matt Lynch has admitted that he approved the letter.

112. On or about March 11, 2008, Plaintiff filed a charge of discrimination and retaliation with the Connecticut Commission on Human Rights and Opportunities, and the U.S. Equal Employment Opportunity Commission, alleging violations of the Connecticut Fair Employment Practices Act and the Americans with Disabilities Act. Soon thereafter, Defendants were notified of Plaintiff's filing.

113. On March 27, 2008, Plaintiff returned to work from his medical leave, and was immediately subjected to additional retaliation and intimidation.

114. During Plaintiff's first meeting on the morning of March 27, 2008, Thomas O'Shea treated Plaintiff with hostility and disdain, intimidated Plaintiff, and precluded Plaintiff from discussing certain topics.

115.     Later that same day, Plaintiff complained verbally about O'Shea's conduct to Christine Sailer of Human Resources.

116.     On March 30, 2008, Plaintiff sent an e-mail to Matt Lynch, Thomas O'Shea, General Counsel, and Christine Sailer, complaining about O'Shea's retaliatory behavior towards him, and requesting that O'Shea not be allowed to continue supervising the valuation unit, given his hostility towards Plaintiff.  Despite Plaintiff's request, O'Shea was still allowed to supervise the valuation unit, and he continued to retaliate against Plaintiff.

117.     In response to his complaint about O'Shea's conduct, Thomas O'Shea, sent an e-mail falsely denying Plaintiff's accusations, and fabricating allegations that Plaintiff came to the meeting with "an agenda", that Plaintiff is "unwilling to accept" certain things, that Plaintiff "continue[s] to challenge our attempts to move forward", and that it is "counterproductive to argue over every business decision that UBS makes and to challenge [his] judgment and the judgment of others at UBS."

118.     In addition to exhibiting hostility towards Plaintiff, Mr. O'Shea also acted to negatively alter the terms and conditions of Plaintiff employment.

119.     For instance, Thomas O'Shea required Plaintiff to keep a log summarizing his daily activities at work and provide it to him so he can monitor Plaintiff's work.  Plaintiff was never asked to maintain such a document before he engaged in protected conduct, and, to Plaintiff's knowledge, no other department head or managing director is asked to perform such a task.  Plaintiff proposed to Thomas O'Shea that this requirement be imposed on the other employees in the valuation unit, but he rejected Plaintiff's proposal - - further evidence that Plaintiff was being singled out.

120.     Defendants also retaliated against Plaintiff by prohibiting him from attending an annual client conference, which is attended by numerous clients and consultants.  Before he engaged in the aforementioned protected conduct, Plaintiff had been invited to attend this conference every year for approximately ten years to represent the company's valuation function and respond directly to all questions regarding quarterly valuation performance, process, and observed appraisal trends.  In response to Plaintiff's protected conduct, however, Defendants acted to limit and/or prohibit Plaintiff's access to clients and consultants.

121.     Defendants also retaliated against Plaintiff by removing and/or undermining his authority as the head of valuation.

122.     For instance, Thomas O'Shea refused to allow Plaintiff to resume responsibility for working with an outside firm to perform a benchmarking study of competitor valuation departments.  This study certainly related to valuation processes, policies, and procedures.  As such, it clearly fell within the purview of Plaintiff's responsibility as head of valuation.  Plaintiff commenced work on the project before his medical leave of absence, and upon his return, communicated to Matt Lynch, Thomas O'Shea, and Christine Sailer, that he looked forward to resuming his responsibilities on the project.  Nevertheless, Defendant refused to allow him to participate, and it assigned responsibility for the project to Human Resources.

123.     In an April 2, 2008 meeting with Thomas O'Shea and Christine Sailer, Plaintiff asked to discuss issues concerning the study so that he could resume responsibility for the project, but was told by Thomas O'Shea that he was no longer charged with doing the study and, since he was no longer involved, there was no need to discuss it with him.

124.     Thomas O'Shea refused to discuss Plaintiff's concerns about the reliability of the valuations from the Fourth Quarter of 2007.  During a meeting on April 2, 2008, with Thomas

O'Shea and Christine Sailer, Plaintiff again attempted to discuss what actions have been taken to confirm the reliability of the Fourth Quarter valuations, which were questionable because of (1) inadequate staffing in the valuation unit; (2) extremely heavy volume of 4th quarter valuations; (3) clear pattern of errors from earlier quarters was revealed in the 4th quarter; and (4) virtual absence of approved 2008 budgets provided to appraisers possibly understating 2008 planned capital, thereby possibly overstating respective valuations. Plaintiff asked whether any action had been taken with respect to his recommendation that Defendant retain an independent consultant to assess the reliability risk and identify whether errors were made in the Fourth Quarter of 2007 that have not yet been identified. Plaintiff explained that this was an issue of paramount importance since there were record deposits and withdrawals from the RESA and PMSA accounts in the Fourth Quarter of 2007 ($934.1 Million), and the valuations from that quarter translated into the unit values that served as the new basis for clients following the T2 conversion. Plaintiff also advised that the issue needed to be resolved because valuation errors in the Fourth Quarter of 2007 would impact the appreciation performance of the March 31, 2008 valuation results that were being reported by Defendant UBS Realty that week.

125. Thomas O'Shea refused to discuss Plaintiff's concerns - - only stating that the errors he disclosed had been reported to compliance for an investigation. Plaintiff told O'Shea that he was not only talking about the errors that had already been disclosed, but rather being proactive to confirm the existence, or non-existence, of additional errors - - given the fact that there was reason to question the reliability of all valuations from the Fourth Quarter of 2007. In response, Thomas O'Shea merely stated that it was in the hands of compliance, and he did not need to tell Plaintiff anything else.

126.    Defendants' refusal to discuss these issues with Plaintiff directly interfered with his ability to perform his job responsibilities as the head of valuation, and it further reinforces how Defendants treated Plaintiff differently because of his protected conduct.

127.    At that April 2, 2008 meeting with Thomas O'Shea and Christine Sailer, Plaintiff also raised concerns about reported favorable "side letter agreements" that had been executed with select clients in order to obtain consent agreements during the T2 conversion process. Plaintiff explained that it had been reported to him that unique favorable rights and privileges had been given to select clients in order to obtain signed consent agreements, and which were not offered and available to all investors.  Plaintiff questioned whether such favorable rights and privileges created a so-called preferred class of investors, and Plaintiff opined that if true, it may create a potential valuation dilemma.  Plaintiff explained that, before the T2 conversion, a common unit value was established in each quarter for all investors in the RESA account, but now, after the T2 conversion, if some investors receive preferred rights and privileges that other investors did not receive, it may not be possible to establish a common unit value for all investors in the newly-named Trumbull Property Fund (formerly RESA) because it may be necessary to account for those preferred rights and privileges during the valuation process.

128.    Plaintiff said that, if true, there was a need to identify any unique favorable rights and privileges by individual investor and disclose, measure, quantify, and value their impact on unit values for the preferred clients versus the unit values for the common class of investors. Plaintiff also suggested that, if true, there also may be a need to engage an independent consultant and/or securities expert to conduct an analysis on valuation unit impact for the preferred clients versus the unit values for the common class of investors.

129. Plaintiff also said that, if true, there may be a need to disclose two separate classes of investors in financial statements, as well as the methodology to measure, quantify, and value the respective benefit to the preferred class of investors.

130. Finally, Plaintiff questioned whether, if in fact Defendant UBS Realty provided favorable rights and privileges to select investors, did it breach its fiduciary responsibility to all other clients who trade in and out of the fund at the same unit value, but do not receive the preferred rights and privileges.

131. In response to Plaintiff's concerns, Thomas O'Shea confirmed that different clients did get different indemnification rights, but he completely dismissed Plaintiff's concerns as to the existence of a preferred class of investors, and stated that no special rights and privileges were created that needed to be accounted for in any valuations.

132. Nevertheless, Thomas O'Shea refused to divulge details about the reported "side letter agreements", and stated that the issue did not involve Plaintiff because Plaintiff was only responsible for the valuation of properties, not the establishment of all valuations or unit values, and therefore, he did not need to discuss it with Plaintiff because the concerns that he was raising were not really part of his job.

133. Contrary to the statement by O'Shea about the limit of Plaintiff's job responsibilities, before he engaged in the aforementioned protected conduct, Plaintiff's responsibilities were never limited to only the valuation of properties. Before he engaged in the aforementioned protected conduct, reporting of all valuations and the establishment of unit values certainly fell within the purview of Plaintiff's job responsibilities. However, after Plaintiff engaged in the aforementioned protected conduct, Defendant UBS Realty acted to take important responsibilities away from him in retaliation for his protected conduct.

134.    Another instance of removal of authority occurred on April 3, 2008.  Plaintiff raised concerns about the valuations done on the "Presidential Way" buildings and asked for more time to conduct research on the signing of a major tenant lease in the 120 Presidential Way building (approximately 65 percent of the building).  If this lease was indeed executed before March 31, 2008, it needed to be shared with the independent appraiser to estimate its impact on market value.  Plaintiff estimated this impact at a positive $500,000, exceeding the 3 percent threshold for the fund's test of materiality.  If so revised by the appraiser, this would have reduced the respective account's total value change by an estimated 50 percent.  Thomas O'Shea told Plaintiff that Defendant UBS Realty was going to report the existing number, and denied Plaintiff's request for additional time to fully research the aforementioned concerns.

135.    Before Plaintiff engaged in the aforementioned protected conduct, as the head of valuation, it had always been his responsibility to decide when a valuation was ready to be reported.  Subsequent to Plaintiff's protected activities, Thomas O'Shea acted to override Plaintiff and undermine his authority for exercising that crucial responsibility.  These actions by O'Shea represent the first time in the Plaintiff's history as the head of valuation since 1989 that his direct supervisor had prohibited his independence and due diligence in establishing market value for any property or fund.  Thomas O'Shea's actions in that regard not only constitute additional evidence of retaliation against Plaintiff, but they also threatened the independence and reliability that is necessary in valuation reporting, and certainly increased the risk of additional valuation error.

### Plaintiff Claimed Violation of SOX; Defendants Continued to Retaliate

136.    On April 10, 2008, Plaintiff filed a Complaint with the U.S. Occupational Hazard & Safety Administration (OSHA) alleging illegal retaliation in violation of Section 806 of the

Sarbanes Oxley Act of 2002. On April 11, 2008, Plaintiff notified Defendants that he had filed such a Complaint with OSHA. Defendants engaged in further retaliation against Plaintiff after the filing of said complaint.

137.    On April 14, 2008, Plaintiff complained to Mario Cueni, General Counsel and Chief Risk Officer of the Global Asset Management division of Defendant UBS AG - - the individual to whom Thomas O'Shea reports. Plaintiff requested that Cueni intervene to protect him from discrimination and retaliation, and to ensure that Defendants act in accordance with their legal and ethical obligations to clients.

138.    Thereafter, Plaintiff continued to report additional details concerning valuation inaccuracies, and advocated for disclosure to clients. Nevertheless, Defendants refused to allow any client disclosures to be made.

139.    On or about April 18, Defendants advised Plaintiff that an investigation into his concerns regarding valuation discrepancies was nearing completion, but he could not see the report unless he agreed to a confidentiality agreement that prohibited him from discussing the contents of the report with anyone, without any exception for government investigators or Plaintiff's counsel.

140.    Plaintiff also informed Defendants that he believed two new policies instituted by Defendants in his absence were unethical, and were in violation of Plaintiff's ethical obligations as a professionally licensed MAI appraiser. Despite Plaintiff's declaration that these policies put his professional license at risk, Defendants forced him to follow these two new policies, without permitting any disclosures to clients. One policy, the Capital Holdback Policy, contains an artificial upward bias on affected values, resulting in increased management fees for Defendants. Even though this new policy represented a change to the valuation process and resulted in

increased management fees, Defendants refused Plaintiff's requests to disclose the details of this new policy to clients. The other policy, the Traffic Light Policy, eliminated the valuation unit's review of the appraisal's software for a substantial number of scheduled valuations. This policy reduced internal quality controls and will certainly result in additional appraisal error. Defendants forced Plaintiff to comply with this new policy as well, even though Plaintiff declared that it was contrary to his ethical obligations as a professionally licensed MAI appraiser.

141.    On April 28, 2008, Plaintiff complained again to Mario Cueni. In his complaint, Plaintiff stated his concerns about Defendants' new policies, and requested again that Thomas O'Shea be removed from supervising him and the valuation unit.

142.    On April 29, 2008, Plaintiff met with an investigator from OSHA to provide additional information in support of his complaint.

143.    Defendants failed several Sarbanes Oxley valuation certifications and Plaintiff reported additional events through Defendants' internal Sarbanes Oxley reporting procedures.

144.    Thomas O'Shea completed an override of several internal controls and certification rejections proposed by Plaintiff through Defendants' Sarbanes-Oxley reporting procedures.

145.    On May 4, 2008, Plaintiff wrote again to Defendants, and Mario Cueni, and requested authorization to disclose valuation errors to clients.

146.    On May 13, 2008, Plaintiff again wrote to Defendants, and Mario Cueni, to complain about further acts of retaliation against him.

147.    On May 14, 2008, and May 15, 2008, Defendants, through Mario Cueni and Thomas O'Shea, told Plaintiff that he was not authorized to disclose any of the valuation errors that had been identified to clients.

**Defendants Precluded Plaintiff From Meetings and Lied to Clients**

148.    On or about May 19, 2008, Defendants prohibited Plaintiff from attending a meeting with representatives from a particular client (ARMB), whose investments were implicated by valuation and appreciation errors that had been identified, but not disclosed to clients.  Plaintiff complained that it was illegal retaliation to preclude him from meeting with those client representatives.

149.    Instead of honestly informing the client representatives about the reason for Plaintiff's absence from the meeting, Defendants violated Plaintiff's rights and disclosed Plaintiff's confidential protected health information to create a false justification for Plaintiff's absence, and further mislead the client.

**Plaintiff Continued to Complain About Retaliation and Advocate for Compliance with Legal and Ethical Obligations to Clients, So Defendants Fired Him**

150.    On May 27, 2008, Plaintiff complained again to Thomas O'Shea, and Human Resources, about retaliation against him.

151.    On May 30, 2008, Plaintiff complained again that changes in UBS policy would result in a significant reduction in quality control standards, and expressed the opinion that the changes should be disclosed to clients because they will increase the risk of valuation error.

152.    On June 9, 2008, Plaintiff complained again about retaliation to Defendants, and Mario Cueni, and expressed concern that new policies weakened internal control standards and violated UBS policies regarding fiduciary obligations to clients.  Plaintiff again requested that Mario Cueni intervene.

153.    On June 11, 2008, Plaintiff commenced a lawsuit against Defendants in Connecticut Superior Court alleging unlawful retaliation, and a violation of the Connecticut equivalent to the federal Sarbanes-Oxley statute, Connecticut General Statutes § 33-1336.

Plaintiff also claimed that Defendants unlawfully retaliated against him because he engaged in activity protected by the First Amendment, in violation of Conn. Gen. Stat. § 31-51q, and because he made reports to a public body, in violation of Conn. Gen. Stat. § 31-51m. In that lawsuit, Plaintiff also complained about the improper disclosure of his confidential medical information, and claimed that Defendants invaded his privacy, in violation of the common law of the State of Connecticut.

154.    On June 13, 2008, Mario Cueni wrote an e-mail to Plaintiff accusing him of insubordination for his complaints about Thomas O'Shea, a clear act of retaliation against Plaintiff.

155.    On June 16, 2008, Plaintiff responded to Mario Cueni, and to Defendant's Human Resources department. Plaintiff set forth the details of the UBS Code of Ethics and Employee Handbook provisions pursuant to which he was reporting his complaints of discrimination, retaliation, and concerns about internal controls and fiduciary obligations to clients, as well as the compliance with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute (MAI Code of Ethics). Among other things, Plaintiff stated, "I have and should continue to be able to exercise my employee rights provided for by the UBS Code of Ethics and the UBS Handbook, and my professional obligations required by the MAI Code of Ethics. I also must satisfy my fiduciary responsibilities as the head of valuation to our clients to report valuation policies imposed by others that I believe are detrimental to our clients' interests. Thus, in conclusion, I vehemently disagree with you that I have engaged in insubordination. With all due respect, your email characterizing my actions as insubordinate represents another act of retaliation against me by UBS."

156.    Thereafter, on June 16, 2008, Plaintiff forwarded his communication to Mario Cueni to John Fraser, Chairman and CEO of the UBS Global Asset Management Group, of which UBS Realty Investors LLC is a part.  Fraser neither responded to Plaintiff's e-mail, nor protected Plaintiff from further retaliation, and he failed to address his concerns about illegal and unethical business practices.

157.    By that time, it had become obvious that Plaintiff's reputation was tarnished in the workplace.  Plaintiff was not only treated differently by his superiors, such as Matt Lynch and Thomas O'Shea, but other employees began to ignore him and/or treat him with disrespect. Plaintiff can only presume that this different treatment is the result of negative statements made about him to others in the workplace.

158.    Throughout this period, Defendants continued to systematically undermine Plaintiff's authority and remove responsibilities from Plaintiff to not only retaliate against him, but also to prevent Plaintiff from contributing information, or gaining information, about the concerns he raised.  Defendants treated Plaintiff as if he was the problem, as opposed to thanking him for his efforts to bring these important matters to the attention of others, and allowing him to be part of the solution.  Clearly, Defendants subjected him to retaliatory treatment that stands in stark contrast to the stellar evaluations that Plaintiff received before he engaged in the aforementioned protected conduct.

159.    For instance, on June 11, 2008, Plaintiff questioned why changes were made to the valuation process without his involvement, and without anyone notifying him that changes had been made.  He never received a response.

160.    Additionally, Plaintiff repeatedly requested permission to contribute to, and participate in, the coordination of the benchmarking study focusing on valuation practices in the

industry that Defendant initially assigned to him, but then stripped away from him after he engaged in protected conduct. As late as June 20, 2008, Plaintiff requested to see a draft of the report so that he could review it and contribute comments before the report became final. Defendants never provided Plaintiff with any such opportunity.

161.    As the end of the Second Quarter 2008 approached, the values reported by the independent appraisers retained by Defendants meant that Defendants were going to have to acknowledge significant write-downs on several important properties. Faced with that reality, Defendants' senior management and portfolio managers began pressuring the employees in the valuation unit regarding the values.

162.    On June 11, 2008, upon sharing the news of the preliminary write-down, Portfolio Manager Kevin Crean told Plaintiff "we must get the appraiser to understand this [distinction between Class A, B, and C mall trades]." Plaintiff responded that there is no "must" because the "appraiser is independent and will use his best judgment to set pricing in the appraisal." Crean immediately responded, "They're making these decisions with no real sales; we must get them to reflect this."

163.    On June 25th and 26th, Portfolio Manager Jeff Maguire separately requested that both Tom Gould and Chris Taylor of the valuation unit allow him access to the original appraisal submissions so he could track all of the changes and discussions between the independent appraiser and the UBS employee responsible for reviewing the appraisals. Both Tom Gould and Chris Taylor expressed opposition to the request, on the basis that it insinuates that their respective reviews and communications with the appraisers were suspect, and that the end values were therefore, suspect. Another portfolio manager requested that the valuation unit copy all of their notes and work files in advance of the Valuation Review Committee meeting scheduled

before the end of the quarter. One member of the valuation unit commented that it felt "like an investigation."

164.    At the Valuation Review Committee meeting on June 26, 2008, Defendant's senior management and portfolio managers became very angry and upset with the valuation results, and directed their anger at Plaintiff and the others in the valuation unit. Those in attendance described the meeting as "the worst meeting I ever attended," and "it was a bloodbath; I got so nervous I was afraid to speak up to defend you in the meeting." During that meeting, Plaintiff expressed the concern that, due to the size of the write-downs, there was a need to confirm that nothing was missed in the previous quarter, i.e., to determine whether some portion of the write-downs should have been acknowledged in the previous quarter. Plaintiff questioned whether Defendants' internal controls needed examination and revision.

165.    On June 27, 2008, following the Valuation Review Committee meeting, Matt Lynch met with Plaintiff in his office. Lynch became angry with Plaintiff regarding his questions during the Valuation Review meeting the day before concerning the sufficiency of Defendant's internal controls. Plaintiff reiterated that as the head of the valuation unit, he needed to review the possibility that some portion of the write-downs was missed during the previous quarter because of a lack of internal controls. Lynch disagreed, stating that the previous quarter was over, and there was only a need to focus on the current quarter. Plaintiff also told Lynch during that meeting that Plaintiff must disclose any errors or control issues to Compliance in accordance with Defendants' Sarbanes Oxley reporting requirements. Plaintiff then assured Lynch that the valuation unit would finish the current quarter quickly as the highest priority, and then will look into the internal controls from the previous quarter thereafter. Lynch became so angry with Plaintiff, and yelled at Plaintiff so loudly, that a member of Plaintiff's staff became

nervous, and she could hear Lynch's raised voice 50 feet away even though the office door was closed.

166.    On June 27, 2008, Plaintiff sent an e-mail to Matt Lynch, Thomas O'Shea, and Human Resources, summarizing the meeting.

167.    On the following day, June 28, 2008, Plaintiff sent an e-mail to Matt Lynch, Thomas O'Shea, Mario Cueni, General Counsel and Chief Risk Officer of UBS Global Asset Management, as well as Human Resources, complaining about the aforementioned acts of intimidation and retaliation. Among other things, Plaintiff stated, "UBS Realty's valuation function reports up through Tom O'Shea as UBS Realty's General Counsel, who then reports up to Mario Cueni, UBS Global Asset Management's General Counsel and Chief Risk Officer. We cannot be subjected to intimidation as demonstrated above by the performance-driven managers of UBS Realty. This reporting relationship was established many years ago so the valuation unit could act with the highest level of integrity and independence. Nothing has changed from the original intent of establishing this reporting relationship to Mario Cueni; nothing must interfere with the preservation of independence of my responsibilities and that of the valuation unit, as promised to our clients. Finally, no valuation unit member should ever feel that they are so intimidated by the portfolio managers that they fear to speak and defend the fair market values reported by the independent appraisers." Plaintiff requested that the "inappropriate actions are adequately addressed and resolved on behalf of the valuation unit and our clients."

168.    On that same day, Saturday, June 28, 2008, Plaintiff forwarded his e-mail correspondence to John Fraser, Chairman and CEO of UBS Global Asset Management. In that e-mail, Plaintiff wrote, "As I have received no relief, protection or consideration to my claims

from Mario Cueni, Matt Lynch, or UBS Human Resources, I again request that you take the appropriate action to address and resolve the acts of intimidation described in my e-mail below."

169.     On the morning of the following business day, Monday, June 30, 2008, Defendants demanded that Plaintiff leave the premises, and Plaintiff was placed on an involuntary, unpaid, leave of absence.

170.     As of the date that Plaintiff left the office, despite the passage of several months, and the closing of several financial quarters, to Plaintiff's knowledge, NO disclosures were made to clients, NO errors were corrected to reflect accurate information for the respective quarters, and NO excess fees collected by Defendant UBS Realty were refunded.  During this time, Defendant allowed investors to continue to trade in and out of accounts, processing more than **$1 Billion** in deposits and withdrawals.  During this time, to Plaintiff's knowledge, Defendant made no disclosures to any of those same investors or potential investors that it has uncovered a clear pattern of errors, and that the head of its valuation unit believed that the valuations from the Fourth Quarter of 2007 were of questionable reliability.  Moreover, Defendants failed to institute the necessary internal controls to prevent further valuation error, and it continued with the T2 conversion, without taking any actions to confirm the reliability of the Fourth Quarter valuations, even though the head of its valuation unit called into question the reliability of the unit values that served as the basis for investors trading in and out of the newly-named Trumbull Property Fund (formerly RESA) and Trumbull Property Income Fund (formerly PMSA).

171.     When Plaintiff left the office on that date, the closing date of the second quarter valuations, all of the appraisals were final except one.  That remaining valuation was finalized later in the evening on June 30, 2008, and reported to accounting on July 1, 2008.

172.     On July 28, 2008, while still on leave, Plaintiff sent an e-mail to Mario Cueni, General Counsel and Chief Risk Officer for UBS Global Asset Management, and John Fraser, Chairman and CEO of UBS Global Asset Management, titled "UBS Realty Valuation and Ethical Issues." In the e-mail, Plaintiff wrote, "I must report what I believe to be a most serious breach of UBS's fiduciary obligation to our clients in violation of Statement 11 of the Global Real Estate – US Code of Business Conduct and Ethics (UBS Code of Ethics)."

173.     In that e-mail, Plaintiff wrote that after he was forced to leave the office on June 30, 2008, "value write-downs totaling approximately $55 Million were reversed out by UBS management during the first week of July that were previously finalized with the independent appraisers and the UBS Realty valuation and accounting units prior to June 30th. My information is that these write-downs were attributed to two regional mall valuations located in Cambridge, Massachusetts and Dallas, Texas. I infer that the reversal of these write-downs was directed by UBS Realty senior management, Matt Lynch, Tom O'Shea, and Kevin Crean as the portfolio manager for these two major retail assets. If my information is correct, it is now apparent that the demand for my immediate departure of the premises may have presented senior management with the opportunity to alter these then-final valuations avoiding $55 Million of value loss which was to be incorporated in the reporting of second quarter appreciation and total return performance to the affected clients. If my information is correct, it is apparent that senior management may have interfered with the valuation process and may have misrepresented and mislead its clients in the reporting of these two mall valuations by possibly directing Chris Taylor of the valuation unit to alter these valuations (one external, one internal with external concurrence) after the then-respective values were finalized prior to June 30th." Plaintiff made clear in his e-mail that information was brought to his attention by a "senior UBS officer."

174.    Plaintiff continued in his e-mail by writing, "Accordingly, honoring my fiduciary responsibility to the clients and as current head of the valuation function for UBS Realty, I respectfully request that a formal, independent investigation be conducted to confirm and disclose senior management's possible interference with the valuation process after June 30th, their suspected direction to Chris Taylor of the valuation unit to effect these changes, and their potential involvement in resetting these valuations and conclusions. If my information is correct, I believe that the results of this independent investigation should be disclosed to the respective clients of these assets (Trumbull Property Fund (TPF), Boeing and Aetna General Account) given the severity of this claim."

175.    Plaintiff also provided additional details regarding each property. With respect to CambridgeSide Galleria, Plaintiff wrote that it was valued by the independent appraiser on June 30, 2008 at $475.5 Million, and the total write-down for the second quarter was $65 Million shared by the TPF account (71.1%), Boeing (20%) and Aetna General Account (8.9%). Plaintiff wrote that he believed that the value was increased (after he was forced to leave the office on June 30, 2008, and after the independent appraiser considered its value to be final) to $498 Million, reducing the write-down on this asset by $22.5 Million.

176.    With respect to Galleria Dallas, Plaintiff wrote that, on June 30, 2008, the property was valued internally at $484.4 Million, resulting in a write-down of approximately $33.1 Million. Plaintiff also wrote that the internal valuation was shared, concurred and approved by the appraiser of record, and approved by the investment's asset managers, prior to June 30, 2008. Plaintiff wrote that while the interim valuation was reported to accounting as final as of June 30, 2008, Defendants reversed out the write-down in its entirety after they forced Plaintiff to leave the office.

177.     Plaintiff also wrote that the valuations of these properties were reviewed at the Valuation Review Committee meeting on June 26th, and explicitly stated to be final.  Plaintiff also wrote that Matt Lynch, Kevin Crean, and other portfolio managers were quite upset with the specific write-downs of the two retail assets at the meeting.  Plaintiff also wrote about his previous opposition to the intimidation and criticism asserted by UBS managers in response to the write-downs leading up to June 30th.

178.     Plaintiff also wrote that "Any interference by UBS senior management to direct and influence the valuation unit to alter these then-final values at June 30th after my physical departure is, I believe, unethical and a violation of the UBS fiduciary obligation to its clients.  Any interference and avoidance of material write-downs, in my opinion, not only violates UBS Code of Ethics but also damages credibility with its clients in return for short-term appreciation gain.  Given the commitment to purchase all or a portion of Boeing's interest in Cambridgeside Galleria, any interference in establishing this asset's value for an intra-account transfer would be not only unethical, but also possibly illegal.  If my information is correct, I believe that these actions must be disclosed to each affected client before any such intra-account transfer can even be contemplated."  Plaintiff also went on to write that, if his information is correct, it would represent the second time in the past year that Boeing, as an individual client, was the beneficiary of favorable treatment.

179.     Plaintiff also wrote that "only a formal independent investigation can objectively assess the severity of this reported claim by one of the UBS officers, requiring a comprehensive review of all verbal and written directives given to the valuation unit and independent appraisers by senior management."

180.     Approximately two weeks after Plaintiff expressed his concerns to John Fraser and Mario Cueni, Defendants notified Plaintiff that they terminated his employment.

181.     On August 13, 2008, Defendants notified Plaintiff that his employment was terminated, retroactive to June 30, 2008.

182.     As further evidence that Defendants represent an integrated employer, Defendants presented Plaintiff with a proposed Separation and General Release Agreement dated August 13, 2008, which designated him as a Participant under the UBS Global Asset Management Separation Program.  Defendants' proposed Agreement contained language "confirm[ing] the termination of your employment with UBS Realty Investors, a part of UBS Global Asset Management, a business group of UBS AG ("the Firm") as of June 30, 2008."

183.     Defendants have now fabricated, and publicized, a false narrative that Plaintiff was terminated because of "outsourcing," that Plaintiff only complained about Defendants' conduct because he was upset about Defendants' plan to outsource, and that Plaintiff took actions that were contrary to the best interests of Defendants' clients.  By publishing that false narrative to third parties, including clients, consultants, and the media, Defendants have further damaged Plaintiff and his reputation.

**COUNT ONE:**          **VIOLATION OF SARBANES OXLEY ACT OF 2002, 18 U.S.C. § 1514A**

184.     Based on the foregoing, Defendants illegally retaliated against Plaintiff for his protected conduct in violation of 18 U.S.C. § 1514A.

185.     Plaintiff provided information, caused information to be provided, or otherwise assisted in an investigation regarding conduct which he reasonably believed constitutes a violation of a law, rule, or regulation covered by 18 U.S.C. § 1514A(a)(1), and he provided said information or assistance to a federal regulatory agency, as well as persons employed by

Defendants with supervisory authority over Plaintiff and persons employed by Defendants who had the authority to investigate, discover, or terminate misconduct.

186.     In addition, Plaintiff filed, caused to be filed, testified, participated in, or otherwise assisted in a proceeding relating to an alleged violation of a law, rule or regulation covered by 18 U.S.C. § 1514A(a)(2).

187.     Defendants had knowledge of Plaintiff's protected conduct, and Defendants discharged, suspended, threatened, harassed, and discriminated against Plaintiff in the terms and conditions of his employment because he engaged in the aforementioned protected conduct.

188.     Defendants' actions have caused Plaintiff to suffer damages, including, but not limited to, compensatory damages, economic damages, loss of employment benefits, damage to reputation, emotional and physical distress, as well as loss of enjoyment of life.

189.     Plaintiff has also incurred, and will continue to incur, attorneys' fees and costs.

## COUNT TWO:          VIOLATION OF CONNECTICUT GENERAL STATUTES SECTION 31-51m

190.     Based on the foregoing, Defendants illegally retaliated against Plaintiff because he engaged in activity protected by Connecticut General Statutes § 31-51m.

191.     Plaintiff has engaged in protected conduct under Conn. Gen. Stat. § 31-51m by reporting a violation or a suspected violation of state and federal laws to public bodies.  For instance, in March 2008, Plaintiff filed a complaint of discrimination with the Connecticut Commission on Human Rights and Opportunities alleging that Defendants violated the Connecticut Fair Employment Practices Act.  On April 10, 2008, Plaintiff filed a complaint with OSHA alleging that Defendants violated Section 806 of the Sarbanes Oxley Act of 2002, 18 U.S.C. § 1514A.

192.     Plaintiff has exhausted all available administrative remedies pursuant to Conn. Gen. Stat. § 31-51m.  On November 14, 2008, the Commission on Human Rights and Opportunities issued a release of jurisdiction with respect to Plaintiff's claims under the Connecticut Fair Employment Practices Act.  On December 4, 2008, Plaintiff received notice from OSHA that the administrative process had concluded with respect to Plaintiff's claim alleging a violation of 18 U.S.C. § 1514A.

193.     Defendants illegally disciplined or otherwise penalized Plaintiff in retaliation for his protected conduct in violation of Conn. Gen. Stat. § 31-51m.

194.     Defendants' actions have caused Plaintiff to suffer damages, including, but not limited to, compensatory damages, economic damages, loss of employment benefits, damage to reputation, emotional and physical distress, as well as loss of enjoyment of life.

195.     Plaintiff has also incurred, and will continue to incur, attorneys' fees and costs.

**COUNT THREE:     VIOLATION OF CONNECTICUT GENERAL STATUTES SECTION 33-1336**

196.     Based on the foregoing, Defendants illegally retaliated against Plaintiff because he engaged in activity protected by Connecticut General Statutes § 33-1336.

197.     Plaintiff provided information, caused information to be provided, or otherwise assisted in an investigation regarding conduct which he reasonably believed constitutes a violation of a law, rule, or regulation covered by § 1336(a)(1), and he provided said information or assistance to a federal regulatory agency, as well as persons employed by Defendants with supervisory authority over Plaintiff and persons employed by Defendants who had the authority to investigate, discover, or terminate misconduct.

198. In addition, Plaintiff filed, caused to be filed, testified, participated in, or otherwise assisted in a proceeding relating to an alleged violation of a law, rule or regulation covered by § 1336(a)(2).

199. Defendants had knowledge of Plaintiff's protected conduct, and Defendants discharged and discriminated against Plaintiff in the terms and conditions of his employment because he engaged in the aforementioned protected conduct.

200. Defendants' actions have caused Plaintiff to suffer damages, including, but not limited to, compensatory damages, economic damages, loss of employment benefits, damage to reputation, emotional and physical distress, and loss of enjoyment of life.

201. Plaintiff has also incurred, and will continue to incur, attorneys' fees and costs.

**COUNT FOUR:**     **VIOLATION OF CONNECTICUT GENERAL STATUTES SECTION 31-51q**

202. Based on the foregoing, Defendants illegally retaliated against Plaintiff because he engaged in activity protected by Conn. Gen. Stat. § 31-51q.

203. Defendants violated Conn. Gen. Stat. § 31-51q when they subjected Plaintiff to discipline on account of the exercise by Plaintiff of rights guaranteed by the first amendment to the United States Constitution or section 3, 4, or 14 of article first of the Constitution of Connecticut. Plaintiff engaged in speech touching upon matters of public concern, including, but not limited to, (1) internal complaints regarding failure to comply with fiduciary duties to clients and investors, failure to disclose material information to clients and investors, and inadequate internal controls; (2) commencing a proceeding with OSHA in April 2008 detailing his concerns regarding failure to comply with fiduciary duties, failure to disclose material information, and inadequate internal controls; (3) providing additional information to OSHA following the filing of said complaint; (4) commencing a lawsuit in Connecticut Superior Court in June 2008

alleging unlawful retaliation because he engaged in activity protected by the First Amendment, pursuant to Conn. Gen. Stat. § 31-51q, as well as violations of Conn. Gen. Stat. § 33-1336, and § 31-51m; and (5) opposing favoritism in favor of certain clients, to the detriment of others.

204. Defendants had knowledge of Plaintiff's protected conduct.

205. Defendants retaliated against Plaintiff because of his protected conduct.

206. There is a causal connection between Plaintiff's protected conduct and Defendants' retaliation against him.

207. Defendants' actions have caused Plaintiff to suffer damages, including, but not limited to, compensatory damages, economic damages, loss of employment benefits, damage to reputation, emotional and physical distress, as well as loss of enjoyment of life.

208. Defendants exhibited a reckless indifference to Plaintiff's rights, or an intentional and wanton violation of Plaintiff's rights, thereby entitling Plaintiff to an award of punitive damages.

209. Plaintiff has also incurred, and will continue to incur, attorneys' fees and costs.

**COUNT FIVE:**        **WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY**

210. Based on the foregoing, Defendants unlawfully discharged Plaintiff's employment in violation of important public policies of the State of Connecticut.

211. Defendants' termination of Plaintiff's employment violated several important public policies of the State of Connecticut, including but not limited to, prohibition against invasion of privacy, prohibition against the unauthorized disclosure of an employee's confidential medical information, compliance with professional ethical obligations, and the need for individuals and corporations in the financial services industry to comply with standards for

ethics, honesty, and integrity in their interactions with, and communications and disclosures to, clients and investors.

212.     Defendants' actions have caused Plaintiff to suffer damages, including, but not limited to, compensatory damages, economic damages, loss of employment benefits, damage to reputation, emotional and physical distress, as well as loss of enjoyment of life.

213.     Defendants exhibited a reckless indifference to Plaintiff's rights, or an intentional and wanton violation of Plaintiff's rights, thereby entitling Plaintiff to an award of punitive damages.

214.     Plaintiff has also incurred, and will continue to incur, attorneys' fees and costs.

## COUNT SIX:          RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12203

215.     Based on the foregoing, Defendants unlawfully retaliated against Plaintiff in violation of the Americans with Disabilities Act, 42 U.S.C. § 12203.

216.     In March 2008, Plaintiff filed a charge of discrimination against Defendants with the Connecticut Commission on Human Rights and Opportunities and U.S. Equal Employment Opportunity Commission, claiming that Defendants discriminated against him and retaliated against him in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* Said charge of discrimination was designated as EEOC Charge No. 16A-2008-00841. Plaintiff subsequently amended said charge of discrimination after Defendants terminated his employment.

217.     On April 2, 2009, the EEOC issued Plaintiff a Notice of Right to Sue regarding said charge of discrimination. Plaintiff received said Notice of Right to Sue on April 6, 2009. Plaintiff is proceeding with his claim under the Americans with Disabilities Act within 90 days of receiving that Right to Sue.

218.     Plaintiff engaged in activity that is protected by the Americans with Disabilities Act, 42 U.S.C. § 12203, in that he opposed practices that he reasonably believed, in good faith, were prohibited by the Americans with Disabilities Act, and because he exercised rights afforded to him by the Americans with Disabilities Act.  For instance, Plaintiff complained internally and externally about discrimination on the basis of disability, Plaintiff requested reasonable accommodation, and Plaintiff filed a charge of discrimination with CHRO and EEOC.

219.     Defendants had knowledge of Plaintiff's protected activity.

220.     Defendants subjected Plaintiff to a series of adverse employment actions, including, but not limited to, the termination of his employment, because he engaged in said protected activity.

221.     Defendants' adverse employment actions against Plaintiff were causally connected to Plaintiff's protected activity, in that a close temporal relationship exists between the adverse employment actions and the protected activity.

222.     Defendants' actions have caused Plaintiff to suffer damages, including, but not limited to, compensatory damages, economic damages, loss of employment benefits, damage to reputation, emotional and physical distress, as well as loss of enjoyment of life.

223.     Defendants exhibited a reckless indifference to Plaintiff's rights, or an intentional and wanton violation of Plaintiff's rights, thereby entitling Plaintiff to an award of punitive damages.

224.     Plaintiff has also incurred, and will continue to incur, attorneys' fees and costs.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiff claims judgment against Defendants and:

1.  Compensatory damages, including, but not limited to, economic damages, loss of employment benefits, emotional and physical distress, damage to reputation, loss of enjoyment of life, and embarrassment;

2.  Back Pay, with interest;

3.  Punitive damages, pursuant to 42 U.S.C. § 1981a, Conn. Gen. Stat. § 31-51q, and common law;

4.  Reinstatement, with full seniority and benefits, or Front Pay;

5.  Injunctive and Equitable Relief;

6.  Attorney's fees and litigation costs, pursuant to 18 U.S.C. § 1514A, 42 U.S.C. § 12203, 42 U.S.C. § 12117, 42 U.S.C. § 2000e-5, 42 U.S.C. § 1988, and Conn. Gen. Stat. §§ 31-51q & 31-51m;

7.  Interest pursuant to Conn. Gen. Stat. § 37-3a; and

8.  Such other relief in equity or law that may pertain.


**JURY DEMAND**

Plaintiff hereby claims a trial by jury.

> PLAINTIFF,
> RICHARD TRUSZ
>
> By:_____/s/Todd D. Steigman_____
> Todd D. Steigman, Esq. (ct26875)
> Madsen, Prestley & Parenteau, LLC
> 44 Capitol Avenue, Suite 201
> Hartford, CT 06106
> (860) 246-2466 (tel.)
> (860) 246-1794 (fax)
> tsteigman@mppjustice.com

## **CERTIFICATION**

I hereby certify that on the 22nd day of May 2009, a copy of foregoing Third Amended Complaint was filed electronically [and served by mail on anyone unable to accept electronic filing].  Notice of this filing will be sent by e-mail to all parties by operation of the Court=s electronic filing system [or by mail to anyone unable to accept electronic filing].  Parties may access this filing through the Court=s system.


_____/s/_____
Todd D. Steigman