UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Richard Trusz,<br>　　*Plaintiff*, | Civil No. 3:09cv268 (JBA) |
| 　　　*v.* | |
| UBS Realty Investors, LLC and UBS AG,<br>　　*Defendants*. | March 30, 2010 |

RULING ON MOTION TO DISMISS [Doc. # 23]

Plaintiff, Richard Trusz, has brought suit against Defendants UBS Realty Investors, LLC ("UBS Realty") and UBS AG ("UBS"), alleging violations of the federal Sarbanes Oxley Act, 18 U.S.C. § 1514A; the state statutory analog, Conn. Gen. Stat. § 33-1336; the Connecticut whistleblower statute, Conn. Gen. Stat. § 31-51m; Conn. Gen. Stat. § 31-51q; and common-law wrongful discharge.  Defendants have moved to dismiss the Second Amended Complaint.   For the reasons that follow, only Count Five will be dismissed.

I.　　Background

Trusz alleges the following facts.  He began working for UBS Realty's predecessor in 1984, and when that company was acquired by UBS AG in 1999, he became an employee of UBS Realty and UBS AG.  He worked in a variety of capacities and was head of the valuation unit for UBS Realty and its predecessors.  He was a voting member on UBS Realty's Investment Committee and was named Managing Director in 2005.

UBS Realty is a limited liability company with a offices in Hartford, Connecticut. UBS AG is a corporation with offices in Stamford, Connecticut. Its stock is publicly traded on the New York Stock Exchange and it has a class of securities registered under Section 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(d).

UBS Realty is a part of UBS AG's Global Asset Management Group. In its 2008 Form 20-F/A, filed with the United States Securities and Exchange Commission ("SEC"), UBS AG represented that its various business groups and subsidiaries constitute a single integrated firm. Each business group is led by a member of the Group Executive Board. Senior executives of UBS Realty report to Paul Marcuse, Head of Global Real Estate for UBS's Global Asset Management Group, and to Mario Cueni, General Counsel and Chief Risk Officer for the Global Asset Management Group. The valuation unit at UBS Realty, supervised by Trusz, was responsible for determining the market value of all real estate and mortgage investments in accounts UBS Realty managed, based on analysis of information contained in independent appraisals of each property. As head of the valuation unit, Trusz was responsible for managing the valuation process and assuring the integrity of the appraisals and consistency of the valuation policies and procedures. Trusz holds the professional "MAI" designation from the Appraisal Institute and is licensed as a Certified General Appraiser by the State of Connecticut.

For years, Trusz's supervisors praised his performance, and he received ratings of "exceeds profile" or "greatly exceeds profile" in formal performance evaluations prepared by Thomas O'Shea, UBS Realty's General Counsel. As the amount of assets managed by UBS Realty grew, Trusz increasingly felt that the valuation unit needed more staff. In July 2006 he requested of O'Shea and Dean Lidquist, then UBS Realty's Chief Financial Officer, that the valuation unit be given more staff resources to meet this growing volume of assets. Trusz emphasized that increased staffing was necessary to "meet necessary reporting deadlines and reduce the risk of appraisal error." Trusz's continued requests for additional

2

staffing through 2007 were denied, despite two staff medical leaves.  During 2007 O'Shea pressured Trusz to accelerate reporting appraisal results.

In October 2007, during a Valuation Review Committee meeting, Trusz informed O'Shea and Matt Lynch, UBS AG's Head of Global Real Estate and President and CEO of UBS Realty, that the value for a property named "3200 Windy Hill Road" in UBS Realty's "RESA account" was overstated in the Second Quarter of 2007 by approximately $3 million, meaning that UBS Realty collected excess management fees and that clients traded in and out of the account at incorrect values.  A week later, Trusz reported to O'Shea that the value for a property named "Crown Colony" in UBS Realty's ARMB account was overstated for the Second Quarter of 2007 by $1.7 million and that this overstatement was responsible for a client's write-down in the Third Quarter of 2007.

Over the next several months, into early 2008, Trusz continued to reiterate to Lynch and O'Shea his concerns about valuation unit understaffing and a series of valuation errors, none of which UBS Realty responded to.  In a February 6, 2008 meeting with O'Shea and Christine Sailer from UBS Realty's Human Resources Department, Trusz advised that valuation errors had to be rectified, full disclosure made to clients, and excess fees to UBS returned.  He also expressed concerns about side-letter deals entered into with clients regarding the conversion to a T2 valuation system, which he regarded as a questionable business practice.  At that meeting, Trusz first complained that he was the victim of illegal discrimination on the basis of disability, namely a heart condition from which he was suffering.

Trusz claims that in response to his claims of discrimination and valuation errors, Defendants began retaliating against him, undermining his authority, and removing his job

responsibilities.   On March 6, 2008, he was told that he was no longer permitted to communicate with clients "until these issues are resolved."   Trusz filed a charge of discrimination and retaliation with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") on March 11, 2008, alleging violations of the Connecticut Fair Employment Practices Act ("CFEPA") and the Americans with Disabilities Act ("ADA").   Trusz alleges that thereafter, UBS Realty continued to discriminate against him, requiring him alone to provide a log of daily work activities; not allowing him to attend an annual client conference; diminishing his responsibilities and authority; and refusing to discuss with him further his allegations of valuation errors.

On April 10, 2008, Trusz filed a complaint with the Occupational Health and Safety Administration ("OSHA"), alleging that he engaged in protected activity under the Sarbanes Oxley Act ("SOX"), and was retaliated against because of his protected activity.   OSHA notified the SEC, which sent an investigator to meet with Trusz about his allegations on April 29, 2008.

Trusz informed his supervisors that UBS's Capital Holdback Policy, which contained an artificial upward bias on affected values, and the Traffic Light Policy, which eliminated the valuation unit's review of the appraisal's software, violated his ethical obligations as a professional licensed MAI appraiser.   Defendants nonetheless forced him to abide by the two policies.

Trusz filed suit in Connecticut Superior Court, alleging violations of Conn. Gen. Stat. §§ 33-1336, 31-51m, 31-51q, and a claim of common-law invasion of privacy, the latter predicated in part on the improper disclosure of his confidential medical information.   On

June 13, 2008, Mario Cueni accused Trusz of insubordination, in response to which Plaintiff complained to Cueni, the UBS Realty Human Resources Department, and John Fraser, CEO of the UBS Global Asset Management Group, that he continued to be retaliated against and that UBS Realty was failing to meet its ethical obligations.

During this time, UBS Realty contracted with independent appraisers, who reported values in June 2008 that would require significant write-downs on several important properties, which prompted senior management to pressure the valuation unit "regarding their values."  At the Valuation Review Committee meeting on June 26, 2008, Trusz expressed particular concerned that the size of the write-downs would necessitate consideration of whether some portion should have been acknowledged in the previous quarter.  Senior management and portfolio managers were "very angry and upset with the valuation results," and those in attendance described the meeting as a "blood bath." Following the meeting, Lynch had a private, angry meeting with Trusz about Plaintiff's questions and allegations during the earlier senior management meeting.

On June 27 and 28, 2008, Trusz wrote to senior executives of UBS Realty and UBS Global Asset Management, complaining about intimidation and pressure on members of the valuation unit.  On June 30, 2008, Trusz was asked to leave Defendants' premises and was placed on an involuntary, unpaid leave of absence.  On July 28, 2008, Trusz sent an e-mail to Cueni and Fraser to "report what [he] believe[d] to be a serious breach of UBS's fiduciary obligation to our clients in violation of Statement 11 of the [UBS Code of Ethics]," explaining that after he was forced out of the office, that "value write-downs totaling approximately $55 million were reversed out by UBS management during the first week of

July that were previously finalized with the independent appraisers and the UBS Realty valuation and accounting units."

On August 13, 2008, Defendants notified Trusz that his employment was terminated retroactive to June 30, 2008. Trusz filed an amended complaint with OSHA on September 3, 2008, alleging new instances of retaliation including his termination. Trusz requested that OSHA release jurisdiction over his claim so he could file suit in federal court, and his request was granted in a letter Trusz received on November 26, 2008.

II.     Motion to Dismiss Standard

Defendants have moved to dismiss all counts for lack of subject-matter jurisdiction, under Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim, under Rule 12(b)(6).

A case may be dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it," the determination of which may make reference to evidence outside the pleadings. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). A plaintiff has the burden of proving by a preponderance of the evidence that jurisdiction exists. *Id*; *see also Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Even without detailed allegations, a claim will be found facially plausible so long as "the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. Conclusory allegations are not sufficient. *Id.* at 1949–50.

III.    Discussion

        A.    Counts One and Three

In Counts One and Three, Trusz claims that the Defendants violated SOX and the analogous state statute, Conn. Gen. Stat. § 33-1336. Defendants move to dismiss these counts for lack of subject-matter jurisdiction on the grounds that Trusz did not exhaust his administrative remedies before OSHA by not waiting for expiration of the statutory 180-day review period before bringing suit in federal court.

        *1.    Count One:  Federal SOX*

Under 18 U.S.C. § 1514A(b)(1)(B), a person who alleges discharge or other discrimination in violation of the SOX whistleblower protection statute may seek relief

> if the Secretary has not issued a final decision within 180 days of the filing of the complaint and there is no showing that such delay is due to the bad faith of the claimant, bringing an action at law or equity for de novo review in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy.

The regulations implementing SOX similarly provide that "If the [Administrative Review] Board has not issued a final decision within 180 days of the filing of the complaint, and there is no showing that there has been delay due to the bad faith of the complainant, the complainant may bring an action at law or equity for *de novo* review in the appropriate district court of the United States." 29 C.F.R. § 1980.114(a).[1] Additionally, "[f]ifteen days in advance of filing a complaint in federal court, a complainant must file with the

---

[1] Defendants do not argue that Trusz acted in bad faith.

administrative law judge or the Board, depending upon where the proceeding is pending, a notice of his or her intention to file such a complaint." *Id.* § 1980.114(b).

Trusz filed complaint to OSHA on April 10, 2008, but Defendants maintain that his amended OSHA complaint, filed on September 3, 2008, "restarts" the 180-day clock, and that fewer than 180 days elapsed between September 3, 2008 and when Trusz filed suit on February 13, 2009.[2] In essence, Defendants argue that the amended OSHA complaint, which Trusz filed with its forty new paragraphs of factual allegations, covering termination of Trusz's employment, should constitute a new OSHA complaint.

_____

[2] Plaintiff erroneously argues that Defendants' invocation of Rule 12(b)(1) is not appropriate because a failure to exhaust administrative remedies with OSHA, as required under Section 1514A, does not preclude a court's subject-matter jurisdiction. Relying on *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 392–98 (1982), in which the Supreme Court held filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, Trusz urges that this same analysis be applied to SOX. In *Zipes*, the Court emphasized that the timely filing requirement did not implicate jurisdiction under Title VII because "the provision granting district courts jurisdiction under Title VII . . . does not limit jurisdiction to those cases in which there has been a timely filing," and the "provision specifying the time for filing charges with the EEOC appears as an entirely separate provision, and it does not speak in jurisdictional terms or refer in any way to the jurisdiction of the court." 455 U.S. at 393–94.

By contrast, the provision in SOX conferring federal court jurisdiction includes a 180-day administrative review requirement, explicitly tied to jurisdiction. *See, e.g.*, Fraser *v. Fiduciary Trust Co. Int'l*, No. 04cv6958(RMB)(GWG), 2005 WL 6328596 at * 6 (S.D.N.Y. June 23, 2005) ("Before an employee can assert a cause of action in federal court under the Sarbanes Oxley Act, the employee must file a complaint with [OSHA] and afford OSHA the opportunity to resolve the allegations administratively," and "a federal court can only conduct a de novo review of those [SOX whistleblower] claims that have been administratively exhausted" (citing *Willis v. Vie Financial Group, Inc.*, No. 04cv436, 2004 WL 1774575 at * 6 (E.D. Pa. Aug. 6, 2004))); *Lebron v. Am. Int'l Group, Inc.*, No. 09cv4285(SAS), 2009 WL 3365039 at * 7 (S.D.N.Y. Oct. 19, 2009) ("Under section 1514A, OSHA has exclusive jurisdiction over SOX whistleblower claims for 180 days.").

Defendants cite no authority for the proposition that an OSHA complainant must wait 180 days after amending an administrative complaint before filing suit in federal court. Rather, they cite cases that hold that all facts raised in a SOX claim in federal court must first be presented to OSHA, so that OSHA can adequately fulfill its statutory and regulatory review obligations. *See Willis v. Vie Fin. Group, Inc.*, No. 04cv435, 2004 WL 1774575 (E.D. Pa. Aug. 6, 2004); *Portes v. Wyeth Pharms., Inc.*, No. 06cv2689, 2007 WL 2363356 (WHP) (S.D.N.Y. Aug. 20, 2007). Defendants further reason that in order to "afford OSHA the opportunity to resolve the allegations administratively," *Willis*, 2004 WL 1774575 at * 5, OSHA must be given the full 180 days after amendment of an administrative complaint to consider all facts alleged.

While *Willis* and *Portes* dismissed for lack of subject-matter jurisdiction SOX claims based on facts that had not been presented to OSHA, Trusz did give OSHA the opportunity to adjudicate his claims, including his amended complaint. He did not initiate a new OSHA complaint. Instead, he amended his initial complaint, alleging facts and subsequent developments related to the conduct alleged his original complaint. The text of the relevant OSHA statute and regulations specifically confer jurisdiction on federal courts 180 days after the filing of the complaint, which Trusz undisputedly did, and there is neither caselaw nor any statutory or regulatory language mandating that a plaintiff must wait an additional 180 days after he amends his complaint before a federal court has jurisdiction. Since 79 days passed between the time when after Trusz amended his complaint and when he requested that OSHA dismiss his complaint so he could sue in federal court, OSHA was given an opportunity to make a merits determination on the entirety of the allegations now before this Court. Nothing in the letter Trusz received from OSHA on November 26, 2008— which

9

noted that more than 180 days had passed since he filed his initial complaint, and explained that "as a result of [his] electing to proceed with [his] case in Federal Court, rather than before the Secretary of Labor, [his] complaint before this office is hereby dismissed"— suggested that OSHA had been deprived of its administrative review function. (*See* OSHA Release of Jurisdiction Letter, Ex. K to Def.'s Mem Supp.)  OSHA dismissed his entire complaint, not just his original complaint, and no longer has jurisdiction over his claims.

Trusz has not included in his federal-court complaint any facts that were omitted from his OSHA complaint.  Because he waited the requisite 180 days from filing of his initial complaint, and OSHA divested itself of jurisdiction over his claim, Trusz has fulfilled the jurisdictional prerequisites for this Court to hear his federal SOX claim, and Defendants' motion to dismiss Count One under Rule 12(b)(6) is denied.

### 2.    Count Three:   Conn. Gen. Stat. § 33-1336

Unlike SOX, Conn. Gen. Stat. § 33-1336 does not contain any administrative exhaustion requirement and only requires that a claimant bring an action within one year after knowledge of the specific incident giving rise to his claim.  Trusz complied with this requirement.

Defendants also move to dismiss Count Three as to UBS Realty on the basis that it is not an entity covered by Section 33-1336, which only applies to corporations, "the securities of which are registered under Section 12 of the Securities Exchange Act of 1934, as from time to time amended, or that is required to file reports under Section 15(d) of the Securities Exchange Act of 1934, as from time to time amended."[3]  Trusz counters that

---

[3] Like SOX, Section 33-1336 does not expressly cover subsidiaries of publicly traded companies within its coverage, in contrast to other sections of SOX, which specifically

Defendants UBS Realty and UBS AG jointly constitute an "integrated employer," because of their interrelated operations and control, and therefore, he can pursue a Section 33-1336 claim against both the parent corporation (UBS AG) and its non-publicly traded subsidiary (UBS Realty).  (Mem. Opp'n at 18.)  Defendants conceded during oral argument that "if the integrated employer notion were utilized in Connecticut" and the Court "found that [UBS AG and UBS Realty] were integrated employers," the motion to dismiss Count Three as to UBS Realty would lack merit.  (Oral Arg. Tr. at 29:19–30:11.)

The integrated employer test, also referred to as the single employer test, "enable[s] an employee in certain circumstances to assert employer liability against an entity that is not formally his or her employer" and "is used in numerous contexts, such as union representation, responsibility for violations of the Fair Labor Standards Act, and . . . Title VII liability."  *Arculeo v. On-Site Sales & Marketing, LLC*, 425 F.3d 193, 197 (2d Cir. 2005).  An integrated-employer situation exists "where two nominally separate entities are actually part of a single integrated enterprise."  *Id.* at 198 (citing *Clinton's Ditch Coop. Co. v. Nat'l Labor Relations Bd.*, 778 F.2d 132, 137 (2d Cir. 1985).  In such circumstances, "of which examples may be parent and wholly-owned subsidiary corporations, or separate corporations under common ownership and management, the nominally distinct entities can be deemed to constitute a single enterprise."  *Id.*  (citing *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240–41 (2d Cir. 1995)).

The integrated employer test was first developed by the National Relations Labor Board and endorsed by the Supreme Court in *Radio and Television Broadcast Technicians. Local Union 1264 v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 256 (1965), to determine

_____

reference this subsidiaries.

whether a parent and its subsidiary were sufficiently interrelated to meet a jurisdictional requirement of minimum business volume, and has been applied in cases arising under Title VII, the ADA, and the Age Discrimination in Employment Act. *See, e.g.*, *Cook*, 69 F.3d at 1240–41 (Title VII); *Sabol v. Cable & Wireless PLC*, 361 F. Supp.2d 205, 208 (S.D.N.Y. 2005) (ADEA); *Hosler v. Greene*, 5 F. Supp.2d 99, 101–02 (N.D.N.Y. 1998) (ADA). The Department of Labor also applies the integrated employer test to enforce the Family and Medical Leave Act and the Worker Adjustment and Retraining Notification Act. *See, e.g.*, 29 C.F.R. § 825.104(c)(2) ("Separate entities will be deemed to be parts of a single employer for purposes of FMLA if they meet the 'integrated employer' test."); 20 C.F.R. § 639.3(a)(2) ("[S]ubsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent."). This District has applied the integrated employer test to extend personal jurisdiction to an international company because of its interrelatedness with its domestic subsidiary under SOX and Section 33-1336. *Haleja v. ING Groep, N.V.*, 582 F. Supp. 2d 227, 236–37 (D. Conn. 2008). Additionally, the Department of Labor, on behalf of OSHA, has endorsed this test and urged that the OSHA Administrative Review Board ("ARB") adopt it for determining subsidiary coverage under Section 1514A.[4] *See* Letter from Gregory F. Jacob, Solicitor of Labor, to Honorable Patrick

---

[4] The ARB and Administrative Law Judges have determined that under SOX, both non-publicly traded subsidiaries and their parent companies can be covered employers. *See, e.g.*, *Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, No. 04-SOX-11 (A.R.B. May 31, 2006) (vice-president of subsidiary acted as agent of parent company, and therefore, subsidiary was covered employer, even though it did not have securities registered with the SEC or file reports with the SEC); *Morefield v. Exelon Servs., Inc.*, No. 2004-SOX-00002 (A.L.J. Jan. 28, 2004) (SOX is a remedial statute, and to effect the interest of Congress in protecting whistleblowers, subsidiaries, which are "an integral part of the publicly traded company,"

Leahy and Honorable Charles E. Grassley (Sep. 17, 2008), *available at* http://www.osha.gov/dep/oia/whistleblower/Jacob_Reply.pdf. Because this Court concludes that the integrated employer test would be applicable in a SOX case, and given the similarity between the SOX statute and Conn. Gen. Stat. § 33-1336, this test will be used for purposes of determining whether the Court has subject matter jurisdiction over Trusz's Section 33-1336 claim.

The Second Circuit uses a four-part test in determining whether a parent and subsidiary are integrated or joint employers and both liable: "(1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control." *Cook,* 69 F.3d at 40–41. The second element, centralized control of labor relations, is of particular importance, because it reflects the degree to which both parent and subsidiary influenced actions taken against the employee. *Id.*

Trusz has alleged that UBS AG and UBS Realty constitute an integrated employer, sharing an "integrated One-Firm Approach" meaning common management, shared human resources strategies, integrated training, and shared compensation plans. Trusz alleges that although he was directly employed by UBS Realty, his employment was governed by UBS AG's policies and procedures and that UBS AG officials were involved in and made decisions concerning the functioning of UBS Realty. By pleading a sufficient level of interrelatedness and control in human resources decisions between UBS AG and UBS Realty, Trusz has met

---

must be considered covered employers); *Gonzalez v. Colonial Bank*, 2004-SOX-39 (ALJ Aug. 20, 2004) ("As the parent company is a respondent in this case and it is determined that Congress intended to provide whistleblower protection to employees of subsidiaries of publicly traded companies, Complainant has set forth a cause of action under the Act sufficient to withstand a motion for summary decision" as to the subsidiary).

his burden under Rule 12(b)(1) of pleading facts supporting the inference that UBS Realty and UBS AG constituted an integrated employer to show subject matter jurisdiction over his Section 33-1336 claim as to UBS Realty.  Therefore, Defendants' motion to dismiss Count Three is denied.

> B.     Count Two

In Count Two, Trusz alleges that Defendants violated Conn. Gen. Stat. § 31-51m, which protects whistleblowers against retaliation.  Defendants move to dismiss this count for lack of subject-matter jurisdiction, again arguing that Trusz has failed to exhaust his administrative remedies.  Trusz alleges that he filed complaints with the CHRO and OSHA, and both provided him with notice that they were concluding their investigations.  Before either reached a final merits decision of his complaints, he requested and received letters from both OSHA and the CHRO, relinquishing their jurisdiction over his complaints. Defendants do not dispute that Trusz has alleged activity covered by Section 31-51m reporting to the CHRO disability discrimination based on his heart condition under CFEPA and reporting SOX violations to OSHA.  Defendants instead argue that Trusz failed to exhaust remedies by effectively short-circuiting the administrative process by requesting that the CHRO and OSHA dismiss his complaints and issue letters releasing their jurisdiction so that he may proceed in federal court.

Section 31-51m(c) of the Connecticut General Statutes provides in relevant part that "[a]ny employee who is discharged, disciplined or otherwise penalized by his employer in violation of the provisions of subsection (b) may, after exhausting all available administrative remedies, bring a civil action."  The essence of Defendants' motion to dismiss Count Two is their view that release-of-jurisdiction notices from the CHRO and OSHA, before the

expiration of their statutorily-delineated administrative time periods, do not satisfy the exhaustion requirement of Section 31-51m(c).

In arguing that such release letters, procured at Plaintiff's initiative, do not exhaust administrative remedies, Defendants rely on *Burnham v. Karl and Gelb, P.C.*, in which the Connecticut Supreme Court held that "when a plaintiff fail[s] to follow the administrative route prescribed by the legislature for his claim, the plaintiff fails to exhaust his or her administrative remedies." 252 Conn. 153, 169 (2000) (internal quotations omitted). Yet *Burnham* does not address Defendants' contention that a release of jurisdiction letter from an administrative authority in compliance with statute and regulation is an end run around the legislatively-prescribed "administrative route," and Defendants cite no other authority in support of their proposition.

"Statutes requiring exhaustion serve a purpose when a significant number of aggrieved parties, if given the choice, would not voluntarily exhaust." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (administrative remedies provided for in the Prison Litigation Reform Act must be properly exhausted). In *Woodford*, the Supreme Court addressed the meaning of exhaustion in the context of administrative law, explaining that

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits). . . . Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.

*Id.* at 90 (emphasis and parenthetical in original) (internal quotations omitted).

15

For Trusz to have properly exhausted his administrative remedies, he must have utilized all steps set out by OSHA or the CHRO, in regulation or statute, complying with their respective deadlines and procedural rules.  Before seeking dismissals, he complied with the 180-day waiting period with OSHA set forth in SOX and the 210-day waiting period with the CHRO set forth in CFEPA.[5]  Trusz properly complied with all steps set out by both

---

[5] Conn. Gen. Stat. § 46a-101 provides:

(a) No action may be brought . . . unless the complainant has received a release from the commission in accordance with the provisions of this section.

(b) The complainant and the respondent, by themselves or their attorneys, may jointly request that the complainant receive a release from the commission at any time from the date of filing the complaint until the expiration of two hundred ten days from the date of filing of the complaint. The complainant, or his attorney, may request a release from the commission if his complaint with the commission is still pending after the expiration of two hundred ten days from the date of its filing.

(c) The executive director of the commission shall grant a release, allowing the complainant to bring a civil action, within ten business days after receipt of the request for the release, except that if a case is scheduled for public hearing, the executive director may decline to issue a release. The commission may defer acting on a request for a release for thirty days if the executive director of the commission, or his designee, certifies that he has reason to believe that the complaint may be resolved within that period.

(d) Upon granting a release, the commission shall dismiss or otherwise administratively dispose of the discriminatory practice complaint pending with the commission without cost or penalty assessed to any party.

OSHA and the CHRO, electing to sue after their statutory and regulatory deadlines had passed. Thus, he has properly exhausted.[6]

Trusz alleges that he has complied with the CHRO's deadlines and procedural rules, and neither OSHA nor the CHRO have jurisdiction over his administrative complaints, and he has exhausted remedies, as required by Section 31-51m(c). Defendants' motion to dismiss Count Two is therefore denied.

> D.     Count Four: Section 31-51q[7]

In Count Four, Mr, Trusz claims that Defendants illegally retaliated against him for engaging in activity protected by Conn. Gen. Stat. § 31-51q. Defendants move to dismiss arguing that Trusz has failed to state a claim that he was unlawfully retaliated against for the exercise of his free speech rights.

Under Section 31-51q,

> Any employer . . . who subjects any employee to discipline or discharge on
> account of the exercise by such employee of rights guaranteed by the [F]irst

---

[6] Courts have held that administrative right-to-sue letters and other releases from jurisdiction constitute proper administrative exhaustion. *See, e.g.*, *Ganzy v. Sun Chem. Corp.*, No. 06cv3424(FB)(MDG), 2008 WL 3286262 at * 4 (E.D.N.Y. Aug. 8, 2008) ("After their terminations, plaintiffs properly exhausted their administrative remedies by timely filing written charges of discrimination with the Equal Employment Opportunity Commission, which dismissed their charges and issued right-to-sue letters."); *Johnson v. Fleet*, 371 F. Supp.2d 155, 159 (D. Conn. 2005) ("[T]his Court concludes that it has jurisdiction over plaintiff's federal claims, which were properly exhausted with the EEOC's issuance of a right to sue letter."); *Morales v. Rent-A-Center, Inc.*, 306 F. Supp.2d 175, 183 (D. Conn. 2003) (the plaintiff "did properly exhaust his administrative remedies by filing a complaint with the appropriate administrative agency, which issued him a right to sue letter").

[7] The parties do not dispute that a well-pleaded Section 31-51q claim can give rise to federal-question jurisdiction. *See Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F. 3d 108, 116 (2d Cir. 2004).

[A]mendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages.

To state a claim under Section 31-51q, "a plaintiff must allege that (1) he was exercising rights protected by the First Amendment to the United States Constitution (or an equivalent provision of the Connecticut Constitution); (2) he was fired on account of his exercise of such rights; and (3) his exercise of his First Amendment rights did not substantially or materially interfere with his bona fide job performance or with his working relationship with his employer." *D'Angelo v. McGoldrick*, 239 Conn. 356, 361 (1996).[8]

---

[8] Defendants argue, as a threshold manner, that Plaintiff's speech is not protected by the First Amendment because he spoke as part of his official job duties. They rely on *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), in which the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, however, was expressly limited only to employees who work in the public sector; the Court explained that when the respondent in that case, Richard Ceballos "went to work and performed the tasks he was paid to perform, [he] acted as a government employee," and held that "[r]estricting speech that owes its existence to a *public* employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421–22 (emphasis added). The Supreme Court in *Garcetti* did not address any limitations on the exercise of free speech by private employees. Moreover, *Garcetti* has not been applied to Section 31-51q.

Recognizing that Trusz was not a public employee, Defendants contend that while the issue of whether private employees performing their official duties are protected by the First Amendment was not a question before the Court in *Garcetti*, its logic should apply to private employers under Section 31-51q because Section 31-51q and Section 1983 are analogous, and thus, the parameters of their speech protections should be the same. However, their obvious difference is in the context of private employment, because Section

Section 31-51q is not

> limited to freedom of speech in the public arena. Nevertheless, the statute
> does not protect all speech. The statute applies only to expressions regarding
> public concerns that are motivated by an employee's desire to speak out as
> a citizen. The court must consider, therefore, whether [the plaintiff] spoke
> as a citizen upon matters of public concern or instead as an employee upon
> matters only of personal interest. The Connecticut Supreme Court has
> concluded that it is within the province of the trial court to determine, as a
> matter of law, which topics are considered to be of public concern. The
> resolution of whether an employee's statements address such a topic is,
> however, within the province of the jury, to be determined by looking to the
> content, form and context of the particular statements in question.

*Campbell v. Windham Cmty. Mem. Hospital*, 389 F. Supp. 2d 370, 381–82 (D. Conn. 2005)

(internal citations and quotations omitted).  Speech on a matter of public concern relates "to

any matter of political, social, or other concern to the community." *Connick v. Myers*, 461

U.S. 138, 146 (1983); *Garcia v. State Univ. of New York Health Sci. Ctr.*, 280 F.3d 98, 105 (2d

Cir. 2001).

While Trusz's CHRO complaint alleging disability discrimination against him

reflects only his personal interest and does not implicate any concern to the community,

Plaintiff's allegations about his complaints of inaccurate valuations, insufficient internal

controls, and breached fiduciary duties to investors, may constitute speech which concerns

---

31-51q covers private employers while Section 1983 does not.  *See Cotto v. United Techs.
Corp.*, 48 Conn. App. 618, 629, *aff'd*, 251 Conn. 1 (1999).  The Connecticut legislature
intended to "provide coverage for the exercise of constitutional rights at a private as well as
at a public workplace." *Cotto*, 251 Conn. at 8.  Although First Amendment protections
extend to private employees in Connecticut, it does not follow that the rationale for public
workplace limitations delineated in *Garcetti* should also apply to private workplaces. As a
remedial statute, Section 31-51q "deserves a generous construction that implements its
purpose," *Cotto*, 251 Conn. at 8, and the *Garcetti* Court explicitly directed its holding only
to public employees.

the public.  When employees speak out about potentially illegal activities of their employers that affect third parties or the community at large, courts have held that public concerns are implicated.  *See, e.g.*, *Campbell,* 389 F. Supp. 2d at 382 ("Whether a non-denominational not-for-profit hospital is discriminating against patients or disclosing confidential information is a matter of public concern."); *Calderon v. Dinan & Dinan PC*, No. 05cv1341(JBA), 2006 WL 1646157, * 6 (D. Conn. Jun. 13, 2006) ("if the firm were violating state wage and hour laws pertaining to the accounting of paychecks . . . or hiding cash income in violation of the tax laws, these are issues of public concern" because they "are directed to issues in which the public and state and federal governments would take an interest"); *Thibeault v. Scap Motors, Inc.,* No. 04cv1936(JCH), 2005 WL 2041968, *4 (D. Conn. Aug. 23, 2005) ("Whether a private entity is acting criminally," altering invoices to inflate costs and receive overly large subsidies from a supplier, "is a matter of public concern.").[9]

Trusz's alleged speech about UBS Realty pressuring employees to value properties higher or lower than their actual worth and knowingly misrepresenting such values to investors may concern more than the "scope of the terms and conditions of [his] employment." *Campbell*, 389 F. Supp.2d at 382.  The resolution of whether Trusz's statements actually reflected a public regulatory and financial concern, or for instance, only manifested his personal-professional concern that he not be blamed, requires a fully developed record of "the content, form and context of the particular statements in question" and whether his statements impacted his bona fide job performance.  *Daley v. Aetna Life &*

---

[9] That Trusz expressed his concerns within UBS Realty and UBS AG rather than publicly does not cause him to relinquish protection of the First Amendment.  *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 414 (1979).

*Cas. Co.*, 249 Conn. 766, 782 (1999).  At this stage, Trusz has alleged sufficient facts to raise a claim under 31-51q, and the motion to dismiss is denied as to Count Four.

      E.      Count Five

Finally, in Count Five, Trusz claims wrongful discharge in violation of important public policies of the state.  Defendants move to dismiss Count Five because there are available statutory remedies for the wrongs he alleges.  Trusz responds that his discharge violated public policy because it was a response to his insistence that he comply with his professional codes of ethics as an appraiser and a reaction to his lawsuit in state court challenging the disclosure of his protected health information to third parties. (Mem. Opp'n at 39.)

Connecticut courts recognize an exception to the traditional rules governing at-will employment to permit causes of action for wrongful discharge where the termination contravenes a clear mandate of public policy.  *See Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 474 (1980).  In evaluating such claims, a court must determine whether a plaintiff has "alleged that his discharge violated any explicit statutory or constitutional provision . . . or whether he alleged that his dismissal contravened any judicially conceived notion of public policy."  *Thibodeau v. Design Group One Architects, LLC*, 260 Conn. 691, 697–99 (2002).

First, Plaintiff relies on no statutory or constitutional prohibition against terminating an employee who insists on abiding by a professional code of ethics, nor on any such judicially conceived notion of public policy.  Trusz cites *Matzin v. Delaney, Zemetis, Donahue, Durham & Noonan, P.C.,* No. CV 044000288 S, 2005 WL 2009277, *2–3 (Conn. Super. July 29, 2005), in which a lawyer who was discharged for expressing concerns that

opposing counsel violated the Connecticut Rules of Professional Conduct could claim wrongful discharge because a clear statement of public policy allegedly violated was found in the Rules of Professional Conduct regulating the conduct of attorneys, which "were approved by the judges of the Superior Court." *See also Lewis v. Nationwide Mut. Ins. Co.*, No. 02cv512(RNC), 2003 WL 1746050, * 2 (D. Conn. Mar. 18, 2003). Yet, unlike the Rules of Professional Conduct for attorneys, the ethical rules for the conduct of MAI certified appraisers have not been approved and adopted by any public entity.

As to Trusz's suggestion that his discharge was retaliation for bringing suit in Superior Court because his employer intentionally disclosed his confidential medical information, that claim is precluded by the availability of Conn. Gen. Stat. § 31-51m, which creates a private cause of action for employees who are discharged for reporting the "unethical practices, mismanagement or abuse of authority" by an employer. Where a statutory remedy exists for an alleged discharge in violation of public policy, it precludes a common law wrongful discharge action. *Burnham*, 252 Conn. at 162 (retaliatory discharge claim precluded by existence of Section 31-51m); *see also Atkins v. Bridgeport Hyrdaulic Co.*, 5 Conn. App. 643, 648 (1985) ("A finding that certain conduct contravenes public policy is not enough by itself to warrant the creation of a contract remedy for wrongful dismissal by an employer. The cases which have established a tort or contract remedy for employees discharged for reasons violative of public policy have relied upon the fact that in the context of their case the employee was otherwise without remedy and that permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated."). Because Trusz could have brought—and did bring—an action under Section 31-51m, he cannot raise a common law wrongful discharge claim on the grounds that Connecticut recognizes an

important public policy prohibiting unconsented disclosure of individual medical information.

Finally, Trusz argues that he should be able to raise a wrongful discharge claim as an alternative theory of liability if any of his statutory claims are dismissed, so that he may argue that the "public policies embodied in those statutes constitute important public policies of the State of Connecticut that support a claim for wrongful discharge." (Mem. Opp'n at 40.) Each of the statutes to which Trusz refers, and under which he has brought this action, contains private causes of action, and any pleading or proof failure of such claims does not mean that there is no statutory remedy. The wrongful discharge cause of action "is not intended to be a catch-all for those who either procedurally or on the merits fail to establish a claim under existing" statutes. *Kilduff v. Cosential, Inc.*, 289 F. Supp. 2d 12, 18 (D. Conn. 2003). Trusz has failed to allege facts supporting any clear public policy mandate that his discharge violated and that is not protected by an existing statutory scheme. Therefore, Defendant's motion to dismiss is granted as to Count Five.

IV.     Conclusion

Accordingly, Defendant's Motion to Dismiss [Doc. # 23] is GRANTED as to Count Five of the Second Amended Complaint and DENIED as to Counts One, Two, Three, and Four.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 30th day of March, 2010.

23