IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------------X
                                     :

RICHARD TRUSZ                     :            3:09 CV 268 (JBA)
                                     :
                                     :

V.                                 :
                                   :

UBS REALTY INVESTORS LLC, AND   :            DATE: SEPTEMBER 7, 2010
UBS, AG                           :
                                   :
------------------------------------------------------------X

## RULING ON PLAINTIFF'S SECOND MOTION TO COMPEL

On February 13, 2009, plaintiff Richard Trusz first commenced this action against

defendants UBS Realty Investors LLC ["UBS Realty"] and UBS AG, arising out of defendants'

alleged concealment of overvaluing real estate investments of its clients, which was

uncovered by plaintiff, leading to his termination by defendants.  (Dkt. #1; see also Dkts.

##4, 22).  In his Third Amended Complaint, filed May 22, 2009 (Dkt. #33), plaintiff alleges

the following six counts: violation of the Sarbanes Oxley Act of 2002, 18 U.S.C. § 1514A

(Count One); violation of Conn. Gen. Stat. §§ 31-51m, 33-1336, and 31-51q (Counts Two-

Four); wrongful discharge in violation of public policy (Count Five); and retaliation in violation

of the Americans with Disabilities Act, 42 U.S.C. § 12203 (Count Six).  On March 30, 2010,

U.S. District Judge Janet Bond Arterton filed her Ruling on Motion to Dismiss, under which

she dismissed Count Five of the Second Amended Complaint.  Trusz v. USB Realty Investors,

LLC, 09 CV 268 (JBA), 2010 WL 1287148, at *10-11  (D. Conn. March 30, 2010).  Defendants

filed their Answer and Affirmative Defenses to the Third Amended Complaint on June 15,

2010.  (Dkt. #108).

A Stipulated Protection Order was approved by Judge Arterton on October 9, 2009.

(Dkts. ##37, 44).  On November 3, 2009, Judge Arterton referred this file to this Magistrate

Judge for discovery. (Dkt. #55; see also Dkts. ##63, 94, 106). Under the current scheduling orders, filed by this Magistrate Judge on May 5 and August 24, 2010, all fact discovery is to be completed by December 30, 2010, and all expert discovery is to be completed by March 1, 2011, without prejudice to plaintiff seeking an extension of the latter deadline. (Dkts. ##98, 122). Familiarity is presumed with the previous discovery rulings filed by this Magistrate Judge, including the twenty-seven page Ruling on Plaintiff's First Motion to Compel, filed December 1, 2009 (Dkts. ##61-62)["December 2009 Ruling"], Ruling on Defendants' Motion to Quash, filed December 10, 2009 (Dkt. #65), Ruling Following Partial In Camera Review, filed December 21, 2009 (Dkt. #72), Ruling on Plaintiff's Motion for Extension of Time, filed January 4, 2010 (Dkt. #77)["January 2010 Ruling"], and Ruling Regarding Potential In Camera Review of European Personnel Records, filed January 22, 2010 (Dkt. #85). (See also Dkts. ##75, 79, 81, 99, 101, 119, 121-22).[1]

Presently pending before the Court is plaintiff's Second Motion to Compel and brief in support, filed June 3, 2010 (Dkt. #104),[2] as well as his First Motion to Seal Disks of Defendants' Production Marked Confidential, filed the next day (Dkts. #105, 107).[3] On July

---

[1]The December 2009 Ruling observed: "Counsel already have filed four discovery motions . . .; they need to do better in attempting to resolve these disputes between themselves, without continually imposing upon the Court and costing their clients unnecessary fees." (At 19, n.16)(internal citations omitted). The January 2010 Ruling continued: "Th[is] motion arises due to the inability of counsel to agree upon an extension of merely three business days. **Counsel are hereby forewarned that if they fail to conduct themselves in a civil, and professional manner, the Court will not hesitate to impose sanctions as warranted**." (At 2)(emphasis in original).

[2]The following nine exhibits are attached: copies of correspondence between counsel, dated December 17 and 1, 2009, January 27-28, 2010, November 13, 2009, May 5, 2010, and January 15, 2010 (Exhs. 1-3, 5-6, 8); copy of plaintiff's First Set of Interrogatories and Requests for Production, dated May 22, 2009 (Exh. 4); and copies of e-mail correspondence between counsel, dated June 2, 2010, and December 2 and 5, 2008 (Exhs. 7, 9).

[3]Exhs. 7, 8, and 21-32 were filed under seal.

1, 2010, defendants filed their brief in opposition. (Dkt. #111[4]; see also Dkts. ##109-10).

Three weeks later, plaintiff filed his reply brief (Dkt. #114)[5] and Motion to Seal Portions of

Reply Brief and Unredacted Exhibits (Dkt. #115). (See also Dkts.##112-13).

For the reasons stated below, plaintiff's Second Motion to Compel (Dkt. #104) is

granted in part and denied in part.

## I. DISCUSSION

Plaintiff raises five arguments with respect to his Second Motion to Compel: (1)

defendants engaged in a "massive document dump" by producing 1.8 million documents

allegedly responsive to plaintiff's Requests for Production Nos. 67 and 118 (regarding

outsourcing and valuation), but they failed to review these documents and the overwhelming

majority of these documents are irrelevant  (Dkt.#104, Brief at 1-18); (2) plaintiff renews his

prior Motion to Compel with respect to multiple discovery requests that were denied without

prejudice in the December 2009 Ruling (id. at 19 & n.5); (3) defendants did not fully comply

with respect to four items (Regional Mall Valuations, Consent Agreements and T2 Conversion,

Damages, and Outsourcing and PwC), and other requests (id. at 28-33); (4) defendants

---

[4]The following seven exhibits were attached: copy of Valuation Review Checklist: Independent Appraisals (Exh. A); copies of correspondence between counsel, dated January 15, 2010, June 3, 2010, and December 17, 2009 (Exhs. B, D, G); copy of the December 2009 Ruling (Exh. C); copy of Defendants' Answers and General Objections to Plaintiff's First Set, Second Set and Third Set of Interrogatories and Requests for Production, all dated January 26, 2009, in Trusz v. UBS Realty Investors LLC et al., in the Hartford Superior Court (Exh. E); and copy of Defendants' Answers and Objections to Plaintiff's First Set of Interrogatories and Requests for Production, dated June 26, 2009 (Exh. F).

[5]The following six exhibits were attached: copy of Valuation with Programming Changes (Exh. 1); copy of Updated Valuation Review, as of June 30, 2008 (Exh. 2)(under seal); copy of Uniform Standards of Professional Appraisal Practice, 2008-09 Edition (Exh. 3); copy of Quarterly Sign Off, quarter ending 3/31/08 (Exh. 4); copy of e-mail, dated December 8, 2007 (Exh. 5)(under seal); and copy of Smith, UBS Overvalued Property by $100 Million, Fired Executive Says, http://www.bloomberg.com/apps/news?pid=20670001&sid=aE3unrW9nV4E (Exh. 6).

violated the "good faith" requirements of paragraph 2 of the Protective Order by designating all documents as "CONFIDENTIAL" (id. at 33-37); and (5) plaintiff is entitled to sanctions (id. at 20-28).[6]

In their brief in opposition, defendants disagree with each of plaintiff's contentions, arguing instead that: (1) defendants "conducted diligent searches and produced all responsive non-privileged documents" ordered by the December 2009 Ruling for the four items listed (Regional Mall Valuations, Consent Agreements and T2 Conversion, Damages, and Outsourcing and PwC)(Dkt. #111, at 2-11); (2) defendants appropriately crafted search terms to review their electronic documents; the search and production was so massive because plaintiff served 208 document requests in this federal lawsuit and the related state court action; even a brief review of each document by an attorney "would cost 50,000 attorney hours"; and defense counsel utilized two software programs to weed out spam or junk e-mails, as well as privileged communications, all of which resulted in the production of fifty-eight discs to plaintiff (id. at 11-17, 19-28 & Exhs. E-F); (3) defendants, having produced more than four million pages of documents "consisting of sensitive personnel and proprietary information," designated all of them "confidential," but upon request from plaintiff's counsel, has removed such designation for public reports (id. at 28-29 & Exh. D); and (4) to the extent that plaintiff requests additional documents, plaintiff ought to bear the financial burden for production of these documents (id. at 3, n.2).

In his reply brief, plaintiff has responded that: (1) defendants solely are responsible

---

[6]Plaintiff also complains that defendants produced 538,000 pages from plaintiff's work computer (Dkt. #104, Brief at 3), but as defendants appropriately argue, plaintiff specifically had requested copies of "all documents, including emails and electronically stored documents concerning electronic files from Richard Trusz's computer . . . " (Dkt. #111, at 17-19 & Exh. E). This is a classic example of the well known adage, "Be careful what you wish for, because you might just get it."

for the problem, in that the "actual language of Request[s] Nos. 67 and 118" was "very narrow in scope" (Dkt. #114, at 1-4); (2) defendants did not fully comply with the December 2009 Ruling with respect to seven items (Regional Mall Valuations, Workfiles and Other Documents Concerning Valuations, Quarterly Sign Off Records by Asset Managers, Each Version of Side Letter Agreement, Dyna Valuation Files Filed Electronically in the Valuation Unit Files, Damages, and Outsourcing and PwC)(id. at 4-10 & Exhs. 1-6); and (3) defendants did not respond to plaintiff's request to renew his First Motion to Compel (id. at 10).

The Magistrate Judge will address these issues in an order which differs from that of counsel.

## A. ALLEGED "DOCUMENT DUMP"

On December 1, 2009, defense counsel sent plaintiff's counsel three CD's that contained all emails sent to or from plaintiff's home or work e-mail, all stamped as confidential, comprising more than 210,000 pages. (Dkt. #104, Brief at 3 & Exh. 2). Subsequent to the December 2009 Ruling, on December 17, 2009, defense counsel forwarded to plaintiff's counsel documents responsive to Requests for Production Nos. 2-3, and four CD's responsive to Connecticut Interrogatory No. 102, representing 538,000 pages from plaintiff's work computer, all of which were designated as confidential; defense counsel further promised additional electronic documents by January 15, 2010. (Dkt. #104, Brief at 3 & Exh. 1; Dkt. #111, at 18-19, n.11 & Exh. G).[7]

As promised, on January 15, 2010, defense counsel forwarded a ten-page letter to plaintiff's counsel, with nearly 10,000 documents, and eight CD's of documents, in response

---

[7]The December 17, 2009 letter contains a small, and very common, typographical error, in that it promised the additional documents by January 15, 200**9**, instead of January 15, 20**10**. (Dkt. #104, Brief, Exh. 1; see also Dkt. #111, Exh. G).

to the December 2009 Ruling; by then, defendants had produced approximately two million pages of documents, and promised the balance "by next week." (Dkt. #111, at 4 & Exh. B). On January 27-28, 2010, defense counsel forwarded another twelve CD's,[8] containing documents with the search term "outsourc*," responsive to Requests for Production Nos. 67 and 118, all marked as "confidential." (Dkt. #104, Brief at 3-5 & Exh. 3). According to plaintiff, for these discs (identified as Disc Nos. 21-32[9]), "[m]ore than [ninety-nine] percent of the documents contained on those [eleven] discs are not even responsive to [p]laintiff's Requests Nos. 67 and 118[,]" as they include subjects such as: other properties in the U.S., China, India, Brazil and Luxembourg; documents in foreign languages; IT documents; mass e-mails; SEC Forms for companies other than UBS; documents regarding USB architecture; computer art; and documents regarding the Worldcom litigation. (Dkt. #104, Brief at 5-17). Plaintiff further contends that on November 13, 2009, obviously prior to the December 2009 Ruling, defendants produced Disc. No. 9, that they claimed contained documents responsive to Requests Nos. 67 and 118, also designated as confidential; plaintiff similarly asserts that these documents were irrelevant, and included mass e-mails, unrelated UBS research, documents written in French, unrelated audits, the India fund, and unrelated clients. (Dkt. #104, Brief at 17-18 & Exh. 5).

In contrast, defendants argue that the production of 4,004,183 pages of documents, "which is almost exactly the volume of documents that [defendants] predicted in [their] warnings to [p]laintiff[,]" was in response to plaintiff's excessive discovery requests of 131

---

[8]Defendants' letter indicate that twelve CD's were sent, but plaintiff's counsel argues that there were only eleven. (Compare Dkt. #104, Brief, Exh. 3 with Dkt. #104, Brief at 4-5).

[9]Labeling the discs Nos. 21-32 suggests that there were, in fact, twelve CD's. (See Dkt. #104, Brief at 6-17).

interrogatories and 208 document requests in this federal lawsuit and the related state action. (Dkt. #111, at 15-16, 19-21; see also Dkt. #111, Exhs. E-F). In addition, defendants respond that they began document production "on a rolling basis" beginning as early as January 2009, without plaintiff having complained that documents were "unintelligible, irrelevant, improperly stamped 'confidential,' or otherwise problematic. . . ." (Dkt. #111, at 16-17). Defendants complain that plaintiff never "identified a different or narrower set of search term that he would like [d]efendants to run[,]" had been forewarned by defendants that the search terms would result "in an estimated [four] million pages of documents[,]" and instead waited until defendants "incurred many of thousands of dollars to search for and copy [their] emails and electronic documents. . . ."  (Id. at 17, 21). Defendants described the "elaborate review" they conducted in order to remove privileged and/or unresponsive information, using a software named "Concordance" to review the e-mails and another software program named "X1 Professional" to review the electronic documents; whenever possible, defense counsel added alternative search terms to "identify and remove unresponsive documents." (Id. at 22-24). According to defendants, between January 26, 2009 through January 2010, defendants produced fifty-eight discs, which include seventeen discs of plaintiff's e-mails, six discs of plaintiff's computer files, one disc containing audio files of plaintiff's voice messages, fifteen discs of e-mails with the requested search terms, one disc containing both e-mails and electronic documents to add searches required by the December 2009 Ruling, and the balance discs of electronic documents with the requested search terms. (Id. at 24-26).  As to Requests for Production Nos. 67 and 118, defendants assert that on January 26, 2009, they identified what search terms that would use, which produced 1,871,457 pages of electronic documents, or which ninety-nine percent (or

7

1,864,544 contained the term "outsourc\*."   (Id. at 26-27).[10]

Plaintiff is quite correct that "[w]hen producing documents, the responding party cannot attempt to hide a needle in a haystack by mingling responsive documents with large numbers of nonresponsive documents." Hagemeyer N. Am., Inc. v. Gateway Data Sciences Corp., 222 F.R.D. 594, 598 (E.D. Wis. 2004)(citing Bratka v. Anheuser-Busch Co., Inc., 164 F.R.D. 448, 462-63 (S.D. Ohio 1995)).   However, as defendants point out, a massive production of documents is not necessarily a "document dump" if the opposing party has posed overbroad discovery requests.  See Burt Hill, Inc. v. Hassan, No. Civ. 09-1285, 2010 WL 419433, at *8 & n.10 (W.D. Pa. Jan. 29, 2010)(where plaintiff's computer servers contained in excess of two terabytes of information, approximately one million files, over an eighteen month period, plaintiff's production of 14,000 responsive documents cannot be characterized as a "document dump" if "this is exactly what [defendants'] overbroad discovery request contemplates."); CBT Flint Partners, LLC v. Return Path, Inc., No. 1:07-CV-1822-TWT, 2008 WL 4441920, at *1-3 (N.D. Ga. Aug. 7, 2008)(plaintiff's emergency motion to compel was denied where plaintiff made no effort to meet-and-confer first with defendants or identify specific categories of documents, so that defendants' search of 102 search terms selected by plaintiff generated 1.4 million documents).

As the Sedona Conference recognized last year, cooperation between counsel regarding the production of electronically stored information ["ESI"] "allows the parties to save money, maintain greater control over the dispersal of information, maintain goodwill with courts, and generally get to the litigation's merits at the earliest practicable time."  The

---

[10]Defense counsel further complains that the first time they heard about this problem was when they received this most recent discovery motion.  (Id. at 27-28).  In his reply brief, plaintiff responds that he brought this problem to defendants' attention as early as May 5, 2010.  (Dkt. #114, at 3-4; Dkt. #104, Exh. 6).

Case for Cooperation, 10 SEDONA CONF. J. 339, 339 (2009). Although

> [d]iscovery disputes have existed since discovery began[,] . . . ESI has vastly
> increased the quantities of available information and the way it can be
> accessed. With almost all information electronically created and stored, there
> has been an exponential increase in the amount of information litigants must
> preserve, search, review, and produce. ESI is often stored in multiple
> locations, and in forms difficult and expensive to retrieve. These reasons
> compel increased transparency, communication, and collaborative discovery.
> . . . [I]n order to preserve our legal system, cooperation has become
> imperative.

Id. at 340. In language that strongly resonates here, the Sedona Conference advised:

> Cooperation . . . requires . . . that counsel adequately prepare prior
> to conferring with opposing counsel to identify custodians and likely sources
> of relevant ESI, and the steps and costs required to access that information.
> It requires disclosure and dialogue on the parameters of preservation. It also
> requires forgoing the short term tactical advantages afforded one party to
> information asymmetry so that, rather than evading their production
> obligations, parties communicate candidly enough to identify the appropriate
> boundaries of discovery. Last, it requires that opposing parties evaluate
> discovery demands relative to the amount in controversy. In short, it forbids
> making overbroad discovery requests for purely oppressive, tactical reasons,
> discovery objections for evasive rather than legitimate reasons, and
> "document dumps" for obstructionist reasons. In place of gamesmanship,
> cooperation substitutes transparency and communication about the nature
> and reasons for discovery requests and objections and the means of resolving
> disputes about them.

Id. at 344-45 (emphasis in original)(footnote omitted). See also id. at 342-45, 354-62;

Allman, Conducting E-discovery After the Amendments: The Second Wave, 10 SEDONA CONF.

J. 215, 216 (2009)("cooperation among parties in [e-]discovery has emerged as a decisive

mandate . . . ").

Among the items about which the court expects counsel to "reach practical

agreement" without the court having to micro-manage e-discovery are "search terms, date

ranges, key players and the like." 10 SEDONA CONF. J. at 217 (footnote omitted). Moreover,

"[t]he use of key words has been endorsed as a search method for reducing the need for

human review of large volumes of ESI[,]" to be followed by "a cooperative and informed

process [which includes] sampling and other quality assurance techniques." Id. at 223 (alternation in original)(footnotes omitted).

In this case, the issues raised in this motion largely could have been eliminated had counsel <u>actually</u> conferred with each other about refining the search terms.  Therefore, **on or before September 30, 2010**, counsel shall hold an <u>in person conference with one another</u>, at which they <u>shall</u> conduct themselves in a professional and constructive manner, in order to ascertain if there are more discrete search terms, or combinations of search terms, that can be applied by defendants, so that the volume of documents produced are substantially less than 1.8 million, with the expectation that as a result, a significantly higher percent of the documents captured by the searches will be relevant.  **If, however,** counsel are unable to agree on revised search terms, then the Magistrate Judge will appoint a Special Master to whom the parties can submit this dispute, with the issue of compensation to be determined by this Magistrate Judge.  <u>See Perfect Barrier LLC v. Woodsmart Solutions Inc</u>, No. 3:07-CV-103 (JVB), 2008 WL 2230192, at *1-2 (N.D. Ind. May 27,2008)(where plaintiff requested copies of <u>all</u> e-mails, and defendant produced 75,000 pages of e-mail in electronic disc form, all of which were designated as confidential "attorney's eyes only," Magistrate Judge indicated his intention to appoint Special Master to examine these documents if counsel were unable to reach their own agreement); <u>see also</u> Fed. R. Civ. P. 53(a)(1)(C), 53(a)(3).  The appointment of a Special Master is particularly appropriate here, given that counsel already have imposed upon this Magistrate Judge to make decisions over petty issues such as a three-day extension of time (January Ruling at 2) and over two additional days of depositions (Dkt. #122).

B. SPECIFIC ITEMS

1. REGIONAL MALL VALUATIONS

The December 2009 Ruling ordered defendants to respond to Requests for Production Nos. 40-43, 74-81, 82, 101, 102, and 122, and with respect to Requests for Production Nos. 105-12, defendants were ordered to produce only summary statements, without prejudice to plaintiff seeking particularized backup documents, as appropriate. (At 13-14). Plaintiff has identified eight categories of documents not produced with respect to CambridgeSide Galleria and another eight categories of documents not produced with respect to Galleria Dallas. (Dkt. #104, Brief at 29-30 & Exhs. 6-7).

Defendants have responded that for each of these items, "the documents listed were either produced, not found after a reasonable inquiry, or never requested[,]" and that all were produced "with cover letters that identified them." (Dkt. #111, at 2-8 & Exh. B; see also Dkt #104, Exh. 8). The responsive documents consist of more than 6,000 pages. (Dkt. #111, Exh. D). Plaintiff argues that while defendants produced some of the documents ordered in the December 2009 Ruling, "they continue to withhold documents," and that to the extent that plaintiff's most recent requests exceed those in their original Requests for Production, defense counsel represented in his letter, dated June 3, 2010, that "We do not object to producing the documents in your letter if they exist and were not produced. We will look to see if those documents exist and were produced." (Dkt. #114, at 4-5; Dkt. #111, Exh. D). Plaintiff also expresses concern over the fact that the final appraisal for CambridgeSide Galleria on June 30, 2008 (when plaintiff left defendants) was $475.5 million, whereas an appraisal from Cushman & Wakefield dated two days earlier had an appraisal of $498.0 million. (Dkt. #114, at 5-6 & Exh. 2). Thus, plaintiff urges that defendants have not produced all documents associated with this appraisal, since there were none that explained

11

this discrepancy.   (Dkt. #114, at 6).   Lastly, plaintiff has requested workfiles, as well as

handwritten notes and e-mail communications by Christopher Taylor and Thomas Gould, the

new co-heads of the valuation unit,  Quarterly Sign Off Records by Asset Managers, and

Dyna Valuation Files; plaintiff again argues that defense counsel agreed to produce these

documents in his June 3, 2010 letter. (Id. at 6-8 & Exh. 4; Dkt. #114, at 4-9).

Once again, it is necessary for counsel to meet and confer on these issues.  In the

absence of any agreement, this is a matter which will be addressed by a Special Master.

## 2.  CONSENT AGREEMENTS AND T2 CONVERSION

The December 2009 Ruling granted in part with respect to  Interrogatory No. 10 and

Requests for Production Nos. 58-63, 64, 65, 66, and 121,

> to the extent that defendant UBS Realty is to provide a sample side letter
> agreement and/or sample consent agreement (or samples thereof, if there
> was more than one version), with a representation as to how many of its
> three hundred customers signed each version, as well as sample written
> communications with customers . . ., without prejudice to plaintiff seeking
> additional discrete documents, as appropriate.

(At 14-16).   Plaintiff complains that defendants "have failed to fully comply" with the court

because they have not produced copies of "each version" of a side letter or identified how

many clients entered into each particular side letter.  (Dkt. #104, Brief at 30-31 & Exh. 8;

Dkt. #111, Exh. B; see also Dkt. #114, at 8).  Defendants have characterized this claim as

"baseless[,]" particularly when defense counsel offered, in his June 3, 2010 letter, to "make

a judgment as to how many investors we would consider to be in each category. . . . [I]f you

would like the additional information noted above, we would be happy to provide it."  (Dkt.

#111, at 8-9 & Exhs. B,  D).  Thus, **on or before September 24, 2010**, defendants will

provide this additional information to plaintiff.[11]

### 3. DAMAGES

The December 2009 Ruling ordered defendants to respond to Interrogatories Nos. 16-17 and Requests for Production Nos. 95-96 to the extent agreed upon by defendants, namely that defendants were "willing to produce relevant compensation-related information for its employees without indicating the name of the employee, and similarly [would] provide additional documents responsive to Interrogatory No. 17 and Request No. 96, beyond the 350 documents it already has provided to plaintiff in the state court action." (At 17-18 (emphasis ,internal quotations, & internal citations omitted); see also Dkt. #104, Exh. 8). Plaintiff complains that defendants only "partially responded by producing information regarding some, but not all, of the managing directors of [d]efendant UBS Realty" and compensation information was not provided; as a result, plaintiff requests that the Court order defendants "to disclose all bonus, incentive and contingent compensation, awards of stock options and strike prices, and all other data regarding compensation paid to all managing directors at UBS Realty, excluding Matthew Lynch[,] the President of UBS Realty." (Dkt. #104, Brief at 31). Plaintiff acknowledges, however, that on June 3, 2009, defendants agreed to produce additional compensation information for 2009, including options and the strike price, for some UBS Realty Managing Directors. (Dkt. #104, Brief at 31, n.9; see also Dkt. #111, Exh. D).

As defendants explained in their January 15, and June 3, 2010 letters and in their brief in opposition, of defendant UBS Realty's eleven managing directors, defendants produced information regarding six of them (approximately 1500 pages for 2008), but

---

[11]This item is but one of the many reflective of counsels' inexplicable inability to communicate with each other in a productive fashion.

excluded five – Lynch, its President; Thomas O'Shea, plaintiff's supervisor; and three others who supervised many more employees than plaintiff (fifteen to forty-five employees, as opposed to five supervised by plaintiff). (Dkt. #111, at 9-10 & Exhs. B, D). Defendants agreed to produce the 2009 information when it became available in mid-June 2010. (Id.).

In his reply brief, plaintiff argues that defendants should produce documents regarding a specific individual who earned less money than plaintiff, as well as all other managing directors who served as members of the Investment Committee, in which plaintiff participated. The mere fact that this specific manager earned less than plaintiff does not make him comparable to plaintiff. However, if any of the other Managing Directors (other than Lynch and the directors just discussed) were members of the Investment Committee, like plaintiff, then plaintiff is entitled to compensation information regarding such Managing Director[s]. Defendants shall respond, as appropriate, **on or before September 24, 2010**.

### 4. OUTSOURCING AND PRICEWATERHOUSE COOPERS

The December 2009 Ruling required defendants to respond to Request for Production Nos. 94 and 124-27. (At 20-21). Plaintiff complains that while defendants have produced documents that are responsive to these requests, they "have failed to fully comply with . . . the Court's Ruling." (Dkt. #104, Brief at 32 & Exh. 8). Plaintiff continues that because defense counsel represented on June 3, 2010 that defendants had produced "all" documents which were responsive to those requests, the Court should order defendants to fully respond, or certify that all responsive documents have been produced. (See Dkt. #111, Exhs. B, D).

In their brief in opposition, defendants reiterate that "Yes, [d]efendants believe they have fully complied[,]" and if plaintiff finds any document that is missing, he "should so advise [d]efendants so that the parties can resolve the issue." (Dkt. #111, at 11 & Exhs. B,

14

D).  In his reply brief, plaintiff has identified a 3rd quarter 2008 review referenced in the Bloomberg article, and further seeks any handwritten notes by Lynch, O'Shea and five other UBS employees regarding phone conversations with PWC.  (Dkt. #114, at 10).  If counsel are unable to resolve any dispute regarding these limited issues, then those issues are to be addressed by a Special Master.[12]

## C.  DISCOVERY REQUESTS PREVIOUSLY DENIED WITHOUT PREJUDICE

As plaintiff summarizes, the December 2009 Ruling denied plaintiff's First Motion to Compel, without prejudice to renew, with respect to Requests for Production Nos. 24-33, 35-36, 134-38, 67, 86, 92, 39, 116, 118, 132, 133, 139, and 55-57, "if these requests [were] not met by the production of [the] additional four million pages."  (Dkt. #104, Brief at 19 & n.5, 32-33; December 2009 Ruling at 18, 20, 21, 22, 22-23).   Plaintiff complains that defendants have failed to produce these documents.  (Dkt. #104, Brief at 19).   Defendants failed to address this issue in their thirty-page brief in opposition (Dkt. #111), which omission was mentioned in plaintiff's reply brief (Dkt. #114, at 10).    Therefore, plaintiff's Second Motion to Compel is <u>granted</u> with respect to these items, to the extent that defendants have not already complied.   Defendants will produce these documents **on or before October 22, 2010**.

## D.  ALLEGED OVER DESIGNATION OF DOCUMENTS AS "CONFIDENTIAL"

Plaintiff further complains that defendants violated the "good faith" requirement of the Stipulated Protective Order by designating all items as "confidential."  (Dkt. #104, Brief at 33-36 & Exh. 6; <u>see</u> Dkt. #44, ¶ 2).   Plaintiff contends that defendants acted in "bad faith" and "abused the privilege" of designating documents as confidential by having

---

[12]<u>See also</u> notes 1, 11 <u>supra</u>.

identified "every single document" as confidential.  (Dkt. #104, Brief at 33-34 (emphasis in original) & Exh. 9).  By having responded in this way, plaintiff contends that defendants have shifted the burden of reviewing each document from defendants onto plaintiff, in violation of the Stipulated Protective Order.  (Dkt. #104, Brief at 34-36).  Plaintiff has identified certain documents from Discs 8 and 21-32 which are not confidential, such as public SEC Forms, photographs, and mass e-mails. (Id. at 34).   Plaintiff requests that defendants be required to withdraw all of their confidential designations and re-serve these documents, with such designations only where appropriate.  (Id. at 36, citing In re Ullico Inc. Litig., 237 F.R.D. 314, 317-19 (D.D.C. 2006)["Ullico"]).

Defendants have responded that they have produced more than four million pages, starting two years ago in connection with plaintiff's administrative charges and state court lawsuit, and plaintiff's counsel never objected to the confidential designation until May 5, 2010.  (Dkt. #111, at 28-29; see Dkt. #104, Exh. 6).  When plaintiff's counsel drew the public documents to the attention of defense counsel, defense counsel removed the confidential designation.  (Dkt. #111, at 29 & Exh. D).   According to defendants, many of the documents contain "sensitive personnel and proprietary information, including sensitive information relating to [defendant] UBS Realty's investors."  (Dkt. #111, at 28).   Despite defense counsel's invitation to identify other improperly designated documents "so that we can hopefully resolve that issue without court intervention[,]" plaintiff filed the pending motion. (Id.).

In the Ullico case, defendants produced 60,000 documents, consisting of 200,000 pages, and designated more than ninety-nine percent of them as "confidential."  237 F.R.D. at 317.   Many of the documents clearly were not confidential, including copies of newspaper and magazine articles, press releases, publicly available annual reports and ERISA plan

documents, blank income tax forms, and newsletters available on the company's website. Id. at 317-18. Thereafter, defendants voluntarily corrected the designation of approximately 4,000 documents. Id. at 318. U.S. Magistrate Judge Kay characterized defendants actions as "bad faith"; for the Court to permit over-designation to continue "would encourage the designating party to overuse the 'confidential' label in the first place and provide a strategic advantage in the form of an unwarranted and unfair designation of 'confidential' for months." Id. at 317. The Magistrate Judge ordered defendants to remove the "confidential" designation from all documents, and review and re-label them within twenty days. Id. at 318.

The sheer volume of documents here, which is twenty-fold the number of pages produced in Ullico, makes timely review of every page by a human being nearly impossible. Plaintiff is correct that the burden should not fall on him, but defendants appropriately point out that the four million pages were produced at plaintiff's request. Counsel shall confer further regarding what is the most efficient manner, in terms of costs and time, to review the four million pages produced by defendants to remove the confidential designation. See also Perfect Barrier, 2008 WL 2230192, at *1-2 (if Court is required to examine 75,000 pages of e-mails, then Magistrate Judge is likely to appoint a Special Master).

E. SANCTIONS

Plaintiff seeks attorney's fees and costs in connection with having to prepare this motion, and that defendants be compelled to "produce a table of contents containing a detailed description of each document that it has produced in this action, and how certain documents are responsive to certain requests." (Dkt. #104, Brief at 20-28; see also Dkt. #114, at 1-4). Defendants, in turn, argue that plaintiff needlessly has filed this pending motion and if additional searches are required, then plaintiff ought to bear the burden of

paying for the production of documents, in light of plaintiff's "out-of-control requests for more documents." (Dkt. #111, at 3, nns. 1-2).

This is the sixth discovery ruling filed in this case, two of which have been lengthy, in a <u>single</u> plaintiff employment action. There are four more months left for the completion of fact discovery, and at least an additional two months for the completion of expert discovery. (<u>See</u> Dkt. #122). The requests of both sides for sanctions are <u>denied</u>.

## II. CONCLUSION

Accordingly, for the reasons stated in Section I <u>supra</u>, plaintiff's Second Motion to Compel (Dkt. #104) is <u>granted in part to the extent set forth above</u>.

This is not a Recommended Ruling but a Ruling on discovery, the standard of review of which is specified in 28 U.S.C. § 636; FED. R. CIV. P. 6(a), 6(e) & 72; and Rule 72.2 of the Local Rules for United States Magistrate Judges. As such, it is an order of the Court unless reversed or modified by the District Judge upon timely made objection.

<u>See</u> 28 U.S.C. § 636(b)**(written objections to ruling must be filed within fourteen calendar days after service of same);** FED. R. CIV. P. 6(a), 6(e) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Small v. Secretary, H&HS</u>, 892 F.2d. 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit);** <u>Caidor v. Onondaga County</u>, 517 F.3d 601, 603-05 (2d Cir. 20008)**(failure to file timely objection to Magistrate Judge's discovery ruling will preclude further appeal to Second Circuit).**

Dated at New Haven, Connecticut, this 7th day of September, 2010.




                                   /s/ Joan G. Margolis, USMJ
                                   Joan Glazer Margolis
                                   United States Magistrate Judge