IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------------X
:
RICHARD TRUSZ : 3:09 CV 268 (DJS)
:
:
V. :
:
UBS REALTY INVESTORS LLC, AND : DATE: FEBRUARY 8, 2011
UBS, AG :
:
---------------------------------------------------------X

## RULING REGARDING PLAINTIFF'S DESIRE TO DEPOSE SEVERAL EMPLOYEES WHO RESIDE AND ARE EMPLOYED IN EUROPE

The factual and procedural history behind this employment action is set forth in considerable detail in this Magistrate Judge's Ruling on Plaintiff's First Motion to Compel, filed December 1, 2009 (Dkts. ##61-62)["December 1, 2009 Ruling"], Ruling on Defendants' Motion to Quash, filed December 10, 2009 (Dkt. #65), Ruling Following Partial In Camera Review, filed December 21, 2009 (Dkt. #72)["December 21, 2009 Ruling"], Ruling on Plaintiff's Motion for Extension of Time, filed January 4, 2010 (Dkt. #77), Ruling Regarding Potential In Camera Review of European Personnel Records, filed January 22, 2010 (Dkt. #85)["January 2010 Ruling"], Ruling on Plaintiff's Second Motion to Compel, filed September 7, 2010 (Dkt. #124)["September 2010 Ruling"], Ruling on Plaintiff's Motion for Telephonic Discovery Conference, filed January 13, 2011 (Dkt. #166), Ruling on Defendants' Motion for Reconsideration, filed January 13, 2011 (Dkt. #167), and Ruling on Plaintiff's Motion for Reconsideration, filed January 13, 2011 (Dkt. #168), familiarity with which is presumed. (See also Dkts. ##79, 122, 131).

U.S. District Judge Janet Bond Arterton referred this file to this Magistrate Judge for discovery purposes on November 3 and December 4, 2009, and again on June 8, 2010.

(Dkts. ##55, 63, 106). The file was transferred to Senior U.S. District Judge Dominic J. Squatrito on September 17, 2010. (Dkt. #126). Under the latest scheduling order, all discovery will be completed by May 31, 2011 and all dispositive motions are to be filed by June 30, 2011. (Dkt. #160).

Section I.H of the December 1, 2009 Ruling (at 18-20) concerned production of the personnel files of nine employees; the ruling ordered counsel to attempt to resolve between themselves sufficient safeguards to protect the privacy interests of two employees, Thomas O'Shea and Matthew Lynch. Pursuant to the December 1, 2009 Ruling, on December 18, 2009, defendants forwarded to this Magistrate Judge's Chambers personnel files of four employees, Ana Ibis Seebrath, Christine Sailer, Chris Taylor, and Tom Gould; three days later, this Magistrate Judge filed the December 21, 2009 Ruling, which ordered the production of one document from Taylor's file, two documents from Gould's file, and none from Seebrath and Sailer's files.

In defense counsel's letter, dated December 18, 2009, he indicated that defendants have not produced the personnel files of the three last employees – John Fraser, Mario Cueni, and Paul Marcuse -- as defendants believe that production thereof may violate British and Swiss laws, absent a court order from those jurisdictions.[1] In accordance with deadlines set by the Court (see Dkts. ##71, 77), on January 8, 2010, defendants filed their Memorandum of Law Addressing Swiss and English Legal Issues as They Relate to Production of Personnel Files (Dkt. #78), five days later, plaintiff filed his Memorandum of Law Regarding Swiss and English Law and the Production of Personnel Files (Dkt. #80), and two

---

[1]Defense counsel nonetheless produced for plaintiff and for the Court copies of documents pertaining to Fraser, Cueni, and Marcuse that appear on defendants' internal and external websites.

days thereafter, defendants filed their Reply Brief in Further Support of Their Argument Against the Production of Swiss and English Personnel Files (Dkt. #83).

On January 22, 2010, this Magistrate Judge filed the January 2010 Ruling, which held that based on the Swiss and English Data Protection Laws, as well as balancing tests under U.S. law, defendants were not required to produce the personnel files of Fraser, Cueni, and Marcuse for an in camera review, without prejudice to plaintiff attempting to create a more complete record as to why these personnel files are "essential" under Swiss law or "necessary" under British law. (At 4-12). As described in the January 2010 Ruling, Cueni, who lives and works in Switzerland, is General Counsel and Chief Risk Officer of UBS Global Asset Management, a division of UBS AG; Fraser and Marcuse, who live and work in the United Kingdom ["UK"], are the Chairman and CEO of UBS Global Asset Management, and Head of Global Real Estate of UBS Global Asset Management, respectively; although Fraser and Marcuse are located in the UK, their employment contracts are governed by Swiss law. (At 2-3)(internal citations omitted). The hierarchy between plaintiff and these gentlemen is as follows: plaintiff reported to O'Shea, General Counsel of defendant UBS Realty; O'Shea reports to Cueni; Lynch, Head of Global Realty Estate – US and President of defendant UBS Realty, reports to Marcuse; and Cueni and Marcuse both report to Fraser. (At 3)(internal citations omitted). The personnel files of Cueni, Marcuse, and Fraser are located in Switzerland, although Marcuse has an additional personnel file in London. (Id.)(internal citation omitted). Plaintiff had given four reasons why these personnel files are relevant: (1) all three had knowledge of plaintiff's complaints, as early as February 2008, before he was terminated from his employment, and were involved in the retaliation that culminated in his termination; (2) their personnel files may indicate that they were previously accused of

3

discrimination or retaliation; (3) their personnel files may reflect previous training or education concerning compliance with laws prohibiting discrimination or retaliation, or lack thereof; and (4) these personnel files are also likely to contain information relevant to whether defendants are an "integrated employer." (Id.)(internal citation omitted).

In accordance with deadlines set by the Court (see Dkts. ## 79, 81), on January 20, 2010, defendants filed their Memorandum of Law Addressing Plaintiff's Desire to Depose Several Employees Who Reside and Are Employed in Europe (Dkt. #84).[2] On November 15, 2010, plaintiff filed his Response to Defendants' Memorandum of Law Addressing Plaintiff's Desire to Depose Several Employees Who Reside and Are Employed in Europe (Dkt. #139).[3]

---

[2] Six exhibits were attached: copies of e-mails between counsel, dated January 15 & 19, 2010 (Tab A); copy of Legal Organization Chart (Tab B); affidavit of Mario Cueni, dated January 20, 2010, with Subexhibit 1 (Tab C)["Cueni Aff't"]; affidavit of John Fraser, dated January 20, 2010 (Tab D)["Fraser Aff't"]; affidavit of Paul Marcuse, dated January 20, 2010 (Tab E)["Marcuse Aff't"]; and copy of Notice of Rule 30(b)(6) Deposition of Defendant UBS Realty Investors LLC, dated November 6, 2009 (Tab F). See also Dkts. ##86-88.

[3] Forty-three exhibits were attached: excerpts from the deposition of Thomas O'Shea, taken on September 14 & 29, and October 13, 2010 (Exh. A)["O'Shea Depo."]; copy of Defendants' Revised Rule 26(A)(1) Initial Disclosures, dated May 15, 2009 (Exh. B); excerpts from the deposition of Matthew Lynch, taken on October 28, 2010 (Exh. C)["Lynch Depo."]; excerpts from the deposition of Michelle Cullen, taken on September 23, 2010 (Exh. D)["Cullen Depo."]; copy of "Notes to file" (Exh. E); copy of e-mail, dated February 13, 2008 (Exh. F); copy of e-mail, dated March 12-13, 2008 (under seal)(Exh. G); copy of e-mail, dated April 15, 2008 (Exh. H); copy of e-mail, dated April 16 & 22, 2008 (Exh. I); copy of e-mail, dated April 16-17, 2008 (Exh. J); copy of UBS Group Managing Board (Exh. K); copy of e-mail, dated May 13 & 15, 2008 (Exh. L); copy of e-mail, dated May 13, 2008, and letter, dated May 4, 2008 (Exh. M); copy of e-mail, dated May 18, 2008 (Exh. N); copy of e-mail, dated May 30, 2008 (Exh. O); copy of e-mail, dated June 13, 2008 (Exh. P); copy of e-mail, dated June 13 & 16, 2008 (Exh. Q); copy of e-mail, dated June 27-28, 2008 (Exh. R); copy of e-mail between counsel, dated June 30, 2008 (Exh. S); excerpts of deposition of Jeffrey G. Maguire, taken on October 19, 2010 (Exh. T)["Maguire Depo."]; copy of e-mail, dated November 11, 2008 (under seal)(Exh. U); copy of UBS Group Compliance Risk Reports for 2nd and 3rd Quarters of 2008 (under seal)(Exh. V); copy of UBS Group Quarterly Whistleblowing Reports for 2nd and 3rd Quarters of 2008 (under seal)(Exh. W); copy of Uniform Application for Investment Adviser Registration (Exh. X); copy of Glossary of Terms (Exh. Y); copy of Memorandum, dated July 23, 2008 (Exh. Z); copy of Approval of T2 Project (under seal)(Exh. AA); copy of GREMC Minutes, dated October 2, 2007 (under seal)(Exh. BB); copy of e-mail, dated October 8-9, 2007 (Exh. CC); copy of e-mail, dated October 17, 2007 (Exh. DD); copy of Global Real Estate Organisation and Governance (under seal)(Exh. EE); copy of web page with UBS Group Executive Board (Exh. FF); copy of Defendants' Answers and Objections to Plaintiff's Fourth Set of Interrogatories and Requests for Production, dated September 20, 2010 (Exh. GG); copy of

4

See also Dkts. ##89-90, 142-44). On December 20, 2010, defendants filed their Reply Brief in Further Opposition to Plaintiff's Desire to Depose Several Employees Who Reside and Are Employed in Europe. (Dkt. #153.[4] See also Dkts. ##146-47, 151-52, 154-55, 157).

## I. DISCUSSION

In their original brief, defendants repeated that they offered to have Cueni, who is O'Shea's supervisor and who plaintiff contacted by e-mail, deposed in London; in contrast, plaintiff had no communication with Marcuse and sent three e-mails to Fraser, to which Fraser did not respond. (Dkt. #84, at 2, 5-6; Tab A). However, defendants contend that even if Cueni is deposed, much of his testimony will be protected by the attorney-client privilege, particularly since his communications with O'Shea and Lynch (both of whom are attorneys) centered around plaintiff's claims of retaliation. (Dkt. #84, at 2-3). Defendants continue that none of the depositions are warranted since these individuals never have been employees of UBS Realty, and they had no involvement in the decision-marking process regarding plaintiff's concerns. (Id. at 3-4; Cueni Aff't; Fraser Aff't; Marcuse Aff't). As

---

correspondence between counsel, dated October 1, 2010 (Exh. HH); copy of correspondence between counsel, dated October 15, 2010 (Exh. II); copy of Defendants' First Amended Responses and Objections to Plaintiff's First Requests for Admission, dated June 17, 2010 (Exh. JJ); copy of e-mail between counsel, dated January 27 & February 2, 2010 (Exh. KK); copy of statement from Lex Mundi, "In-House Counsel and the Attorney-Client Privilege" (Exh. LL); excerpts from deposition of Kevin Crean, taken on October 6, 2010 (Exh. MM)["Crean Depo."]; copy of Investor Day 2005 Global Asset Management (Exh. NN); copy of Minutes of Management Committee, dated June 26, 2008 & September 16, 2008 (under seal)(Exh. OO); copy of e-mail between counsel, dated October 15, 22 & 26, 2010 (Exh. PP); and copy of correspondence between counsel, dated November 2, 2010 (Exh. QQ). See also Dkts. ##142-44.

[4]Ten exhibits were attached: copy of additional excerpts from the O'Shea deposition, taken on September 14, 2010 (Exh. A); copy of Defendants' Responses and Objections to Plaintiff's First Requests for Admission, dated June 26, 2009 (Exh. B); copy of additional excerpts from the Lynch Deposition, with Subexhibit 2, under seal (Exh. C); copy of additional excerpts from the Cullen Deposition (Exh. D); copy of excerpts from deposition of Christine Menard, taken on November 23, 2010 (Exh. E); copy of Notice of Rule 30(b)(6) Video Deposition of Defendant UBS Realty Investors LLC, dated November 6, 2009 (Exh. F); copy of e-mail, dated April 28, 2008 (under seal)(Exh. G); copy of e-mail, dated May 14, 2008 (under seal)(Exh. H); copy of e-mail, dated June 13, 2008 (under seal)(Exh. I); copies of case law (Exh. J).

previously indicated, defendants argue that Cueni's involvement was limited to some e-mail exchanges with plaintiff between April 14 and June 9, 2008. (Dkt. #84, at 4-5; Cueni Aff't, ¶¶ 3-5). According to defendants, the more appropriate deponents about the elimination of plaintiff's job are O'Shea and Lynch, who were designated as defendant UBS Realty's Rule 30(b)(6) deponents. (Dkt. #84, at 6-7 & Tab F). Defendants further contend that the paucity of knowledge by the three European executives hardly justifies the expenses and inconvenience of taking depositions in London or Zurich, and serve only to harass defendants. (Dkt. #84, at 6, 7-8). Lastly, defendants assert that any depositions must be held in accordance with the Hague Convention. (Id. at 8-10).

In his brief in opposition, plaintiff responds that Cueni, Marcuse and Fraser were personally involved in plaintiff's matters, in that they oversaw UBS Realty; the three of them were immediately informed of what transpired during plaintiff's meeting on February 6, 2008 with O'Shea and Sailer; Cueni and Marcuse were kept informed of the situation by Seebrath, a Human Resources Executive at UBS, in e-mails, dated February 13, 2008; O'Shea and Marcuse exchanged e-mails on March 13, 2008 about the situation; in April 2008, after plaintiff filed his Sarbanes-Oxley complaint, he requested that Cueni intervene to protect him from discrimination and retaliation, and they exchanged e-mails through June 2008; during this time period, Cueni also communicated with Michelle Cullen, defendant UBS Realty's Chief Compliance Officer, and Fraser was involved in e-mail exchanges about the plaintiff's complaint with, inter alia, O'Shea, while Lynch was in e-mail communication with Marcuse; Lynch recalled that Cueni was involved in discussions with both him and O'Shea; on June 13, 2008, two days after plaintiff served a lawsuit against both defendants, Cueni sent plaintiff an e-mail accusing him of insubordination, with which Lynch agreed; on June 16, 2008, plaintiff sent an e-mail to Fraser, which included his e-mail to Cueni that same day;

twelve days later, on June 28, 2008, plaintiff sent an e-mail complaining to Lynch, on which Cueni was copied, and later forwarded this e-mail to Fraser; two days later, on June 30, 2008, defendants made a proposal to plaintiff, conditioned on his leaving the premises of UBS that morning and O'Shea testified that Cueni, Marcuse and Frasier were involved in the "signing off" of this proposal; on July 28, 2008, plaintiff sent another e-mail to Fraser; and on August 13, 2008, defendants informed plaintiff that his employment was terminated, retroactive to June 30, 2008, and O'Shea concedes that he discussed defendants' decision to terminate plaintiff with Cueni prior to defendants' notification to plaintiff. (Dkt. #139, at 4-15; O'Shea Depo. at 30, 33, 53, 63, 206-10, 213-15, 277-79, 405-07, 420-22, 447-51, 467, 470, 476, 548-53, 559, 566, 703-05; Lynch Depo. at 56-59, 74-79, 81-82, 89-90, 97-98, 125-26, 140-41; Cullen Depo. at 130-34, 139-58, 182-83; Exhs. E-J, L-S).

Plaintiff contends that he needs to depose Marcuse, Cueni and Fraser because Lynch and O'Shea "have imperfect recollections of their communications with these individuals[,]" Lynch having spoken with Marcuse and Cueni "a number of times in 2008" prior to plaintiff's termination and also with Cueni "on several occasions" thereafter, and O'Shea similarly having had "several" communications with Cueni prior to plaintiff's termination, and some communications with Fraser and Marcuse. (Dkt. #139, at 15-16; O'Shea Depo. at 206-09, 213-15, 217, 276-79, 405-07, 420-22, 447-51, 467, 470, 476, 548-53; Lynch Depo. at 125, 130, 81- 82, 89-90, 140-41, 156, 57-59, 81, 82). According to plaintiff, Fraser endorsed the retaliatory actions take by Lynch and O'Shea against plaintiff, including calling Lynch after the publication of an article by Bloomberg in November 2008 to express his support of their actions, and attending a meeting at UBS Realty in Hartford in 2009 at which this litigation was a topic, among others. (Dkt. #139, at 16-17; Lynch Depo. at 126-27; Maguire Depo. at 166-69). Lastly, Marcuse and Cueni were involved in e-mail correspondence regarding

7

media inquiries after plaintiff's termination, with Cueni identified in internal UBS compliance reports that mention plaintiff.  (Dkt. #139, at 17; Exhs. U-W).

Plaintiff further argues that these three depositions are necessary because Cullen has testified that Cueni, Marcuse and Fraser are the "control persons" of defendant UBS Realty, and in particular Marcuse, who approves all major decisions regarding UBS Realty, including vetoing Lynch's decisions, who in 2007 assigned O'Shea the task of investigating valuation outsourcing and was in frequent communication with him about it, and who chairs the Global Real Estate Management Committee, of which Lynch and O'Shea are members.  (Dkt. #139, at 17-20; O'Shea Depo. at 40, 53, 104-10, 132-33, 276-77; Lynch Depo. at 111-14, 118-25; Cullen Depo. at 38-41, 68-81;  Exhs. K, X, Z, AA-FF).  In addition, Marcuse and Cueni also are members of the UBS AG Group Management Board, which "plays a crucial role in achieving UBS's one-firm vision" and Fraser is a member of the UBS AG Group Executive Board, which has "executive management responsibility for UBS Group and its business."  (Dkt. #139, at 20-21; Exhs. K, BB-FF; see also Dkt. #139, at 21-23; Exh. JJ).  Lynch and O'Shea have not attended any of these Board meetings and Cullen testified that the policies of defendant UBS AG apply to defendant UBS Realty.  (Dkt. #139, at 21; O'Shea Depo. at 698-701; Lynch Depo. at 122-24; Cullen Depo. at 70-77, 79-80).   Under all these circumstances, plaintiff contends that Cueni, Marcuse and Fraser are not immune from depositions, as senior executives sometimes are in employment disputes.  (Dkt. #139, at 33-40).

Plaintiff further argues that the depositions should proceed under the Federal Rules of Civil Procedure, to be held in the United States, and not under the Hague Convention; plaintiff is willing, however, to reimburse defendants for their reasonable travel costs if the depositions cannot be scheduled on dates when those individuals already have travel plans

to the United States. (Dkt. #139, at 23-31; Lynch Depo. at 128-30; Maguire Depo. at 166-69; Crean Depo. at 32-36; Exhs. KK, NN-OO). Plaintiff also disagrees with defendants' "blanket invocation" of the attorney-client privilege for all of Cueni's communications regarding this matter, particularly since Switzerland does not even recognize an attorney-client privilege for inside counsel, and according to O'Shea, not every communication he had with Cueni was to obtain legal advice. (Dkt. #139, at 31-33; O'Shea Depo. at 206-17; Exhs. LL, PP-QQ).

In their reply brief, defendants repeated that in January 2010, defendant UBS AG offered to produce Cueni in London for a deposition, if plaintiff withdrew his request to depose Fraser and Marcuse, and that defendant UBS AG's "offer still stands." (Dkt. #153, at 3). Defendants again argue that none of these three senior executives possesses "unique personal knowledge" of the underlying facts to warrant their deposition, Cueni has no unique knowledge of relevant, non-privileged facts in this case, and the mere fact that Fraser and Marcuse were informed of plaintiff's complaints is insufficient, particularly when plaintiff has deposed, or intends to depose, eighteen other individuals, including Lynch, O'Shea, Cullen, Carol Kuta (Head of Portfolio Accounting and Reporting), Christine Sailer Menard (Director/former Human Resources Client Relations Manager with UBS Global Asset Management), Jeffrey Maguire (Managing Director, UBS Realty's Operational Risk Controller), Mark McKell (Executive Director, UBS Realty's Operational Risk Controller), Kevin Crean (Managing Director & Portfolio Manager, Trumbull Property Fund at UBS Realty), Thomas Gould (Director and Co-Head of Valuation with UBS Realty), Christopher Taylor (Director and Co-Head of Valuation with UBS Realty), Vincent Maniscalco (Senior Director, Retail Industry Group at Cushman & Wakefield), Hope Cahoon (Senior Manager at KPMG), Thomas Anathan (Managing Director and UBS Realty's Head of Marketing and Client Services), James Fishman

9

(Executive Director and Region Head of Asset Management with UBS Realty), Steve Kapiloff (Executive Director and Legal Counsel with UBS Realty), Richard Zalatoris (Executive Director and Asset Manager with UBS Realty), Kiku Taura (Managing Director and Global Head of Human Resources with UBS Global Asset Management), and Ana Ibis Seebrath (Executive Director and Human Resources – Client Relations Manager with UBS Global Asset Management). (Id. at 1-2, 3-17, 23-24; O'Shea Depo. at 206, 209, 214, 217, 278, 411, 643-44; Lynch Depo. at 89, 111-16; Cullen Depo. at 71-72; 76-77, 131, 139; Menard Depo. at 94; Exhs. F-I; see also Dkt. #79). As to Cueni, defendants again assert that the attorney-client privilege applies to his communications and thus limits the scope of his deposition. (Dkt. #153, at 17-23; O'Shea Depo. at 217; Cullen Depo. at 131, 139). Defendants also argue that less burdensome and intrusive discovery methods are available to the parties, including depositions on written interrogatories under FED. R. CIV. P. 31. (Dkt. #153, at 25-27). Lastly, defendants argue that the Federal Rules of Civil Procedure do not control, and that the depositions should be conducted in London in accordance with the Hague Convention. (Id. at 27-33).

A. NECESSITY FOR DEPOSITIONS

Defendants are correct that as a general rule, a business' senior executives are not to be deposed when they lack first-hand, unique personal knowledge about a plaintiff's claims, and instead possess only second-hand knowledge of the events based upon communications with lower level company employees, and particularly when those lower level employees already have been deposed. See, e.g., Serrano v. Cintas Corp., No. 04-40132, 2010 WL 2490775, at *2 (E.D. Mich. Jun. 10, 2010); Alliance Indus., Inc. v. Longyear Holdings, Inc., No. 08 CV 490S, 2010 WL 4323071, at *2-5 (W.D.N.Y. Mar. 19, 2010: Little League Baseball, Inc. v. Kaplan, No. 08-60544-CIV, 2009 WL 426277, at *1-3 (S.D. Fla. Feb.

10

20, 2009); Diesel Props., S.r.L. v. Greystone Bus. Credit II LLC, No. 07 CIV. 9580 (HB), 2008 WL 5099957, at *1-2 (S.D.N.Y. Dec. 3, 2008); El Camino Res. Ltd. v. Huntington Nat'l Bank, No. 1:07 CV 598, 2008 WL 4833009, at *1-3 (W.D. Mich. Nov. 5, 2008); Harris v. Computer Assocs. Int'l, Inc., 204 F.R.D. 44, 46-47 (E.D.N.Y. 2001). Depositions of senior executives are permissible when such senior executives have had direct involvement in the underlying claims, or if the subordinates are unable to testify in a meaningful fashion at their depositions. See, e.g., Speadmark, Inc. v. Federated Dep't Stores, Inc., 176 F.R.D. 116, 117-18 (S.D.N.Y. 1997); Kuwait Airways Corp. v. Am. Security Bank, N.A., Civ. No. 86-2542, 1987 WL 11994, at *1-4 (D.D.C. May 26, 1987); Amherst Leasing Corp. v. Emhart Corp,, 65 F.R.D. 121, 122-23 (D. Conn. 1974).

While defendants argue that Cueni does not have the "requisite unique knowledge of relevant facts[,]" they continue to offer him as a deponent. (Dkt. #84, at 2; Dkt. #153, at 3). Despite defendants' protestations, the e-mails, by themselves, document that by April 2008 (if not earlier), Cueni was interjected into sufficient aspects of plaintiff's underlying claims such that he possesses unique personal knowledge of relevant facts, and not merely information that was obtained through O'Shea, Sailer, Lynch, Cullen, and Ibis. (Dkt. #143, Exhs. F-J, L-R; Dkt. #153, Exhs. G-I; see also O'Shea Depo. at 206, 209, 214, 217, 278, 643-44; Cullen Depo. at 131, 139). Cueni gathered information regarding these issues, formed his own opinion about them, and communicated directly with plaintiff. (Dkt. #153, Exh. I)

Fraser's involvement, in contrast, was far more fleeting. His role appears to be primarily ensuring that the matter was properly delegated to the appropriate personnel at UBS. (See, e.g., Dkt. #143, Exhs. G, J; see also O'Shea Depo. at 411). The mere fact that plaintiff sent two e-mails to Fraser, on June 16 and 28, 2008, in which he sought

"appropriate action" by Fraser (Dkt. #143, Exhs. Q-R), and to which Fraser never responded, hardly translates into unique personal knowledge. As defendants correctly argue, a plaintiff should not be able to create grounds to depose a senior executive of a company which he or she is suing by sending an e-mail with "the mere click of a mouse." (Dkt. #153, at 6, citing Doble v. Mega Life & Health Ins. Co., No. C 09-1611 (CRB)(JL), 2010 WL 1998904, at *2-4 (N.D. Cal. May 18, 2010)). Fraser's expression of "general support" of O'Shea and Lynch's response to plaintiff's complaints and concern that the matter had received publicity in Bloomberg similarly does not alter this conclusion. (Lynch Depo. at 126-27).

The situation is the same for Marcuse, who was informed of the nature of plaintiff's complaints, and who may have assigned O'Shea the responsibility of researching the valuation outsourcing in 2007; Marcuse, however, did not make the decision to eliminate plaintiff's position, nor did Lynch seek his approval. (Lynch Depo. at 89, 134; O'Shea Depo. at 206). On November 11, 2008, O'Shea sent an e-mail to several people, on which Marcuse was copied, regarding defendants' response to the Bloomberg article. (Dkt. #143, Exh. U). These factors, in combination, do not constitute unique personal information.

Therefore, of the three European executives plaintiff wishes to depose, the only one who possesses unique personal information is Cueni.

B. ATTORNEY-CLIENT PRIVILEGE

Defendants further argue that much of Cueni's potential testimony will be protected by the attorney-client privilege in that many of the communications Cueni had with O'Shea and Lynch, both of whom are attorneys, or with other colleagues at defendant UBS AG were privileged. (Dkt. #84, at 2-3). As previously indicated, Cueni is General Counsel and Chief Risk Officer of UBS Global Asset Management, a division of defendant UBS AG.

In contrast, plaintiff argues that the treatise upon which defendants are relying

indicates that Switzerland does not recognize an attorney-client privilege for inside counsel, such as Cueni, that the burden rests upon defendants to prove that the "predominant purpose" of the communications was to solicit or render legal advice, and that in the Second Circuit, and elsewhere, federal courts have permitted in-house counsel to be deposed, because of their "increased participation in the day-to-day operations of large corporations." (Dkt. #143, at 31-33 & n.6, quoting United States Postal Serv. v. Phelps Dodge Refining Corp., 852 F. Supp. 156, 160 (E.D.N.Y. 1994); see also Exhs. LL, PP-QQ)). See also Chase Manhattan Bank, N.A, v. T & N PLC, 156 F.R.D. 82, 84 (S.D.N.Y. 1994).

Defendants have responded that contrary to plaintiff's claims, they have not asserted a blanket invocation of the attorney-client privilege, as reflected by their production of various e-mails sent or received by Cueni, by their having offered Cueni for deposition, and having produced O'Shea, its General Counsel, for nearly sixteen hours of deposition. (Dkt. #153, at 17, 18). Defendants further recognize that the attorney-client privilege does not apply to an in-house attorney's business-related communications, but emphasize that it still applies to his legal-related communications, so that the "few non-privileged communications" with Cueni would result in a deposition that is "a waste of time and money." (Id. at 18-19). Defendants also posit that plaintiff is cherry-picking which laws should apply, by arguing that the deposition should be held in the U.S. in accordance with the Federal Rules of Civil Procedure (see Section I.C. infra), but that Swiss law should govern on the issue of privilege. (Id. at 17-18).

As plaintiff correctly observes, the treatise upon which defendants rely, entitled "In-House Counsel and the Attorney-Client Privilege – Switzerland," explicitly states: "According to the traditional understanding in Switzerland, the attorney-client privilege is only available to external counsel, but not to an in-house counsel admitted to the bar." (Dkt. #143, Exh.

LL, at 1). Even bearing in mind the more modern approach elsewhere, the treatise nonetheless concludes:

> Despite these sound and reasonable arguments for a protection of the communication with the in-house counsel, it is still the prevailing opinion in Switzerland that an in-house counsel does not enjoy the attorney-client privilege. Therefore, Swiss State courts do not exclude from evidence the production of documents drafted by an in-house counsel or the testimony of an in-house counsel.

(Id.).

Moreover, in summarizing his communications with Cueni (O'Shea Depo. at 206-07, 208-09, 213-17), O'Shea responded that it was "impossible to answer" whether the "primary purpose" of his communications was "[t]o solicit or obtain Cueni's legal guidance and advice . . . [o]r . . . to keep him apprised of an important situation that was developing in [O'Shea's] business unit":

> I mean, in some conversations it might have been to kind of get his legal advice, and in some conversations it might have been to notify him of a development. So it's impossible to kind of generalize as to all of the conversations that I might have had over a period of time with [Cueni].

(Id. at 217). Thus, plaintiff is entitled to inquire as to the communications with Cueni that were of a business nature, that is, keeping him apprised of the developments with plaintiff, but defendants may assert the attorney-client privilege to those communications that took place once the situation shifted from a business decision regarding an employee to one where litigation by an employee was anticipated in the U.S. See, e.g., Astra Aktiebolag v. Andrx Pharmaceuticals, Inc., 208 F.R.D. 92, 100-02 (S.D.N.Y. 2002)(applying American attorney-client privilege despite absence of such a privilege in Korea, where the documents were created).

### C. FEDERAL RULES AND/OR HAGUE CONVENTION

Defendants lastly argue that plaintiff should be required to comply with the "stringent

procedural requirements" of both the Federal Rules of Civil Procedure and the Hague Convention in taking any foreign depositions. (Dkt. #84, at 8; see also Dkt. #153, at 27-30). According to defendants, in the UK, the letter of request must be transmitted through the central authority in London, is to be accompanied by a list of questions to be posed to the witness by the English court, and may request permission for the American attorney to ask questions directly of the witness, which request remains within the discretion of the English court, or alternatively, may seek permission from the English court for an English solicitor to take the testimony of the witness. (Dkt. #84, at 9, citing http://travel.state.gov/law/info/judicial/judicial_671.html).

Plaintiff, in contrast, argues that the depositions should proceed under the Federal Rules of Civil Procedure, not the Hague Convention, and should take place in the United States. (Dkt. #139, at 23-31). Plaintiff argues that in Société Nationale Industrielle Aérospatiale v. U.S. District Court, 482 U.S. 522 (1987), the U.S. Supreme Court made clear that litigants in the U.S. are not required to proceed under the Hague Convention, and that numerous federal courts have ordered foreign residents to appear for deposition in the U.S., including Swiss residents. (Dkt. #139, at 24-28, citing, inter alia, Schindler Elevator Corp. v. Otis Elevator Co., 657 F. Supp. 2d 525, 529-34 (D.N.J. 2009)["Schindler Elevator"](compelling deposition of Swiss party in the U.S.), Ward-THG, Inc. v. Swiss Reassurance Co., No. 96 Civ. 8100 (MBM), 1997 WL 83294, at *1 (S.D.N.Y. Feb. 27, 1997)["Ward-THG"](same), Triple Crown Am. Inc v. Biosynth AG, No. CIV. A. 96-7476, 1998 WL 227886, at *3-4 (E.D. Pa. Apr. 30, 1998)["Triple Crown"](same), Tietz v. Textron, Inc., 94 F.R.D. 638 (E.D. Wis. 1982)(compelling depositions of English witnesses under the Federal Rules), and Sykes Int'l, Ltd. v. Pilch's Poultry Breeding Farms, Inc., 55 F.R.D. 138 (D. Conn. 1972)(same)). Plaintiff further argues that financial considerations also compel that

the depositions take place in the U.S., because otherwise, the parties and their counsel would be required to travel to Europe; plaintiff has offered to reimburse defendants for reasonable travel costs incurred if the depositions cannot be scheduled on dates when those individuals already had plans to come to the U.S. (Dkt. #139, at 28-31). Lastly, plaintiff contends that the depositions need to be held in the U.S. so that they may be supervised. (Id. at 29).

In their reply brief, defendants propose that if any of the depositions are ordered, they should occur in London, so that there is no longer any need to address the unique aspects of Swiss law regarding depositions. (Dkt. #153, at 29, n. 13, 30-33, citing, inter alia, Calixto v. Watson Bowman Acme Corp., No. 07-60077-CIV, 2008 WL 4487679, at *3-4 (S.D. Fla. Sept. 29, 2008)(ordering deposition of Swiss witness to be held in London "or a location otherwise convenient" to the witness)). Defendants assert that none of the proposed deponents travel to the U.S. frequently and have no current plans to travel to the States "in the foreseeable future." (Dkt. #153, at 32). Defendants further argue that at most, three people would need to travel to London – plaintiff's counsel, plaintiff (if he so desired), and one defense counsel. (Id. at 33). Defense counsel also characterized as "insufficient" and "speculative" plaintiff's concerns that the depositions would need to be supervised by the Court here. (Id.). Lastly, defendants requested that if the Court orders that the depositions be held in the U.S., that they occur in New York City, rather than in Hartford, because there are no direct flights from London to Hartford. (Id. at 33, n. 15).

Rule 28(b)(1), which governs the methods for taking depositions in foreign countries, permits such depositions: "(A) under an applicable treaty or convention; [or] (B) under a letter of request, whether or not captioned a 'letter rogatory'[.]"[5] According to defendants,

---

[5] As defendants appropriately argue, the procedures in Rule 28(b)(1)(C) and (D) only apply when a witness appears voluntarily. (Dkt. #84, at 8-9, citing Estate of Yaron Ungar v. Palestinian

16

both of these methods are "in effect, one and the same," in that, as stated above, the UK requires a requesting party to obtain a letter of request before one of its citizens may be deposed. (Dkt. #84, at 9).

This identical issue was addressed less than seventeen months ago in Schindler Elevator, 657 F. Supp. 2d at 527-28, a patent infringement action in which defendant noticed the Rule 30(b)(6) deposition in New Jersey of the Swiss counterclaim defendant in accordance with the Federal Rules. Relying primarily upon Société Nationale, Magistrate Judge Falk held that proceeding under the Hague Convention would unnecessarily delay discovery, in that "utilization of Hague procedures are slow and cumbersome and usually take far longer than discovery procedures under the Federal Rules[,]" and generally are more expensive. Id. at 528-31 (citations omitted). See also Triple Crown, 1998 WL 227886, at *3-4 & n.4.

In Ward-THG, 1997 WL 83294, at *1, in a short opinion, (now former) U.S. District Judge Mukasey permitted "a limited number of depositions" of Swiss nationals to be held in the U.S., based upon plaintiff's willingness "to pay the costs associated with travel and subsistence for the witnesses in question so they can come to this country, which in any event would be cheaper than having the lawyers travel to and sojourn in Switzerland." Similarly, the district judge in Triple Crown, ordered plaintiff to "reimburse defendant[s] for reasonable costs associated with the travel and lodging of [defendants' Swiss] witnesses and to schedule such depositions in a manner which minimizes the time commitment of each deponent and disruption to the operation of defendant[s'] business. This will limit [defendants'] costs and deter plaintiff from unduly prolonging or taking unnecessary

---

Auth., 451 F. Supp. 2d 607, 612 (S.D.N.Y. 2006)).

discovery." 1998 WL 227886, at *4 (citations & footnote omitted). As previously indicated, plaintiff has offered to pay for the reasonable travel expenses incurred if the depositions proceed in the United States. (Dkt. #139, at 30).

Accordingly, the deposition of Cueni shall proceed in accordance with the Federal Rules of Civil Procedure, not with the Hague Convention, and shall take place in the United States, with plaintiff paying for Cueni's reasonable travel expenses incurred. In order to lessen the inconvenience to Cueni, the deposition shall be held in New York City, or in lower Fairfield County, and not in Hartford.

## II. CONCLUSION

Accordingly, for the reasons stated above, plaintiff is entitled to take the deposition of Mario Cueni only, the deposition will be held in New York City or lower Fairfield County and plaintiff will pay for Cueni's reasonable travel expenses incurred, and at that such deposition, plaintiff is entitled to inquire as to the communications with Cueni that were of a business nature, that is, keeping him apprised of the developments with plaintiff, but defendants may assert the attorney-client privilege to those communications that took place once the situation shifted from a business decision regarding an employee to one where litigation by an employee was anticipated in the U.S.

This is not a Recommended Ruling but a Ruling on discovery, the standard of review of which is specified in 28 U.S.C. § 636; Fed. R. Civ. P. 6(a), 6(e) & 72; and Rule 72.2 of the Local Rules for United States Magistrate Judges. As such, it is an order of the Court unless reversed or modified by the District Judge upon timely made objection.

See 28 U.S.C. § 636(b)**(written objections to ruling must be filed within fourteen calendar days after service of same);** Fed. R. Civ. P. 6(a), 6(e) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for

the District of Connecticut; Small v. Secretary, H&HS, 892 F.2d. 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit);** Caidor v. Onondaga County, 517 F.3d 601, 603-05 (2d Cir. 20008)**(failure to file timely objection to Magistrate Judge's discovery ruling will preclude further appeal to Second Circuit).**

Dated at New Haven, Connecticut, this 8th day of February, 2011.

    /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge