## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **RICHARD TRUSZ,** | : | **CIVIL ACTION NO.** |
| **Plaintiff** | : | |
| | : | **3:09-CV-268 (DJS)** |
| **v.** | : | |
| | : | |
| **UBS REALTY INVESTORS LLC,** | : | |
| **and UBS AG,** | : | |
| **Defendants** | : | **MARCH 11, 2011** |
| | : | |

### <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S THIRD MOTION TO COMPEL</u>

**I.    <u>Introduction</u>**

Through this third motion to compel, Plaintiff is asking the Court to order Defendants to comply with discovery requests from Plaintiff's Fourth and Fifth sets of discovery, which have not yet been addressed by this Court, as well as several requests from Plaintiff's First set of discovery, which this Court has addressed previously.  Through these requests, Plaintiff is seeking documents and information that are relevant to a number of claims and defenses in this case, including Plaintiff's protected activity, Defendants' response to that activity, whether Defendants constitute an integrated employer, Plaintiff's damages, and Defendant UBS AG.

Plaintiff is fully cognizant that the parties have burdened the Court with numerous discovery disputes in this case.  Plaintiff regrets that he is required to seek the Court's assistance again with respect to the discovery sought in this motion.  But, Defendants' refusal to provide relevant documents and information has forced Plaintiff to file this motion.  The affidavit of Plaintiff's counsel, and the numerous exhibits filed in support of this motion, clearly demonstrate that Plaintiff's counsel conferred with Defendants' counsel in good faith in an effort to obtain this discovery without additional motion practice.  While the parties were able to agree on some of the issues that were discussed, and Plaintiff

compromised on several issues, Defendants continue to oppose the discovery sought in this motion - - all of which is reasonably calculated to lead to the discovery of admissible evidence.

## II.      Relevant Background Regarding These Discovery Disputes

### A.   Plaintiff's Fourth and Fifth Sets of Discovery Requests

Many of the discovery disputes in this motion relate to Plaintiff's Fourth Set of Interrogatories and Requests for Production ("fourth set"), which were served on August 19, 2010.  (Ex. 1.)  The undersigned and Attorney Ritter first discussed those requests on August 23, 2010.  (Affid. of Todd Steigman, Ex. 2.)  Two days later, on August 25, 2010, the undersigned sent an e-mail to Attorney Ritter regarding that discussion.  (August 25, 2010 e-mail, Ex. 3.)  Attorney Ritter indicated that he would respond the following week, (*id*), but several weeks passed without further communication from Defendants' counsel.  On September 27, 2010, Plaintiff received Defendant's objections and responses to Plaintiff's fourth set of discovery.  (Defs' objections and responses to 4th set of discovery, Ex. 4.)

On October 1, 2010, Plaintiff's counsel sent a letter to Defendants' counsel regarding Defendant's objections and responses.  (October 1, 2010 letter, Ex. 5.)  Defendants' counsel sent a responsive letter on October 15, 2010.  (October 15, 2010 letter, Ex. 6.)  On October 22, 2010, Plaintiff's counsel pointed out that Defendants' responsive letter failed to address two of the issues identified by Plaintiff's October 1, 2010 letter.  (October 22, 2010 e-mail, Ex. 7.)  On October 22, 2010, Plaintiff's counsel also asked Defendants' counsel when they were available the following week to discuss outstanding discovery issues.  (*Id.*)  Having not received a response, Plaintiff's counsel wrote again on October 26, 2010 and asked Defendants' counsel when they were available to discuss outstanding discovery issues.  (October 26, 2010 e-mail, Ex. 8.)

On October 27, 2010, Defendants served their objections and responses to Plaintiff's fifth set of requests for production (hereinafter "fifth set")(Ex. 9), which had been served the previous month.

From late October through early December 2010, Plaintiff's counsel continued asking Defendants' counsel when they were available for a telephone call to discuss outstanding discovery issues.  (October 29, 2010 & November 2, 2010 e-mails, Ex.  10.)  In response to a request by Defendants' counsel, Plaintiff's counsel identified the issues that he wanted to discuss in a subsequent communication on November 2, 2010.  (Ex.  10.)  On November 17, 2010, and again on December 6, 2010, Plaintiff's counsel wrote again and asked Defendants' counsel when they were available to discuss outstanding discovery issues.  (November 17, 2010 & December 6, 2010 e-mails, Ex.  11.)

On December 10, 2010, counsel for the parties discussed many discovery issues, including the disputes at issue in this motion.  Plaintiff's counsel sent an e-mail later that day summarizing the conversation.  (December 10, 2010 & December 13, 2010 e-mails, Ex.  11.)

On January 6, 2011, Defendants' counsel sent an e-mail providing an update on the topics that were discussed the previous month.  (Alkhas January 6, 2011 e-mail, Ex.  12.)  Plaintiff's counsel responded that same day, with underlined comments addressing each of the points listed in the e-mail from Defendants' counsel.  (Steigman January 6, 2011 e-mail, Ex.  13.)

On January 11, 2011, Plaintiff's counsel wrote again regarding several of the discovery disputes that the parties had been discussing, and which were identified in the e-mail communications on January 6, 2011.  (Steigman January 11, 2011 e-mail, Ex.  14.)  Later on January 11, 2011, Defendants' counsel provided another response regarding the issues that were being discussed, by listing additional comments in CAPS.  (Alkhas January 11, 2011 e-mail, Ex.  15.)

In January and February 2011, the parties continued discussing issues relating to a number of discovery issues, including the production of electronically stored information.  (*See* sections II.B & IV.A, B, C, *infra*.)  Pursuant to those discussions, Defendants produced additional communications that Paul Marcuse and Mario Cueni exchanged with representatives of UBS Realty in the United States that

they determined were relevant, in response to Plaintiff's 4th set of discovery.  (February 28, 2011 &

March 1, 2011 e-mails, Ex.  16.)  Defendants refused, however, to disclose the criteria used to determine

relevancy, or the number of e-mails between the European executives and UBS Realty senior

management that were withheld.  (March 2, 2011 e-mail, Ex. 17.)

Despite diligent efforts to meet and confer, it is clear that the parties disagree on the following

discovery sought by Plaintiff as part of Plaintiff's fourth and fifth sets of discovery requests (Exs. 4, 9):

- <u>Request No. 169</u>:  documents concerning the termination of another Managing Director in UBS Global Asset Management;

- <u>Request No. 184</u>:  UBS Whistleblowing Reports;

- <u>Interrogatory No. 24</u>:  Compensation Plaintiff Would Have Received but for termination;

- <u>Interrogatory No. 25</u>:  UBS AG Reasonable Inquiry regarding Requests for Admission;

- <u>Request Nos. 163-165</u>:  Communications Among European Executives Regarding UBS Realty;

- <u>Request Nos. 145-47, 157-59, 160-62, 181</u>:  Communications Between European Executives and Senior Management of UBS Realty;

- <u>Request Nos. 178-79</u>:  UBS Policies that Apply to UBS Realty;

- <u>Request Nos. 155-56</u>:  Documents concerning UBS Group Executive Board and Group Management Board.

B.   <u>Additional Discussions Concerning Plaintiff's First Set of Discovery</u>

On January 13, 2011, the Court granted Defendants' motion for reconsideration and reversed the

previous ruling ordering Defendants to respond to several requests contained in Plaintiff's first set of

requests for production, including Request Nos. 24, 26, 28, 30, 39, and 139.[1]  (Doc. No. 167.)

In accordance with the Court's January 2011 Ruling granting reconsideration, counsel for the

parties engaged in further telephonic and written communications regarding these requests.  Counsel for

---

[1] These requests were discussed in the Rulings on Plaintiff's First Motion to Compel, (Doc. No. 62), and Second Motion to Compel (Doc. No. 124), and Ruling granting Defendants' motion for reconsideration (Doc. No. 167).

the parties participated in a telephone call on January 26, 2011, after which Defendants' counsel sent a letter on January 28, 2011 (January 28, 2011 letter, Ex.  18).  On February 2, 2011, Plaintiff's counsel sent a letter requesting additional production in response to Request Nos. 24, 26, 28, 30 (which seek electronically stored documents and communications, No. 39 (which seeks documents regarding the valuation errors disclosed during Plaintiff's employment), and Nos. 115, 116, 118, 132, 133, and 139 (which seek communications with clients and consultants regarding Plaintiff's employment, valuation errors, and this litigation).  (February 2, 2011 letter, Ex.  19).  In that letter, Plaintiff also proposed a process that should be employed for the collection of relevant electronically stored information.  (*Id.*)

Counsel for the parties participated in a telephone call on February 7, 2011, and Plaintiff's counsel sent e-mail correspondence on February 7, 2011.  (February 7, 2011 e-mail, Ex.  20). Defendants' counsel responded with a letter on February 16, 2011, which made clear that the parties were still at an impasse with respect to at least some of the issues[2] (February 16, 2011 letter, Ex.  21).

Nevertheless, the parties continued to confer about those issues on which some level of agreement could be reached, and disputes could be narrowed.  On February 28, 2011 and March 1, 2011, Defendants produced additional documents in response to Request No. 39, and e-mails exchanged between Mr. Cueni and Paul Marcuse and UBS Realty that Defendants determined were relevant and non-privileged.  (February 28, 2011 and March 1, 2011 e-mails, Ex.  16.)  Plaintiff asked additional questions regarding Defendants' failure to produce other documents requested pursuant to Request No. 39, and asked for information about communications between UBS Realty and Messrs. Fraser, Marcuse, and Cueni that Defendants determined were not relevant.  (March 1, 2011 e-mails, Ex. 17.)  On March 2, 2011, Defendants' counsel communicated that they would not provide the information Plaintiff requested.  (March 2, 2011 e-mail, Ex.  17.)  On March 4, 2011, Defendants' counsel communicated that

---

[2] Plaintiff's counsel promptly responded to communicate disagreement with Defendants' characterization of a previous conversation.  (February 16, 2011 e-mail, Ex.  22.)

Defendants would not agree to produce the additional information Plaintiff sought in response to Request No. 39.  (Ex. 23.)

Despite diligent efforts to meet and confer, it is clear that the parties still disagree on the following discovery sought by Plaintiff as part of Plaintiff's first sets of discovery requests (Ex. 24):

- <u>Interrogatory No. 10 & Request No. 58-59</u>:  Copies of the <u>two</u> side letter agreements about which Plaintiff principally complained before his termination:  Chevron & Boeing;

- <u>Request Nos. 24, 26, 28 & 30</u>:  Electronically stored information from specific people, using specific search terms, during a specific time period, using parameters that are reasonably calculated to lead to the discovery of admissible evidence that refer or relate to the allegations in the lawsuit (No. 24), complaints made by Plaintiff to employees of Defendants, (No. 26), the termination of Plaintiff's employment (No. 28), and Defendants' request for Plaintiff to leave UBS on June 30, 2008 (No. 30);

- <u>Request No. 39</u>:  specific documents regarding a handful of properties about which valuation errors were reported before Plaintiff's termination.

## III.   <u>Discovery Sought in Fourth and Fifth Sets of Discovery Requests</u>

### A.   <u>Documents Concerning Termination of Managing Director in Global Asset Management Who Complained of Retaliation</u>

On January 15, 2010, in response to this Court's Ruling on Plaintiff's first motion to compel, UBS identified other Managing Directors within the "Americas" division of UBS Global Asset Management who had been involuntarily terminated.  (January 15, 2010 letter at pp. 2-3, Ex. 25.)  As part of that production, UBS supplied a spreadsheet that provided information regarding the individuals who had been terminated, including whether any of the employees complained about discrimination, retaliation, or any other type of illegal or unethical conduct.  The spreadsheet revealed that one of the Managing Directors, with initials D.L., had complained about retaliation, and was terminated based on an involuntary redundancy - - the same explanation provided by UBS for Plaintiff's termination. (UBS15765 & UBS15767, Ex. 26, filed under seal.)

As part of Plaintiff's Fourth set of discovery, Plaintiff sought "all documents concerning any complaints of retaliation made by [D.L.], who is identified on document UBS 15765 and UBS 15767."

(Req. Prod. No. 169, Ex. 1.)  Defendants objected to this request, on the grounds that it was "overly broad and seeks documents that are not relevant to this matter or not reasonably calculated to lead to the discovery of admissible evidence."  (Obj. Req. Prod. No. 169, Ex. 4.)  Defendants also asserted that D.L. is not a party to this lawsuit, is not referenced in any allegation or defense to this lawsuit, and was never a UBS Realty employee.  (*Id.*)

Evidence regarding discrimination or retaliation against other employees by the defendant is relevant to the issue of the employer's intent.  *Spulak v. K-Mart Corp.*, 894 F.2d 1150, 1156 (10th Cir. 1990)(and cases cited therein); *Philip v. ANR Freight Systems, Inc.*, 945 F.2d 1054, 1056-57 (8th Cir. 1991); *Zubulake v. UBS Warburg LLC*, 382 F. Supp. 2d 536, 544-46 (S.D.N.Y. 2005); *Ri Sau Kuen Chan v. NYU Downtown Hosp.*, 2004 WL 1886009 **4-6 (S.D.N.Y. Aug. 23, 2004) .  *See also Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1423-24 (7th Cir. 1986)(considering evidence of discrimination against other employees).  As the D.C. Circuit explained in a case in which it reversed the district court's decision to exclude testimony from other employees regarding retaliation, "evidence showing that the employer followed a broad practice of retaliation and responded to any protected criticism with disciplinary action has some probative value on the issue of the employer's likely motivation here." *Morris v. Washington Metropolitan Area Transit Auth.*, 702 F.2d 1037, 1046 (D.C. Cir. 1983).

The documents concerning D.L.'s complaint of retaliation are reasonably calculated to lead to the discovery of admissible evidence.  D.L. was a Managing Director within the Americas division of Global Asset Management – a division that this Court already ruled was within the scope of permissible discovery in the Ruling on Plaintiff's first motion to compel.  (Doc. No. 62, at pp. 12-13.)  D.L. also had the same job title as Plaintiff – "Sr. Manager (Sup)", and UBS asserts the same reason for involuntarily terminating the employment of D.L. and Plaintiff – "involuntary redundancy."  (UBS 15765 & UBS

15767, Ex. 26, filed under seal.)  Additionally, D.L. was terminated on August 2, 2009, (*id.*), less than a year after Plaintiff received the August 13, 2008 letter terminating his employment.

D.L.'s position also caused him to interact with the same people who retaliated against Plaintiff. D.L. participated in meetings of the Global Asset Management Risk Committee, along with Thomas O'Shea, Mario Cueni, and John Fraser.  (UBS 23683-696, Ex. 27, filed under seal.)  In fact, documents reveal that D.L. participated in at least one meeting of the UBS Global Asset Management Risk Committee at which Mr. O'Shea discussed the fact that UBS terminated Plaintiff's employment after Plaintiff had filed legal claims against the company.  (UBS 23695, Ex. 27, filed under seal.)  By virtue of his position, D.L. also wrote memos to John Fraser and Mario Cueni.  (*e.g.*, UBS 23697-23702, Ex. 28, filed under seal.)  As a member of the Risk Committee with responsibility for risk control, it is likely that D.L. reported, at least indirectly, to Mr. Cueni, Chief Risk Officer for Global Asset Management.

Thus, these documents dispel the notion that D.L. was far removed from the individuals who Plaintiff claims retaliated against him.  In fact, to the contrary, they prove that D.L. interacted with the same individuals who are accused of retaliating against Plaintiff, and that D.L.'s position was structurally aligned close enough to Plaintiff's position that D.L. participated in meetings at which Plaintiff's termination and legal claims were discussed.  D.L. also wrote memos to Mr. Fraser and Mr. Cueni.  Given D.L.'s position and structural reporting relationship, it is reasonably likely that Mr. Cueni was involved with this complaint of retaliation in some fashion.  Since D.L. was a Managing Director in Global Asset Management, was located in Connecticut, and was involuntarily terminated based on a redundancy less than one year after Plaintiff, it is also likely that some of the same individuals that approved Plaintiff's termination (such as Kiku Taura, the head of Human Resources for Global Asset Management) similarly approved D.L.'s termination.  There is a sufficient nexus between the circumstances of the retaliation claims of Plaintiff and D.L. to mandate compliance with this discovery.

UBS objects on the grounds that D.L. is not a party and was not an employee of UBS Realty, but those factors should not be dispositive.  If non-party status was a valid basis for precluding such discovery, then discovery of complaints of discrimination or retaliation by other employees would never be allowed.  The fact that D.L. was not an employee of UBS Realty should also not preclude this discovery.  As the Court is aware, Plaintiff is alleging that Defendants are an integrated employer.  Therefore, discovery should not be limited to just UBS Realty.  Plaintiff is also alleging that senior executives within Global Asset Management, such as Mr. Fraser, Mr. Cueni, and Mr. Marcuse, were involved in the retaliation against him, and Plaintiff's boss, Mr. O'Shea, reported directly to Mr. Cueni.  In the context us this case, a categorical rule prohibiting this discovery because D.L. was not an employee of UBS Realty would be akin to the categorical rule rejected by the Supreme Court in *Sprint/United Mgmt. Co. v. Mendelsohn*, 128 S. Ct. 1140 (2008).  Consistent with the fact specific inquiry mandated by the Court in *Sprint*, courts have allowed discovery of complaints by other employees, even those employees who worked in different locations under different supervisors.  *See, e.g., Gibson v. Servicemaster Co.*, No. 1:08-cv-210, 2009 WL 1607710 (E.D. Tenn. June 8, 2009).

    B.    <u>Quarterly Whistleblowing Reports</u>

During 2008, Plaintiff's complaints were disclosed internally at UBS and described in the UBS AG Group Whistleblowing reports.  In response to a request by Plaintiff for UBS to provide these reports, Defendants produced two Whistleblowing reports for the second quarter and third quarter of 2008.  (Whistleblowing reports, redacted, Ex. 29, filed under seal.)  Plaintiff requested that Defendants produce these reports in their unredacted form, but Defendants refused.  As part of Plaintiff's fifth set of discovery, Plaintiff sought all UBS Whistleblowing reports since 2007.   Defendants objected.  (Req. No. 184, Ex. 4.)(*See also* 12/10/2010 e-mail (Ex. 11), & 1/6/2011 & 1/11/2011 e-mails (Exs. 12-15).)

These Whistleblowing reports are reasonably calculated to lead to the discovery of admissible evidence for several reasons.  First, to the extent that UBS disciplined or terminated the employment of other employees whose complaints were included in a Whistleblowing report, that information would be probative of how UBS responds to employees who engage in protected activity.[3]  *Morris v. Washington Metropolitan Area Transit Auth.*, 702 F.2d 1037, 1046 (D.C. Cir. 1983); *Worthington v. County of Suffolk*, No. 02-cv-723, 2007 WL 2115038 *4 (E.D.N.Y. July 20, 2007).  Conversely, if UBS did not terminate the employment of other individuals whose complaints were included in the Whistleblowing reports, or treated other employees differently than Plaintiff, that information would also be reasonably calculated to lead to the discovery of admissible evidence.  For instance, if UBS installed safeguards or followed procedures to protect other employees in the Whistleblowing reports from retaliation, but did not install those safeguards or procedures to protect Plaintiff, that disparate treatment would be relevant.

The additional information in the Whistleblowing reports is also relevant because UBS included the complaints by those other employees in the same report in which Plaintiff's complaints were disclosed.  Therefore, information about the other complaints contained in the Whistleblowing reports will provide more context and insight into how UBS perceived Plaintiff's complaints.  In their Answer, Defendants deny that Plaintiff had a reasonable, good faith belief in the complaints that he made. (Answer ¶¶ 107, 185, 197, 218 (Doc. No. 108).)  Since UBS included Plaintiff's complaints in the Whistleblowing reports, a review of the other complaints that UBS included in the Whistleblowing reports is reasonably calculated to lead to the discovery of admissible evidence related to Defendants' perception and understanding of Plaintiff's complaints. A review of the other complaints included in the

---

[3] To probe this area of relevance during Rule 37 good faith discussions, Plaintiff's counsel inquired whether other employees of UBS who made complaints and were included in the Whistleblowing Reports had also been disciplined or terminated like Plaintiff.  Defendants' counsel would only confirm that no other employees of UBS Realty were referenced in the Whistleblowing Reports, (January 6, 2011 and January 11, 2011 e-mails, Exs.  13, 15), but failed to provide any information for any other UBS entity.

Whistleblowing reports would also provide more context and insight into the purpose of these reports, the types of complaints that are deemed "reportable," and how UBS officials use these reports.

The other Whistleblowing reports are also relevant to UBS's application and enforcement of the UBS Group Whistleblowing policy, which prohibits retaliation against employees who make protected complaints.  (Group Whistleblowing policy, Ex. 30, filed under seal.)  That policy applies equally to all divisions of UBS; it is not limited to UBS Realty, or even Global Asset Management.  UBS included Plaintiff's complaint in its Whistleblowing policy, thereby acknowledging that Plaintiff's complaint qualified for protection under the Whistleblowing policy.  UBS witnesses have also acknowledged that the UBS Group Whistleblowing policy applied to Plaintiff's complaints and that Plaintiff was protected under that policy. (Menard Depo. at 154, Ex. 31.)  The other Whistleblower reports will shed further light on how UBS applies and enforces the UBS Group Whistleblower policy, through a discussion of how it responded to other whistleblowing complaints that fell within the scope of that policy, and treated other employees who were also "protected" under the UBS Group Whistleblowing policy.  Plaintiff claims that both Defendants – UBS Realty and UBS AG – retaliated against him.  Defendants cannot disregard that fact and prohibit discovery regarding one of the parties – UBS AG.

The information in the Whistleblowing reports would also reveal more information regarding UBS's corporate culture, and its tolerance for employees who engage in protected speech.  Plaintiff alleges that senior officials of UBS, in the U.S. and in Europe, intentionally violated the law and retaliated against him.  It is also apparent that senior human resources officers at UBS were complicit in the retaliation against Plaintiff.  Defendants identify Ana Ibis Seebrath – head of human resources for UBS Global Real Estate - as one of the decisionmakers who terminated Plaintiff's employment.  Defendants also acknowledge that Kiku Taura, head of human resources for Global Asset Management, approved the termination of Plaintiff's employment.  Mr. Cueni reports to the General Counsel for the

UBS Group, Marcus Diethelm.  As a member of the UBS Group Executive Board and the head of UBS Global Asset Management, Mr. Fraser reports to the Chairman of the UBS Group.  None of these individuals involved have been reprimanded for their actions against Plaintiff.  They have all retained their positions of authority at UBS.  Despite Plaintiff's serious allegations, UBS has apparently not even investigated whether these individuals retaliated against Plaintiff by terminating his employment.  (O'Shea Depo. at 632-33, Ex. 32.)  Even in the absence of an investigation, Mr. Fraser has continued to fully support the actions taken by Mr. Lynch and Mr. O'Shea.  (Lynch Depo. at 126-27, Ex. 33.)

"The Court may also consider as circumstantial evidence the atmosphere in which the company made its employment decisions."  *Josey v. John Hollingsworth Corp.*, 996 F.2d 632, 641 (3d Cir. 1993).  "Corporate discrimination does not occur in a vacuum.  Discrimination feeds on the actions and statements of those involved in the corporate culture."  *Hamlin v. Alliant Techsystems, Inc.*, 636 N.W. 2d 150, 154 (Minn. Ct. App. 2001)(citing Rebecca H. White & Linda H. Krieger, *Whose Motive Matters? Discrimination in Multi-Actor Employment Decision-Making*, 61 La. L. Rev. 495, 509 (2001)).  *See also Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87 (2d Cir. 2001)(holding that evidence of corporate culture is relevant to a circumstantial case of discrimination); *Heyne v. Caruso*, 69 F.3d 1475, 1479 (9th Cir. 1995).  Here, the Whistleblowing reports are reasonably calculated to lead to the discovery of admissible evidence because they will contain information regarding the corporate culture at UBS, including its tolerance for employees who engage in protected complaints.  The Whistleblower reports will also likely provide more information about the corporate environment at UBS, an environment in which senior officials could terminate Plaintiff's employment under circumstances that result in a clear inference of retaliation without UBS conducting any investigation into whether any retaliatory motive was present.

Plaintiff is also seeking punitive damages.  If Defendants intend to defend against the claim for punitive damages by asserting that UBS had a policy that prohibited retaliation against whistleblowers and enforced that policy in good faith, the information contained in the Whistleblowing report would obviously be relevant to rebut that defense.  *See Kuper v. Blue Cross & Blue Shield*, No. 99 Civ. 1190, 2003 WL 359462 **5-6 (S.D.N.Y. Feb. 18, 2003)(rejecting defendant's argument on good faith defense to punitive damages due to lack of evidence of good faith enforcement of anti-discrimination policy).

For those reasons, the Court should order Defendants to fully respond to Request No. 184, and produce unredacted versions of the Whistleblowing reports that were previously produced.

C.       Interrogatory No. 24 – Compensation Plaintiff Would Have Received

Through Interrogatory No. 24, Plaintiff asked Defendants to identify the compensation and value of benefits that Plaintiff would have received after June 30, 2008 if he remained an employee of UBS. (Ex. 1.)  Defendants objected, asserting that the request was "overly broad and unduly burdensome, calls for speculation, and seeks information that is already in Plaintiff's possession."  (Ex. 4.)

This request is not overly broad or unduly burdensome, as it is limited to the value of wages and benefits that Plaintiff would have received if his employment continued.  This request does not call for speculation, as UBS can answer this request based on its knowledge of Plaintiff's compensation and benefits before June 30, 2008, and its knowledge of how compensation has progressed at UBS since June 30, 2008.  Other courts have previously ordered defendants to answer interrogatories of this nature. *See, e.g., Magnello v. TJX Companies, Inc.*, 2007 WL 4105322 *2 (D. Conn. Nov. 15, 2007)(ordering defendant to fully respond to interrogatory No. 19 and identify the wages, fringe benefits and dollar value cost to Defendant of wages and compensation that Plaintiff would have received, assuming that the plaintiff had been hired for a position).  The *Magnello* court ordered the defendant to respond to a similar interrogatory even though *Magnello* was a failure to hire case, not a termination case.  If

13

anything, there is a stronger argument to be made for compliance in this case than in *Magnello*.  Here, Defendant is asked to calculate the expected compensation and benefits of a terminated employee with a long employment and compensation history to use as a basis for a response.  In *Magnello*, the Court ordered the defendant to calculate the wages and benefits for a plaintiff who was never hired, and therefore had no employment or compensation history with the defendant to use as a basis to respond.[4]

D.    Interrogatory 25 – Description of Reasonable Inquiry by UBS AG Under Rule 36

Throughout this litigation, UBS AG has attempted to avoid compliance with Plaintiff's discovery requests.  The dispute regarding Interrogatory No. 25 is another example of that strategy.  On May 21, 2009, Plaintiff served his first set of Requests for Admission.  In response to a letter from Plaintiff regarding deficiencies in Defendant's initial responses, Defendants served their revised responses on June 17, 2010.  (Ex. 34.)  One revision made by Defendants in the revised responses was to include a certification, as required by Fed. R. Civ. P. 36(a)(4), that UBS AG made a reasonable inquiry for each item that it refused to admit for a lack of information.  (Defs' Revised Responses to Req. Adm., Nos. 34-36, 38-39, 41-49, 52-143, 146-159, 163-193, 199-200, 204, 209-214, 224-234, and 237-268, Ex. 34.)

Since many of the requests dealt with subjects that one would expect UBS AG to be able to answer if it had conducted a reasonable inquiry, Plaintiff served an interrogatory asking UBS AG to detail the reasonable inquiry that it certified was conducted.  For instance, one would expect that UBS AG should be able to answer whether members of its Group Executive Board and Group Management Board discussed Plaintiff's termination (Nos. 34-35), or whether John Fraser (a member of the UBS AG Group Executive Board) or Paul Marcuse (member of UBS AG Group Management Board) received or

---

[4] While UBS referred to documents in its response, subject to the objections, it is not clear how the information contained in those documents identifies the compensation and value of benefits that Plaintiff would have received if his employment continued after June 30, 2008.  Those documents do not set forth Defendant's calculation of the amount of compensation and value of benefits Plaintiff would have earned after June 30, 2008 if UBS did not terminate his employment.

authored documents concerning Plaintiff's termination or Plaintiff's complaints (Nos. 36, 38, 39, 41). One would also expect that, after a reasonable inquiry, UBS AG would be able to admit or deny requests that UBS Realty (its wholly-owned subsidiary that is represented by the same counsel) had sufficient information to admit or deny.  (Req. Nos. 36, 38, 39, 41-43, 46-49, 52-143, 146-147, 149-153, 155-159, 163-170, 172-193, 199-200, 204, 209-214, 224-234, 237-248, 253-268.)  One would also expect UBS AG, after a reasonable inquiry, to be able to admit or deny requests relating to a letter signed by its counsel in this action, Attorney Ritter.  (Req. Nos. 155-57.)  One would also expect UBS AG, after a reasonable inquiry, to be able to admit or deny requests relating to Mr. Cueni, who is a member of its Group Management Board, the General Counsel for its Global Asset Management division, and a UBS AG employee.  (Req. No. 204.)  One would also expect UBS AG, after a reasonable inquiry, to be able to admit or deny requests relating to Mr. Fraser, who is a member of the UBS AG Group Executive Board and the CEO of its Global Asset Management division.  (Req. Nos. 224, 237-238, 264.)  Yet, for all of those requests, UBS AG certified that it made a reasonable inquiry under Rule 36, but still lacked knowledge to admit or deny the assertions.

Under those circumstances, Plaintiff has a right to question the adequacy of the "reasonable inquiry" that UBS certified it undertook.  *Uniden America Corp. v. Ericsson Inc.*, 181 F.R.D. 302, 304 (M.D.N.C. 1998)(describing the "reasonable inquiry" that a party must perform under Rule 36); *Tequila Centinela, S.A. de CV v. Bacardi & Co. Ltd.*, 242 F.R.D. 1, 15 (D.D.C. 2007); *Bouchard v. U.S.*, 241 F.R.D. 72, 76-77 (D. Me. 2007); *Henry v. Champlain Enterprises, Inc.*, 212 F.R.D. 73, 78 (N.D.N.Y. 2003); *U.S. ex rel. Englund v. Los Angeles County*, 235 F.R.D. 675, 685 (E.D. Cal. 2006); *Brown v. Arlen Mgmt. Corp.*, 663 F.2d 575, 580 (5th Cir. 1981)(court was within discretion to deem requests admitted for failure to make reasonable inquiry).

Given the questionable nature of UBS AG's "reasonable inquiry," Plaintiff's Interrogatory No. 25 serves the purposes of Rule 36, and is also reasonably calculated to lead to the discovery of admissible evidence. If a request for admission asks a respondent to admit an assertion that is relevant and within the scope of permissible discovery, then information regarding the "reasonable inquiry" necessary to respond to that request must also be within the scope of permissible discovery. If a party consults a document as part of its reasonable inquiry, the identity of the document(s) consulted may lead to the discovery of admissible evidence. If a party seeks information from an employee or official as part of its reasonable inquiry, then the identity of that employee - or the information gleaned from that employee - may also lead to the discovery of admissible evidence. *See* Fed. R. Civ. P. 26(1)(explicitly stating that scope of discovery includes "the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter.").

Moreover, Plaintiff must have a means of assuring that UBS AG undertook a reasonable inquiry that satisfies the requirements of Rule 36.

> We are not persuaded that an answer to a request for admission necessarily complies with Rule 36(a) merely because it includes a statement that the party has made reasonable inquiry and that the information necessary to admit or deny the matter is not readily obtainable by him. The discovery process is subject to the overriding limitation of good faith. Callous disregard of discovery responsibilities cannot be condoned. *See Campbell Indus. v. M/V Gemini,* 619 F.2d 24, 27 (9th Cir. 1980). The abuses of the current discovery rules are well documented. In our view, permitting a party to avoid admitting or denying a proper request for admission simply by tracking the language of Rule 36(a) would encourage additional abuse of the discovery process. Instead of making an evasive or meritless denial, which clearly would result in the matter being deemed admitted, a party could comply with the Rule merely by having his attorney submit the language of the Rule in response to the request. Since a district court may order that a matter is admitted only if an answer does not "comply" with the requirements of the Rule, it could be argued that the only sanction for a party's willful disregard of its obligation to make reasonable inquiry would be an award of the expenses of proving the matter at trial pursuant to Rule 37(c). Without disparaging the deterrent effect of such a sanction, we believe that restricting the district court's discretion in this manner would reduce a

16

litigant's obligation to make "reasonable inquiry" into a mere semantic exercise, and thus severely undermine the policy embodied in Rule 36(a) of limiting the issues before trial.

*Asea, Inc.*, 669 F.2d at 1246-47.  "Considering the close personal, business and litigation relationship between defendants, the failure of each defendant to comply with Rule 36(a) and to make a reasonable inquiry that includes, at a minimum, an inquiry of the other defendants represented by the same counsel, is a clear evasion of that party's obligations under Rule 36(a)."  *A.Farber & Partners, Inc. v. Garber*, 237 F.R.D. 250, 256 (C.D. Cal. 2006)(citing *Asea, Inc. v. Southern Pac. Transp. Co.*, 669 F.2d 1242, 1247 (9th Cir. 1981); *Uniden America Corp.*, 181 F.R.D. at 304).

Defendants' objections to this request are without merit. It is not overly broad or unduly burdensome.  (Defs' Obj. Int. 25, Ex.  4.)  It is limited to those requests that UBS AG certified that it could not admit or deny based on a lack of knowledge, after a reasonable inquiry.  Defendants have not made any representations about how burdensome it would be to respond. For instance, if UBS AG completely failed to do anything as part of its "reasonable inquiry," then there would be no burden on UBS AG to respond.  In addition, this subject is not better suited for a deposition.[5]  Plaintiff should not have to incur the additional expense to pay for a deposition on this subject at this juncture.  UBS AG's failure to admit or deny these requests raises serious questions as to how it could have performed a "reasonable inquiry" that satisfies the requirements of Rule 36, and still lacked sufficient information to admit or deny.  In that circumstance, the burden should fall upon Defendants - - not Plaintiff - - to respond to this Interrogatory and identify the actions taken as part of the "reasonable inquiry."

Lastly, Defendants' objection based on *Safeco v. Rawston*, 181 F.R.D. 441 (C.D. Cal. 1998), is without merit.  Unlike *Safeco*, Plaintiff's Interrogatory 25 does not ask either Defendant to provide facts

---

[5] If the Court agrees with Defendants that this is a topic better suited for a deposition, then Plaintiff requests that the deposition be done at Defendants' expense – since Plaintiff tried to obtain this information through a much more efficient and less expensive method of discovery.  Plaintiff also requests that the Court declare that a deposition on this topic not be counted towards the 18 deposition limit that the Court previously imposed.

supporting each denial.  Plaintiff's Interrogatory 25 is asking UBS AG to provide information about the "reasonable inquiry" that it certified was undertaken for those requests where the adequacy of the "reasonable inquiry" is clearly suspect.  There must be a means of compelling a party to provide information about the "reasonable inquiry" that the party certifies was undertaken when there are serious questions about the adequacy (or inadequacy) of the "reasonable inquiry."  A motion to compel under Rule 36 and Rule 37 should not be the exclusive or preferred means to compel the disclosure of that information; Plaintiff should be able to obtain information about the "reasonable inquiry" before filing the motion in order to determine whether a motion is warranted.  UBS AG should be required to fully respond to Interrogatory 25 so that Plaintiff can assess whether the "reasonable inquiry" certified by UBS AG satisfied the requirements of Rule 36.

       E.      <u>Communications Among Fraser, Cueni, and Marcuse</u>

       1.     *Communications Concerning UBS Realty Investors*

Through document request Nos. 163 through 165, Plaintiff seeks all communications between John Fraser, Mario Cueni, and Paul Marcuse concerning UBS Realty between October 1, 2007 and December 31, 2008.[6]  (Request Nos. 163-165, Ex.  4.)  These requests principally seek documents relevant to establishing that Defendants are an integrated employer.  To the extent that Fraser, Cueni, and Marcuse communicate with each other regarding UBS Realty, then those communications are likely to lead to the discovery of admissible evidence regarding (i) interrelation of operations, (ii) centralized control of labor relations, (iii) common management, and (iv) common ownership of financial control.  *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240-41 (2d Cir. 1995).

Communications among Fraser, Cueni, and Marcuse regarding UBS Realty are also reasonably calculated to lead to the discovery of admissible evidence regarding their involvement in the response by

---

[6] As originally drafted, the scope of these requests was June 1, 2007 through December 31, 2008.  During Rule 37 conferences, Plaintiff agreed to limit these requests to the time period of 10/1/07 through 12/31/08.

UBS to Plaintiff's complaints, and the termination of Plaintiff's employment.  If the communications make direct reference to Plaintiff, or his claims, or a vague reference to the "employee matter" or "employee issue" -- as UBS employees did when writing about Plaintiff -- then those communications would obviously be relevant.  In addition, communications between these individuals regarding UBS Realty could also lead to circumstantial evidence, or evidence that would allow a permissible inference, that these individuals were involved in - - or approved - - the termination of Plaintiff's employment.  For instance, if the communications revealed that Fraser, Marcuse, and Cueni communicated about, or provided approval for, decisions at UBS Realty that were less significant than the complaints made by Plaintiff, or the termination of Plaintiff's employment, then those communications could provide a basis for an inference that they must have been involved in decisions as significant as how to respond to Plaintiff's complaints, or whether to terminate Plaintiff's employment.

Defendants object to these requests on the grounds that they are overly broad, seek documents that are not relevant or not reasonably calculated to lead to the discovery of admissible evidence.  (Defs' Obj. Nos. 163-165.)  For the reasons already cited, these requests do seek relevant information and the documents sought are reasonably calculated to lead to the discovery of admissible evidence.  These requests are also not overly broad.  They are limited to communications regarding UBS Realty among three executives at UBS Global Asset Management who are responsible for the oversight of UBS Realty, and the supervision of its President and General Counsel.  These requests are also properly limited as to temporal scope.  The start of the time period – October 1, 2007 – is one day before the meeting of the Global Real Estate Management Committee where Mr. Marcuse tasked Mr. O'Shea with a review of outsourcing a portion of the valuation function at UBS Realty.  The end of the time period  - December 31, 2008 – is one month after the publication of the article by Bloomberg regarding the litigation between Plaintiff and Defendants.  It is also just a few months after Defendants terminated

Plaintiff's employment, and during the time period that UBS Realty was transitioning a portion of its valuation function to PricewaterhouseCoopers.

Plaintiff tried to confer in good faith with Defendants regarding the scope of these requests in an effort to address Defendants' concerns. Plaintiff tried to discuss these requests with Defendants' counsel in August 2010 – before Defendants' responses were due – and then again in the time period following Defendants' objections. (August 25, 2010 e-mail, Ex. 3; October 1, 2010 letter, Ex. 5.) In those discussions, Plaintiff's counsel invited Defendants to make proposals that would facilitate the discovery of relevant communications. Since Defendants are more knowledgeable about the communications that Cueni, Marcuse, and Fraser exchanged concerning UBS Realty, Defendants' input obviously would have been helpful to address Defendants' concerns about the scope of these requests. *The Case for Cooperation*, 10 Sedona Conf. J. 339, 344 (2009)(recognizing that "knowledge of the responding party's data is usually assymetrical"). But, at every turn, Defendants refused to provide any suggestions or proposals to address concerns about the scope of these requests.

Defendants also object to the requests relating to communications with Mr. Cueni on the grounds of the attorney-client privilege and work product doctrine. (Defs' Obj. Nos. 164, 165, Ex. 4.) But, Defendants have not established that, as an inside counsel, all of Mr. Cueni's communications with Fraser and Marcuse were for the predominant purpose of seeking or providing legal advice. *See Valente v. Lincoln National Corp.*, 2010 WL 3522495 (D. Conn. Sept. 2, 2010).

2. *Communications Regarding Plaintiff's Complaints and Termination*

Through this motion, Plaintiff also renews his previous motions to compel and seeks another order directing Defendants to produce communications among Fraser, Cueni, and Marcuse in response to Requests Nos. 24, 26, 28, and 30 of Plaintiff's first set of discovery requests that relate or refer to the allegations in the lawsuit (No. 24), complaints made by Plaintiff to employees of Defendants, (No. 26),

the termination of Plaintiff's employment (No. 28), and Defendants' request for Plaintiff to leave UBS on June 30, 2008 (No. 30).  (Pl's first set of discovery, Ex.  24.)  The relevance of the information sought in these requests cannot be reasonably questioned.  Nevertheless, Defendants steadfastly refuse to search for responsive communications among Fraser, Cueni, and Marcuse that did not reach the U.S.

### 3.   *Additional Objection Based on Overseas Location of Documents*

In support of their position, Defendants now object to these requests because they seek e-mails that are located on servers overseas.  Even though UBS did not preserve this argument in its objections to these requests, (Obj. Req. Nos. 163-165, Ex. 4; Obj. Req. Nos. 24, 26, 28, 30, Ex. 24), UBS contends that it is not obligated or permitted to even search those servers for relevant communications because they are located overseas.  Defendants are just wrong on the law, as the obligation to respond to discovery mandates the production of documents if they are in the possession, custody, or control of a party - - regardless if they are stored in the United States or in Europe.

In 1968, the Second Circuit acknowledged that "[w]ith the growing interdependence of world trade and the increased mobility of persons and companies, the need arises not infrequently, whether related to civil or criminal proceedings, for the production of evidence located in foreign jurisdictions.  It is no longer open to doubt that a federal court has the power to require the production of documents located in foreign countries if the court has in personam jurisdiction of the person in possession or control of the material."  *U.S. v. First National City Bank*, 396 F.2d 897, 900-901 (2d Cir. 1968)(affirming order directing multinational bank to produce documents in Germany relating to transactions of a client, Boehringer, over objections by bank that compliance with subpoena would cause harm to business and subject it to civil liability under German law on claim by Boehringer).  *See also In re March Rich & Co.*, 707 F.2d 663, 667 (2d Cir. 1983)(in context of grand jury subpoena, "Neither may the witness resist the production of documents on the ground that the documents are located abroad.");

*Malletier v. Dooney & Bourke, Inc.*, 2006 WL 3476735 *5 fn. 7 (S.D.N.Y. Nov. 30, 2006)(citing *Societe Nationale Industrielle Aerospatiale v. United States Dist. Court*, 482 U.S. 522, 539-40 (1987)); *Cooper Industries, Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918, 920 (S.D.N.Y. 1984); *Laker Airways Ltd. v. Pan American World Airways*, 103 F.R.D. 42, 48 (D.D.C. 1984); *Gerling Int'l Ins. Co. v. C.I.R.*, 839 F.2d 131, 140 (3d Cir. 1988); *GAP, Inc. v. Stone Int'l Trading, Inc.*, No. 93 Civ. 0638, 1994 WL 38651 *2 (S.D.N.Y. Feb. 4, 1994)("A court may compel production of documents under the Federal Rules of Civil Procedure, even if they are located in a foreign country, so long as the documents are found to be within the control of a party."). Here, UBS AG is a party to this litigation over which the Court has jurisdiction. Since UBS AG has possession, custody, or control of the documents, it must produce them. The fact that the documents are located overseas is not a valid objection.[7]

Defendants also object to producing communications involving Fraser, Marcuse, and Cueni that are stored on servers located overseas based on European privacy laws. When asked to specify those European privacy laws, Defendants' counsel pointed to the same laws that governed the personnel files of Messrs. Fraser, Cueni, and Marcuse. (February 16, 2011 letter at 4-5, Ex. 21.) UBS maintains that the protection afforded by the European data protection laws to confidential personnel file documents extends fully to responsive e-mails sent and/or received by Fraser, Marcuse, and Cueni. (*Id.*) However, Defendants have not provided any authority indicating that the laws of the country in which the

---

[7] Courts have also held that the obligation of parties to litigation in the United States to produce documents located overseas maintained extends to documents maintained by another corporate affiliate or parent, even if that affiliate or parent is not a party to the case. *Hunter Douglas, Inc. v. Comfortex Corp.*, No. Civ. A. M8-85, 1999 WL 14007 *3 (S.D.N.Y. Jan. 11, 1999); *Cooper Industries, Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918, 920 (S.D.N.Y. 1984); *Alcan Int'l Ltd. v. S.A. Day Manuf. Co., Inc.*, 176 F.R.D. 75, 78-79 (W.D.N.Y. 1996); *Addamax Corp. v. Open Software Foundation, Inc.*, 148 F.R.D. 462 (D. Mass. 1993); *Choice-Intersil Microsystems, Inc. v. Agere Systems, Inc.*, 224 F.R.D. 471 (N.D. Cal. 2004). Here, however, the Court need not even engage in that analysis because Plaintiff is not seeking documents that are maintained by a corporate affiliate of Defendants that is not a party to this litigation. UBS cannot oppose production based on distinctions between corporate affiliates because UBS AG is a party to this litigation over which this Court has jurisdiction, and the documents located overseas are in the possession, custody, or control of UBS AG. But, even if the Court were to apply that analysis, production is still required.

communications are stored accords e-mail communications sent or received in the normal course of business the same level of protection as personal documents contained in a personnel file.  *See also Graco, Inc. v. Kremlin, Inc.*, 101 F.R.D. 503, 521 (D.C. Ill. 1984)("discovery does not 'take place within [a state's] borders' merely because documents to be produced somewhere else are located there. Similarly, discovery should be considered as taking place here, not in another country, when interrogatories are served here, even if the necessary information is located in the other country."); Accordingly, Defendants have not satisfied their burden of demonstrating the presence of any conflict with foreign law.[8]  (Doc. No. 85, at 5-6.)

       F.      <u>Communications Between UBS Realty & Fraser, Cueni, Marcuse</u>

Through document request Nos. 145-147 (Lynch), 157-159 (O'Shea), 160-162 (Seebrath), Plaintiff seeks all communications between Matthew Lynch, Thomas O'Shea, or Ana Ibis Seebrath, and John Fraser, Mario Cueni, or Paul Marcuse during the time period of October 1, 2007 and December 31, 2008.[9]  (Req. Nos. 145-47, 157-59, 160-62, 181 Ex.  4.)  Through document request No. 181, Plaintiff seeks communications between Michelle Cullen and Mario Cueni during that time period.  (Req. No. 181 Ex.  4.)  Michelle Cullen reported indirectly to Mario Cueni, and she communicated with him about issues relevant to this litigation.

The communications between these individuals are relevant for all of the reasons cited above regarding the communications among Fraser, Marcuse, and Cueni regarding UBS Realty.  They are likely a valuable source of information regarding the nature of the supervision of UBS Realty, and its executives, by Marcuse, Cueni, and Fraser.  These communications, as well as their frequency and

---

[8] Even if such a conflict did exist, however, the Court should still order compliance with these requests under the relevant factors.

[9] As originally drafted, the temporal scope of these requests was June 1, 2007 through December 31, 2008. During Rule 37 conferences, Plaintiff agreed to limit these requests to the time period of October 1, 2007 through December 31, 2008.

content, are likely relevant to the determination of whether Defendants constitute an integrated employer.  Plaintiff understands that Mr. Lynch speaks with Mr. Marcuse at least every two weeks, and that in advance of that call, Mr. Lynch prepares a document, similar to an agenda or an update on various issues.  Documents relating to those calls represent one example that would be relevant to integrated employer issues.  In addition to communications such as those, compliance with this request will allow Plaintiff to learn how often the principals of UBS Realty communicate with Marcuse, Fraser, and Cueni, and the types of information about which they communicate.  If these individuals communicate frequently, that would tend to show that Defendants are more, not less, integrated.

The content of the communications between Lynch, O'Shea, or Seebrath and Fraser, Cueni, or Marcuse would also provide additional insight regarding the extent to which Fraser, Cueni, or Marcuse exercised control or influence over UBS Realty.  If the communications revealed that Fraser, Cueni, or Marcuse, frequently communicated with management at UBS Realty regarding the business or operations of UBS Realty then the content, of those communications would also be relevant.  If the communications revealed that the management of UBS Realty sought the involvement of Fraser, Cueni, or Marcuse on matters that were less significant than the issues raised by Plaintiff, his legal claims, or Defendants' response to the same, then those communications would allow a reasonable inference that their involvement was likely sought in the termination of Plaintiff's employment as well.

Defendants also object to these requests on the grounds that they are overly broad.  Plaintiff has agreed to narrow the temporal scope of the requests to the period of October 1, 2007 through December 31, 2008, consistent with other requests.  During discussions with Defendants' counsel about these requests preceding the filing of this motion, Plaintiff asked Defendants' counsel to identify how many communications were exchanged by Lynch, O'Shea, or Seebrath and Fraser, Cueni, or Marcuse during that time period in order to assess the burden of responding to these requests.  (January 6, 2011 Alkhas

e-mail, Ex. 12.)  Even though the number of such communications should be easy to identify through

manipulation of very simple e-mail parameters, Defendants failed to provide that information.

On February 16, 2011,[10] Defendants' counsel wrote that they had recently received a disc that

contains communications responsive to these requests, and were in the process of reviewing the

communications for "privilege, relevancy, and confidentiality purposes."  (February 16, 2011 letter, Ex.

21.)  On February 28, 2011, and March 1, 2011, Plaintiff received some e-mails between Mario Cueni

and Paul Marcuse and employees of UBS in the United States that Defendants deemed to be relevant

and not privileged.  (February 28, 2011 and March 1, 2011 e-mails, Ex. 16.)  Defendants have,

however, refused to disclose the criteria employed to determine relevance, or the number of

communications that were not produced based on (a) relevance or (b) privilege.  (March 2, 2011 e-mail,

Ex. 17.)  Defendants should not be the sole arbiter for relevance, especially when Plaintiff and

Defendants likely have differing views on the relevance of these communications.  Defendants' limited

compliance, and refusal to share information regarding the communications that were withheld, prevents

Plaintiff from obtaining additional relevant information sought in these requests.

G.    Policies of UBS AG or UBS Global Asset Management that apply to UBS Realty

Defendants should also be ordered to comply with Request Nos. 178 and 179, which seek

policies of UBS AG and UBS Global Asset Management that apply to UBS Realty.[11]  (Req. Nos. 178 &

179, attached as Ex. 4.)  The policies of UBS AG and UBS Global Asset Management that apply to UBS

Realty, and with which UBS Realty must comply, obviously represent important evidence of how the

operations and management of UBS Realty and UBS AG are integrated.  *Baker v. Stuart Broadcasting

Co.*, 560 F.2d 389 (8th Cir. 1977)(citing evidence that "Stuart Broadcasting issues policy manuals which

---

[10] Plaintiff served these requests in August of 2010, and Defendants apparently made no effort to start reviewing
responsive communications until February 2011.

[11] When Defendants expressed concern about the burden of producing all such policies, Plaintiff suggested that
UBS could initially provide a list or an index of the policies, from which Plaintiff could selectively ask for
production of those policies he wanted to review.  Defendants rejected that proposal.

Grand Island Broadcasting is to follow" as part of opinion concluding that entities were integrated employer); *Sandoval v. American Building Maintenance Indus., Inc.*, 578 F.3d 787 (8th Cir. 2009)(citing various financial, operations, and personnel policies and procedures that applied to subsidiary in reversing summary judgment on integrated employer issue); *Peltier v. Apple Health Care, Inc.*, 130 F. Supp. 2d 285, 288-89 (D. Conn. 2000)(citing common personnel policies and procedures as evidence of integrated employer relationship); *Richard v. Bell Atlantic Corp.*, 976 F. Supp. 40, 48 (D.D.C. 1997)(considering application of employment policies to subsidiary in integrated employer analysis). Indeed, Judge Arterton's March 30, 2010 Ruling in this case highlighted Plaintiff's allegation that UBS AG policies applied to his employment as a relevant factor in the integrated employer analysis. *Trusz v. UBS Realty Investors*, 2010 WL 1287148 *7 (D. Conn. Mar. 30, 2010).

H.    Documents concerning UBS AG Group Executive Board and Group Management Board

Defendants should also be ordered to respond to Request Nos. 155 and 156, which seek documents, minutes, and agendas concerning meetings of the UBS Group Executive Board and UBS Group Management Board. (Req. Nos. 155 & 156, Ex. 4.) These requests are also relevant to whether Defendants are an integrated employer. As Defendants admit in their Answer, UBS Corporate documents emphasize that these Boards play a role in areas that are important to Defendants' integration. The Group Executive Board "is responsible . . . for the alignment of the business groups to UBS's integrated business model and for the exploitation of synergies across the firm. . . The Group Executive Board plays a key role in defining the human resources policy and the compensation principles of the Group." (Answ. ¶ 19, Doc. No. 108.) The Group Management Board "plays a crucial role in achieving UBS's one-firm vision." (*Id.* ¶ 20.) UBS continues to object to these requests, and failed to respond to additional inquiries from Plaintiff's counsel. (January 26, 2011 & February 4, 2011 e-mail correspondence, Ex. 36.) UBS should be orded to comply with these requests.

## IV.     <u>Renewed Motion to Compel Responses to First Set of Discovery</u>

This Court has previously communicated an expectation that counsel for the parties cooperate in good faith in an effort to agree upon search terms for appropriate persons and time periods.  (Doc. No. 124, at 8-9)(citing to Sedona Conference materials). Since the Court's January 13, 2011 Ruling granting Defendants' motion for reconsideration (Doc. No. 167), Plaintiff has substantially narrowed and clarified the requests that were subject of that Ruling.[12]  In accordance with the Court's instructions, Plaintiff has also attempted to cooperate with Defendants in good faith regarding search terms that are reasonably calculated to lead to the discovery of relevant documents that are responsive to Request Nos. 24, 26, 28, and 30.  But, with the exception of three employees for which Defendants previously agreed to search for additional documents (Doc. No. 132, at 1), Defendants have refused any additional search.

Plaintiff proposed a process that included the solicitation of input from the individuals who actually wrote the e-mails, and did not rely exclusively on the use of search terms.  (February 2, 2011 letter, Ex.  19.)  This proposal is consistent with cases such as *Gross Constr. Assocs., Inc. v. American Manuf. Mutual Ins. Co.*, 256 F.R.D. 134 (S.D.N.Y. 2009), who expressed disapproval of "lawyers designing keyword searches in the dark, by the seat of the pants, without adequate (indeed, here, apparently without any) discussion with those who wrote the emails."  *Id*. at 135.  *See also id.* at 136 ("Electronic discovery requires cooperation between opposing counsel and transparency in all aspects of preservation and production of ESI.  Moreover, when counsel are using keyword searches for retrieval of ESI, they at a minimum must carefully craft the appropriate keywords, with input from the ESI's

---

[12] For instance, Plaintiff agreed to, for the moment, (a) not seek additional search terms for Request Nos. 134-138; (b) not seek additional responses to Request Nos. 25, 27, 29, 31, and 32, (c) with respect to Request No. 39, reduce the number properties for which documents were sought from 22 to 5, as well as limit scope of documents sought for those properties (*compare* 9/4/2009 letter (Ex. 37) *with* 2/2/2011 letter, Ex. 19), and (d) not request search terms for six persons listed in Request Nos. 24, 26, 28, and 30.

custodians as to the words and abbreviations they use . . . .").[13]  Yet, Defendants refused to accept

Plaintiff's proposals regarding the search process, and maintained that they had no obligation to discuss

proposed search terms with any of the individuals in question, or provide information in response to

inquiries about the process used to gather and identify relevant documents, and exclude non-relevant

documents.  (February 7, 2011 e-mail, Ex. 20; March 2, 2011 e-mail, Ex. 17.)

Defendants' refusal to cooperate regarding the additional search terms for UBS Realty

employees is striking since it was Defendants who requested a further opportunity to meet and confer

about these requests.  Defendants requested that the Court reverse the September 2010 Ruling ordering

Defendants to respond to Request Nos. 24, 26, 28, and 30 because the parties needed additional time to

meet and confer about those requests (and others).  But, when the Court granted Defendants the

opportunity to meet and confer further about those requests (Doc. No. 167), Defendants maintained that

their previous searches of UBS Realty employees were sufficient, completely rejected every single one

of the search terms that Plaintiff proposed for UBS Realty employees,[14] and failed to suggest any

additional alternative searches.  (February 2, 2011 letter, Ex.  19; February 7, 2011 e-mail, Ex.  20;

February 16, 2011 letter, Ex.  21.)  Defendants' total refusal to perform any additional searches for any

UBS Realty employee calls into question whether Defendants' requests for another opportunity to

confer were made in good faith, or were simply an effort to delay.

Plaintiff appreciates that the Court has previously expressed frustration about the inability of the

parties to reach agreement on a number of discovery issues, and has specifically indicated that disputes

---

[13] The very Sedona Conference publication cited by the Court in the September 2010 Ruling (Doc. No. 124 at 9) acknowledges that "because knowledge of the producing party's data is usually asymmetrical, it is possible that refusing to 'aid' opposing counsel in designing an appropriate search protocol that the party holding the data knows will produce responsive documents could be tantamount to concealing relevant evidence."  *The Case for Cooperation*, 10 Sedona Conf. J. 339, 344 (2009).

[14] As indicated in Section IV.B, below, Defendants agreed to some search terms for Ms. Seebrath, Ms. Taura, and Mr. Schiffman.  But, it is Plaintiff's understanding that they are not "UBS Realty" employees, and Defendants represented in an October 26, 2010 filing that they would agree to search for additional relevant e-mails from those individuals.  (Doc. No. 132, at 1.)

over search terms are the type of dispute that would be referred to a special master absent agreement. (Doc. No. 124, at 9-10).  At this juncture, however, Plaintiff respectfully requests that the Court decide the present dispute without a referral to a special master.  The Court recently advised that the current discovery deadline of June 30, 2011 is a firm deadline.  (Doc. No. 186.)  Plaintiff also respectfully submits that a further delay associated with a referral to a special master will only inure to the benefit of Defendants, who have opposed these requests for production since 2009.[15] .

A.    Search Terms for Specified UBS Realty Employees for February until December 2008

On February 2, 2011, Plaintiff proposed search terms for UBS Realty employees that were designed to be responsive to Request Nos. 24, 26, 28, and 30.[16]  (Req. Nos. 24, 26, 28, 30, Ex. 24; February 2, 2011 letter, Ex. 19.)

1.    *Group 1 – Lynch, O'Shea, Menard, Cullen*

Defendants should be ordered to run the search terms below for Matt Lynch and Thomas O'Shea (the two principal decisionmakers), Christine Menard (human resources manager), and Michelle Cullen (chief compliance officer who investigated Plaintiff's claims).

The terms "employee matter," "employee issue," "employee claim," "employment matter," "employment issue," "employment claim," and "employment dispute," are all reasonably calculated to lead to admissible evidence and documents that are responsive to Request Nos. 24, 26, 28, and 30 because Defendants' employees regularly used these types of phrases in their internal communications – without using Plaintiff's name - when referring to the situation involving Plaintiff.  Examples of this are attached as Exs. 38 through 53, filed under seal.  (November 11, 2008 E-mail chain:  Subject:  "Re

---

[15] Defendants' most recent request for reconsideration of the Court's September 2010 Ruling based on an alleged desire to meet and confer more about the requests, which was credited by the Court, successfully delayed the adjudication of these requests by six months.
[16] To the extent that search terms were proposed in the February 2, 2011 letter, but not identified in this Memorandum, Plaintiff is not asking the Court to order Defendants to run those search terms.

Employee Issue . . . ."  (UBS 17472-476, Ex.  38); <u>Risk Assessment for Q3 2008</u>:  "Employee legal

claims" (UBS 24412, Ex.  39); <u>Q2 2008 Risk Comm. Minutes</u>:  reference to "employee claim" (UBS

24269, 24272, Ex.  40); <u>notes of 11/13/2008 call with client Steve Sikes</u>:  "employee dispute issue"

(UBS 17429, Ex. 41); <u>Risk Comm. Report Q2 2008</u>:  "2 legal claims from a senior employee" (UBS

23857, Ex. 42); <u>Q2 2008 Risk Comm. Talking Points</u> (page 2):  "the employee claims" (UBS 23890, Ex.

43); <u>Risk Comm. Meeting Minutes</u>:  "employee claims" (UBS 23891, Ex. 44); <u>Risk Comm. Report Q4

2008</u>:  "Former employee lawsuit" (UBS 24075, Ex. 45); <u>Risk Comm. Report Q1 2008</u>:  "employee

claim" (UBS 24114, Ex. 46); <u>9/16/08 notes</u>:  "senior employee claims" (UBS 23846, Ex. 47); <u>Risk

Comm. Report – Q2 2008</u>:  "2 legal claims" (UBS 24243, Ex. 48); <u>June 6, 2008 e-mail re Risk Comm.</u>:

containing references to "2 legal claims from senior employee" (UBSRT 125529, 125531, Ex. 49); <u>Risk

Comm. Report Q2 2008</u>:  "the employee claims" (UBSRT 2137303) and ""2 legal claims from a senior

employee" (UBSRT 2137306, Ex. 50); <u>Quarterly Whistleblowing Report</u>:  references to "legal action",

"employment dispute" (UBS 15916, Ex. 51).  In an internal communication sent by Mr. Lynch

regarding the Bloomberg article, he concedes that UBS has engaged in a concerted "effort to have this

story portrayed as an <u>employee matter</u>. . ."  (UBS 25986, Ex. 52)(emphasis added).   The terms

"<u>litigation</u>," "<u>legal action</u>", and "<u>lawsuit</u>" are appropriate for similar reasons.  (*See, e.g.,* UBS 26324-

26327, Ex. 53)(11/18/2008 letter to clients and consultants using such terms).

 The term "<u>whistleblower</u>(ing)" is also appropriate because Plaintiff's claims were ultimately

included in the UBS Whistleblowing report.  (UBS 159914-916, Ex. 51, filed under seal.)  UBS also has

a Whistleblower policy.  (UBSRT 633-635, Ex. 30, filed under seal.)  Additional documents containing

that term are likely to lead to additional documents addressing how UBS Whistleblowing policies

applied to Plaintiff.

The terms "fiduciary duty" and "fiduciary obligation" are likely to lead to the discovery of admissible evidence regarding Plaintiff's complaints because Plaintiff explicitly complained that Defendants were not complying with their fiduciary duties and obligations to clients.  Similarly, the terms "complaint", "harass(ed)(ment)", "discriminate(d)(ing)(ion)", and retaliate(d)(ing)(ion)" are likely to lead to documents concerning the complaints that Plaintiff made, and the application of policies prohibiting that conduct.  The term "investigate(d)(ing)(ion)" is likely to identify documents concerning the investigations that Defendants claim were performed.

Documents containing "valuation" and "discrepancy(ies)" in the same sentence or "value(ation)", "independent", and "appraiser(al)(ed)" in the same sentence are also likely to lead to the discovery of admissible evidence regarding the valuation errors reported by Plaintiff because Defendant's agents prefer to use to term "discrepancies" instead of "errors", and Defendants repeatedly stress, in response to Plaintiff's allegations, that the values for UBS properties are established by independent appraisers  (*See, e.g.*, UBS 25986, Ex. 52)(e-mail reflecting comments by Matt Lynch that ". . . independent third party appraisers who determine all values").  Therefore, Defendants' internal communications discussing how to respond to Plaintiff's complaints are likely to contain sentences using those terms.

The terms "redundancy," "terminate(ion)", "headcount reduction," and phrases containing the words "position" and "eliminated" within three words are likely to lead to documents concerning Plaintiff's termination.  Plaintiff's employment was terminated for the asserted reason of "redundancy" that resulted in the eliminated of Plaintiff's position.  Christine Menard testified that Plaintiff's employment was terminated as part of a "headcount reduction" plan, (Menard Depo. at 221-22, Ex. 31).

The terms "leave of absence" and "LOA" are likely to lead to documents concerning Defendants' request that Plaintiff leave the premises on June 30, 2008, and the leave of absence he was on thereafter.  (Doc. Req. No. 30.)

> 2.      *Group 2 – Carol Kuta* – Managing Director, Head of Accounting

Many of the search terms proposed for Carol Kuta in the February 2, 2011 letter have already been discussed in Group 1, *supra*, and the explanations provided in support of those terms completely supports their application to Ms. Kuta as well.  The additional terms proposed for Ms. Kuta are specifically tailored to locate documents regarding valuations of particular properties or errors that are at issue in this litigation.

The terms "expense stop" and "recovery(ies)" are types of data on which errors were made that caused several valuation errors.  Carol Kuta and Michelle Cullen have testified that Ms. Kuta played a role in the investigation regarding the valuation errors reported by Plaintiff.  (Cullen Depo. at 122, Ex. 35; Kuta Depo. at 133-34, 140-46, Ex. 54.)  Plaintiff proposes that those terms only be searched with respect to Ms. Kuta's communications with Michelle Cullen (who did the investigation), and Tom Gould and Chris Taylor of the valuation unit (with whom Ms. Kuta communicated about the errors).

The terms "CambridgeSide" and "Ruggles" are proposed as search terms for a limited period of time between June 1 and August 15, 2008, and only with respect to Ms. Kuta's communications with Matt Lynch, Kevin Crean, Chris Taylor, and Tom Gould.  These requests are tailored to identify relevant communications regarding the alteration of the valuation for the CambridgeSide Galleria mall for the 2nd Quarter of 2008.  "Ruggles" is an appropriate search term because that is the name of the appraiser from PricewaterhouseCoopers whom Ms. Kuta asked to intervene in the appraisal of that property, and whose involvement contributed to the reversal of a significant write-down.  Mr. Lynch communicated with Ms. Kuta about involving Mr. Ruggles.  (Lynch Depo. at 191-93, Ex. 33.)  Ms. Kuta asked Mr. Ruggles to

call her in Mr. Crean's office, and Mr. Crean is the Portfolio Manager for the TPF fund which owns the CambridgeSide Galleria asset. (Kuta Depo. at 258-260, Ex. 54; July 1, 2008 e-mail, Ex. 55.) Ms. Kuta facilitated a call between Mr. Ruggles and Messrs. Taylor and Gould, along with the outside appraiser for the property. (July 1, 2008 e-mail, Ex. 56, filed under seal; Taylor Depo. at 136-37, Ex. 57.)

"Folsom", "IPERS", and "Reinhardt" are also appropriate search terms dealing with the error reported on the Folsom Corporate Center property, in the IPERS account, for which Pat Reinhardt is the client representative. Ms. Kuta, along with others from UBS, participated in a meeting with representatives from IPERS (including Mr. Reinhardt) in the end of 2008 regarding Plaintiff's allegations. (Maguire Depo. at 161-65, Ex. 58.)

      3.    *Group 3 – Kevin Crean* – Managing Director, Portfolio Manager for TPF Fund

The search terms proposed for Mr. Crean have already been discussed in the context of Groups 1 and 2. Those explanations are fully applicable here.

      4.    *Group 4 – Jeff Maguire* –Managing Director, Portfolio Manager: ARMB/IPERS

Most of the search terms proposed for Mr. Maguire have already been discussed in the context of Groups 1 and 2. Those explanations are fully applicable here. The additional term not already discussed is "Sikes", for the limited time period between 11/1/2008 and 12/31/2008. Steve Sikes is the main client contact for the ARMB account, for which Mr. Maguire is the Portfolio Manager. During the time period of November and December 2008, it is likely that Mr. Maguire had communications with Mr. Sikes, and exchanged communications with others at UBS that referred to Mr. Sikes, because the Bloomberg article was published in that time period, and the reporter from Bloomberg contacted Mr. Sikes about Plaintiff's allegations.

5.      *Group 5 – Tom Anathan* – Managing Director, Head of Marketing

Plaintiff requests that Defendants be ordered to employ the search terms listed in the February 2, 2011 letter with respect to Tom Anathan, UBS Realty's Head of Marketing, that have been discussed in relation to Groups 1 and 2, and 4, above (any terms specified for Mr. Anathan in the February 2, 2011 letter, but not discussed herein, can be excluded).  The rationale for those terms discussed above is fully applicable for Mr. Anathan as well.  In addition, Plaintiff proposes that the search term "Dohrmann" be used for the limited period of October 1, 2008 through December 31, 2008.  Mr. Dohrmann is the publisher of the Institutional Real Estate letter, and Mr. Anathan communicated with him about the situation between Plaintiff and Defendants surrounding the time of the publication of the Bloomberg article.  Any such communications are likely to lead to the discovery of admissible evidence that Defendants perpetuated a false narrative that damaged Plaintiff's reputation.  (3rd Am. Compl. ¶ 183.)

6.      *Group 6 – Thomas Gould* – Member of Valuation Unit

Plaintiff has proposed a limited set of search terms for Thomas Gould that focus on valuation errors and property specific allegations made by Plaintiff.  (February 2, 2011 letter, Ex. 19.)  Folsom Corporate Center is one of the properties about which Plaintiff reported errors.  Documents containing "tax recovery(ies)" and "Folsom" or "expense stops" and "Folsom" are likely to lead to the discovery of admissible evidence regarding the errors reported on that property because the errors reported dealt with "tax recoveries" and "expense stops."  Similarly, as discussed above in connection with Group 2, the terms "expense stops" and "recovery(ies)" in communications with Michelle Cullen or Carol Kuta are reasonably calculated to lead to the discovery of admissible evidence regarding the errors reported by Plaintiff, and Defendants' investigation into the same.  The term "Reinhardt" is appropriate for Mr. Gould during the limited time period between November and December 2008 for the same reasons articulated in connection with Group 2, above.   The terms "CambridgeSide" and "Ruggles", in

34

communications with the specific persons identified in the February 2, 2011 letter, during the limited time period specified, are reasonably calculated to lead to the discovery of admissible evidence for the same reasons articulated in connection with Group 2, above.

> 7. *Group 7 – Chris Taylor* – Member of Valuation Unit

Plaintiff has proposed a limited set of search terms for Chris Taylor that focus on property specific valuation errors and issues alleged by Plaintiff.  (February 2, 2011 letter, Ex. 19.)  Crown Colony is one of the properties about which Plaintiff reported errors.  Documents containing "expense stops" and "Crown Colony" are likely to lead to the discovery of admissible evidence regarding the errors reported on that property because the errors reported dealt with "expense stops."  Similarly, as discussed above in connection with Group 2, the terms "expense stops" and "recovery(ies)" in communications with Michelle Cullen or Carol Kuta are reasonably calculated to lead to the discovery of admissible evidence regarding the errors reported by Plaintiff, and Defendants' investigation into the same.  The term "Presidential Way" is appropriate for the limited time period of April and May 2008 because Plaintiff made a specific allegation regarding that property during that time period that involved Mr. Taylor.  (3rd Am. Compl. ¶ 134.)  The terms "CambridgeSide" and "Ruggles", in communications with the specific persons identified in the February 2, 2011 letter, during the limited time period specified, are reasonably calculated to lead to the discovery of admissible evidence for the same reasons articulated in connection with Group 2, above.

> 8. *Group 8 – Mark McKell,* Risk Officer

Mr. McKell is the Chief Risk Officer for UBS Realty, and he was involved in a number of meetings and communications involving Plaintiff's claims and allegations.  The search terms of "employee(ment) claim", employee(ment) issue," "employee(ment) matter", and "employee(ment)

dispute" are all reasonably calculated to lead to the discovery of admissible evidence for the reasons articulated in support of those search terms in Group 1, above.

> B.   Production of Ana Ibis Seebrath, Kiku Taura and Jordan Schiffman

Defendants agreed in an October 26, 2010 filing that they would search for and produce additional documents relating to Plaintiff and the allegations in his lawsuit from Ana Ibis Seebrath Seebrath (as well as Kiku Taura, a human resources official, and Jordan Schiffman, UBS counsel, who both approved the decision to terminate Plaintiff's employment).  (Doc. No. 132, at 1.)  In December 2010, Plaintiff followed up with Defendants' counsel about the status of that production since nothing had been produced as of that date.  On January 3, 2011, after the holidays, Plaintiff's counsel inquired again and was advised by Defendants' counsel that he thought the searches were being done.  (January 3, 2011 e-mails, Ex.  59.)  On January 6, 2011, Defendants' counsel advised Plaintiff that UBS was in the process of gathering documents from Seebrath, Taura, and Schiffman using three discrete search terms:  "Trusz," "Rich," and "UBS Realty." (January 6, 2011 e-mail, Ex.  12.)  Plaintiff responded that same day and communicated that he thought the proposed search terms were too narrow, and that the search should be expedited since Ms. Seebrath's deposition was scheduled later that same month. (January 6, 2011 e-mail, Ex.  13.)  On January 11, 2011, Defendants invited Plaintiff to suggest additional search terms, (January 11, 2011 e-mail, Ex.  15), which Plaintiff proposed on January 17, 2011.  (January 17, 2011 e-mail, Ex.  60.)  After some discussion, Defendants agreed to run the search terms proposed by Plaintiff.[17]

---

[17] Attorney Alkhas initially stated that UBS could run the search terms Plaintiff proposed, and raised a concern about a single search term. (Alkhas January 17, 2011 e-mail, Ex.  61.)  Then, Attorney Moeller raised broad-based objections to all of Plaintiff's search terms, (Moeller January 18, 2011 e-mail, Ex.  61), which Plaintiff tried to address (Steigman January 18, 2011 e-mail, Ex.  61).  Then, on January 19, 2011, Attorney Moeller communicated agreement with 11 search terms proposed by Plaintiff (Moeller January 19, 2011 e-mail, Ex.  62), and the undersigned communicated a rationale for the other search terms to which UBS still voiced opposition (Steigman January 20, 2011 e-mail, Ex.  63).  During a phone call the following week, Attorneys Moeller and Alkhas said that UBS would agree to run all of the search terms proposed by Plaintiff.

On March 2, 2011, Defendants produced documents relating to Ms. Seebrath that contained one of more of the 11 search terms agreed to by the parties, and which Defendants' counsel believed to be relevant.  (March 2, 2011 e-mail, Ex. 64.)  On March 7, 2011, Defendants' counsel communicated a breakdown of the other search terms proposed by Plaintiff, and indicated an agreement to review some of the documents that were responsive to some of the search terms.  (March 7, 2011 e-mail, Ex. 65.)  On March 8, 2011, Plaintiff requested that Defendants narrow the search terms that Defendants considered too broad by only considering communications containing those terms to specific individuals.  (March 8, 2011 e-mail, Ex. 65.)  On March 10, 2011, Defendants opposed Plaintiff's request, and Plaintiff responded.  (March 10, 2011 e-mails, Ex. 66.)  Plaintiff requests that the Court order Defendants to comply with the request made by Plaintiff in his March 8, 2011 e-mail.

C.      Request No. 39

The parties have been partially successful at reducing the scope of disagreement regarding Request No. 39, which seeks "all documents concerning any valuation error reported by Plaintiff or any other member of the valuation unit during his employment with Defendant."  (Req. No. 39, Ex. 24.)  Plaintiff agreed to reduce the number of properties about which he sought documents from 22 to 5, and he also agreed to narrow the scope of the documents he sought for each of those properties.  (*Compare* September 4, 2009 letter, Ex. 37, *with* February 2, 2011 letter, Ex. 19.)  On February 16, 2011, Defendants agreed to produce some, but not all, of the documents sought by Plaintiff for those 5 properties, and produced those documents on February 28, 2011.  (February 16, 2011 letter, Ex. 21; February 28, 2011 e-mail, Ex. 67.)  In a further effort to eliminate the dispute regarding this request, Plaintiff attempted again to obtain two additional categories of documentation for 4 properties.  (February 28, 2011 e-mail, Ex. 68.)  But, Defendants would not agree to produce any additional

documentation regarding those properties - - even though the documentation Plaintiff requested clearly concerns valuation errors reported by Plaintiff for those properties during his employment with UBS.

The first category of documentation that Defendants will not agree to produce for these four properties,[18] in the specific quarter requested by Plaintiff, is the workfile maintained by the member of the valuation unit who had responsibility for each property, in those quarters.  (February 2, 2011 letter, Ex.  19; February 28, 2011 e-mail, Ex.  68.)  UBS requires all members of the valuation unit to maintain work files for each property, in each quarter, in order to satisfy relevant Sarbanes-Oxley internal controls and evidentiary requirements.  Those workfiles contain notes, documents, and communications regarding the appraisal of those four properties, during quarters that are relevant to the errors that Plaintiff reported.  Defendants' assertion that these workfiles are not responsive to Request No. 39, (March 4, 2011 e-mail, Ex.  23), is simply mistaken.

The second category of documents sought by Plaintiff for these 4 properties are the property specific Quarterly Sign-Off ("QSO") Certifications for these properties, for the specific quarters indicated.  Again, these documents contain information that is relevant to Plaintiff's allegation that errors occurred in the valuation of these properties, in the quarters alleged.  An example of a portion of a property specific QSO relating to another property is attached hereto as Ex. 69 (RT 545-546).  Based on that example, it is clear that these property specific QSO's contain information that is relevant to the appraisal and valuation of properties, and the information contained in these documents, for the properties and quarters identified, is relevant to Plaintiff's allegation that valuation errors occurred.

Finally, Plaintiff requests that Defendant produce any e-mails between the member of the valuation unit and the third party appraiser responsible for the appraisal of these properties, for three properties:  Folsom Corporate Center, Crown Colony, and Columbia Center.  With respect to Crown

---

[18] The properties identified are Crown Colony, Folsom Corporate Center, Columbia Center, Happy Valley Towne Center.  (See 3rd Am. Compl. ¶¶ 65, 75, 82, 85, 86.)

Colony, Plaintiff requests all e-mails between Chris Taylor of UBS and Rob Skinner from Cushman & Wakefield regarding this property between May 1, 2007 and December 1, 2007.  With respect to the Folsom Corporate Center, Plaintiff requests all e-mails between Thomas Gould of UBS and Judson Kline of Cushman & Wakefield regarding this property between May 1, 2007 and December 31, 2007. With respect to Columbia Center, Plaintiff requests all e-mails between Ron Osborne of UBS and Carolyn Kakareka and Gerry Harvey from CB Richard Ellis regarding this property between May 1, 2007 and January 15, 2008.  The proposed date ranges encompass the time period between the occurrence of the error, the cause of which is likely to be reflected in e-mails sought, and the subsequent identification of the error, which is likely to be communicated in the e-mails sought.  Compliance with these requests will not be burdensome, as the coordination of these appraisals does not require extensive e-mail communication.  .

   D. <u>Side Letters</u>

   Plaintiff also requests that the Court Defendants to produce two side letter agreements, in response to Interrogatory No. 10, and Request. Nos. 58 and 59.  (Interr. No. 10, Req. Nos. 58 & 59, Ex. 24.)  Defendants have refused to produce the two side letter agreements that UBS Realty entered into with Chevron and Boeing – the very side letters about which Plaintiff raised concerns during his employment, and which were addressed in the compliance investigation upon which Defendants have relied.  Defendants insist that Plaintiff is only entitled to the few sentences excerpted in its own compliance investigation.  (January 6, 2011 and January 11, 2011 e-mails, Exs 12-15.)  Plaintiff disagrees.  The small excerpts contained in the compliance investigation lack important context, and do not allow Plaintiff an opportunity to review the side letters in their entirety.  Certainly, if Defendants are going to rely on their compliance investigation regarding this issue, then Plaintiff basic fairness dictates that Plaintiff receive copies of the actual side letters that were considered by the compliance

investigation - - in their entirety.  Since these are the two side letters about which Plaintiff complained during his employment, Defendants' continued refusal to produce these side letters is difficult to comprehend.

**V.    Conclusion**

For the foregoing reasons, Plaintiff requests that the Court grant Plaintiff's third motion to compel, and order Defendants to provide the discovery requested herein.

PLAINTIFF, Richard Trusz

By: _____/s/Todd D. Steigman_____
         Todd D. Steigman, Esq. (ct26875)
         Madsen, Prestley & Parenteau, LLC
         44 Capitol Avenue, Suite 201
         Hartford, CT 06106
         Tel. (860) 246-2466   Fax. (860) 246-1794
         tsteigman@mppjustice.com

**CERTIFICATION**

I hereby certify that on the 11th day of March 2011, a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing].  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing].  Parties may access this filing through the Court's system.

_____/s/_____
Todd D. Steigman