# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

RICHARD TRUSZ,
    Plaintiff,

    v.

No. 3:09-cv-00268 (JAM)

UBS REALTY and UBS AG,
    Defendants.

### AMENDED RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This is a "whistleblower" case about alleged retaliation against a high-level corporate employee whose employment was terminated shortly after he complained about some of his company's business practices. Plaintiff Richard Trusz has filed suit against his former employer, defendant UBS Realty (Realty), and its parent company, defendant UBS AG.

For many years, plaintiff served as head of Realty's real estate valuation unit. Prior to the termination of his employment in 2008, plaintiff raised concerns internally and externally about Realty's valuation procedures and pointed out mistakes in the valuation of several properties. He also complained that he was subject to disability discrimination. According to plaintiff, these complaints led to his termination. But, according to defendants, plaintiff's position was terminated because it became obsolete when they decided to outsource much of the company's valuation review functions.

Plaintiff principally alleges that defendants impermissibly retaliated against him in violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, and other similar statutes. He has moved for partial summary judgment on two of his whistleblower claims and on defendants' affirmative defense that he failed to mitigate his damages. By contrast, defendants have moved for summary judgment in their favor on all counts. I conclude that genuine issues of fact exist as

to all of plaintiff's remaining retaliation claims. Accordingly, I will deny both parties' motions for summary judgment, and this case shall proceed to trial.[1]

## BACKGROUND

Defendant UBS Realty is an institutional real estate manager. It manages more than $17 billion in assets, almost exclusively for large, institutional clients. Realty is a registered investment adviser with the Securities and Exchange Commission, although its securities are not publicly traded. Realty is also an indirect subsidiary of defendant UBS AG, a Swiss global financial services company with approximately $2.8 trillion in assets and securities registered under § 12 of the Securities Exchange Act of 1934. Realty is part of UBS's Global Asset Management group, which is itself part of UBS AG.

Plaintiff began working for Realty's predecessor company in 1984. He served as head of the valuation unit from 1989 until he was fired in 2008. In 2005, he was named a managing director. During his time at the company, his supervisors Matthew Lynch (president of Realty) and Thomas O'Shea (general counsel of Realty) consistently gave him positive performance reviews.

Beginning in 2006, plaintiff began raising concerns about the valuation group to his superiors. He told O'Shea and the chief financial officer in an email in July 2006 that the valuation unit was understaffed and that the risk of valuation errors would increase without changes. In 2007, because of illness among personnel in the valuation group, staffing levels went down, while the assets overseen by the group oversaw continued to grow. Plaintiff wrote a memorandum to O'Shea and Lynch in November 2007 further detailing his concerns about staffing.

---

[1] This is an amended ruling that addresses an argument that the Court previously overlooked concerning plaintiff's retaliation claim under the Americans with Disabilities Act. In all other substantive respects, this ruling is the same as the Court's prior ruling of March 25, 2016 [Doc. #449].

Also in 2007, Realty began to explore outsourcing its valuation review functions. In October 2007, O'Shea asked plaintiff to lead a so-called "benchmarking study" to consider the outsourcing of these tasks. At the same meeting in November 2007 when plaintiff gave O'Shea and Lynch his memorandum about staffing concerns, the three of them also discussed outsourcing. Defendants contend—but plaintiff denies—that he made it clear at this meeting that he considered outsourcing a bad idea.

In January 2008, Trusz sent Lynch and O'Shea the following email:

> Without any meaningful change or other opportunity within UBS, I plan to resign at the end of the first quarter . . . .
>
> I have decided that I cannot put myself through another quarter like the past, risking the well-being of those in the valuation unit, my personal well-being, or facing a growing and already high risk of reporting error.
>
> I also continue to struggle with the work ethics of certain groups in the company versus the valuation unit, portfolio management, accounting and others who exert maximum effort each and every quarter.
>
> After heading what I truly believe is the top valuation program in the nation for 23+ years, I wish to depart on a high note before someone drops and/or we are compelled to restate a client's financial statement due to valuation error.

Doc. #307-30 at 2.

A few days later, Trusz met with Lynch and O'Shea. At this meeting, he described seven valuation errors from prior quarters. He also stated that he had been suffering from heart-related medical issues and could not continue with the *status quo* long term. Defendants contend, and plaintiff disputes, that later that month, his doctor advised him to seek a large payment from Realty if he were to leave the company.

On February 1, 2008, plaintiff retained counsel. A few days later, he met with O'Shea and Lynch again. At this meeting, plaintiff again brought up the valuation errors and said that the clients needed to be notified and management fees returned. He also said that the errors were the result of the inadequate staffing problem that he had previously identified.

The overvaluations plaintiff identified at this meeting totaled approximately $27 million over three different accounts. Realty notified Mario Cueni and Paul Marcuse of UBS AG about these discrepancies shortly after the meeting. At this meeting, plaintiff also complained about so-called "side letters" that Realty engaged in with certain clients, which supposedly granted them "most favored nation" clauses that were not given to all clients. Plaintiff complained that these side letters were not ethical.

At about the same time, plaintiff began a medical leave of absence. While plaintiff was on leave, Tom Gould and Chris Taylor together assumed plaintiff's supervisory role within the valuation unit. Lynch and O'Shea transferred oversight of the benchmarking study to Christine Menard, Realty's human resources manager. According to defendants, Menard also interviewed the other valuation team members about their workload and received no complaints.

In the meantime, a few days after the meeting of February 1 at which plaintiff raised his concerns, Michelle Cullen, the chief compliance officer, began an investigation into the valuation discrepancies that plaintiff had flagged. She completed her investigation in April 2008. In light of her assessment of the company's internal materiality standards and other industry benchmarks, she concluded that there had been valuation errors, but that Realty did not need to disclose them to clients. In April and May, Realty also had outside auditors KPMG review these valuation discrepancies. KPMG's conclusions were substantially the same as those of Cullen.

In March and April 2008, plaintiff filed complaints with the Occupational Safety and Health Administration, the U.S. Equal Employment Opportunity Commission, and the Connecticut Commission on Human Rights and Opportunities, alleging discrimination and retaliation. Over the next few months, the relationship between plaintiff and Realty's management deteriorated. The parties disagree about many of the details, but it is undisputed that plaintiff continued to complain about the valuation discrepancies and that Realty began to limit his exposure to clients and to reduce his responsibilities.

Realty continued to investigate outsourcing valuation review, and in late April 2008, Realty management observed a presentation from PricewaterhouseCoopers (PwC). The final benchmarking report was finished at the end of June 2008. According to the report, many of Realty's competitors already outsourced a significant portion of their valuation review functions. Sometime in July or early August 2008, Lynch and O'Shea decided to outsource much of the current valuation group's responsibilities to PwC.

On August 13, 2008, plaintiff and two junior members of the valuation review team were informed that their positions were being eliminated. The two junior members were permitted to keep working until the outsourcing actually happened; plaintiff, however, was terminated retroactively to June 30. Gould and Taylor—who had previously assumed plaintiff's supervisory responsibilities while plaintiff had been out on medical leave—were promoted together to lead what remained of the valuation team.

Plaintiff has not had a job since he left UBS. He contends that he immediately began looking for a new job after he lost his job at Realty. Defendants contend that he did not begin looking in earnest until May or June 2009. Regardless of timing, it is undisputed that plaintiff has

taken a number of steps to find a new job, such as attending job fairs and monitoring postings in newspapers, and that he has applied for at least some positions.

After exhausting his administrative remedies, plaintiff filed this lawsuit in February 2009. He alleges retaliation in violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A; its state-law analogue, Conn. Gen. Stat. § 33-1336; and the Connecticut whistleblower statute, Conn. Gen. Stat. § 31-51m. He also alleges retaliation in violation of Connecticut's free speech protection for private sector workers, Conn. Gen. Stat. § 31-51q.[2]

This case was previously assigned to Judge Squatrito. Shortly before the transfer of this case to my docket Judge Squatrito certified a question in this case concerning § 31-51q to the Connecticut Supreme Court. The certified question asked whether the rule announced by the United States Supreme Court in *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), that employees do not speak as citizens for First Amendment purposes when making statements pursuant to their official duties, applies as a matter of state law to a claim that an employer violated § 31-51q by retaliating against an employee for exercising rights guaranteed by §§ 3, 4 or 14 of article first of the Connecticut Constitution. Doc. #394. On October 5, 2015, the Connecticut Supreme Court decided the question, holding that the *Garcetti* test does not apply to the free speech protections of the Connecticut Constitution. *See Trusz v. UBS Realty Investors, LLC et al.*, 319 Conn. 175 (2015).

The parties have filed cross-motions for summary judgment. Defendants move for summary judgment on all counts. Plaintiff moves for partial summary judgment on his Sarbanes-Oxley and § 33-1336 claims. He also moves for partial summary judgment on defendants' affirmative defense that plaintiff failed to mitigate his damages by seeking further employment.

---

[2] Plaintiff also alleged discrimination under the Americans with Disabilities Act as a result of his heart condition. Because plaintiff makes no arguments in defense of this claim in his summary judgment briefing, I understand plaintiff to have abandoned this claim and will dismiss Count Six of the Complaint.

Defendants argue that the decision to terminate plaintiff was the result of legitimate business considerations and that plaintiff could have had no reasonable belief that they were violating any securities laws. By contrast, plaintiff contends that there is no real dispute that his objections to Realty's practices were protected activity and that they contributed to his firing. He also contends that there is no issue of material fact that he made meaningful attempts to secure substantially equivalent employment after losing his job.

### DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

### *The Whistleblower Retaliation Claims*

As noted above, plaintiff has alleged three types of whistleblower retaliation claims—one federal claim under the Sarbanes-Oxley Act and two state law claims. For purpose of his Sarbanes-Oxley Act claim, a threshold question is whether Realty—as distinct from UBS AG—is subject to the whistleblowing provisions of the Act. The relevant provision applies to companies either "with a class of securities registered under . . . the Securities and Exchange Act of 1934" or that are required to file reports under that Act. 18 U.S.C. § 1514A. In 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank), which amended § 1514A to state that Sarbanes-Oxley also covers "any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company." *See* Pub. L. 111-203 § 929A (2010). The events at issue in this case all took place before the passage of Dodd-Frank.

UBS AG is a publicly traded company with securities registered with the SEC, and therefore is subject to Sarbanes-Oxley. UBS Realty is an indirect subsidiary of AG, and part of AG's Global Asset Management Group. Defendants concede that if the amended language of § 1514A were to apply, then UBS Realty would also be subject to Sarbanes-Oxley. Nonetheless, defendants argue that the Dodd-Frank amendment materially changed the law, and that, during the events that gave rise to this case, Realty could not be liable under Sarbanes-Oxley. Plaintiff argues that Dodd-Frank is retroactive because it merely clarified the existing meaning of § 1514A.

There is of course a general presumption against applying a new statute retroactively. *See Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994); *Centurion v. Holder*, 755 F.3d 115, 121 (2d Cir. 2014). But when Congress amends a statute in order to clarify—rather than to substantively change—existing law, then the clarifying amendment may apply retroactively. *See,*

*e.g.*, *Cookeville Regional Medical Center v. Leavitt*, 531 F.3d 844, 849 (D.C. Cir. 2008);

*Leshinsky v. Telvent GIT, S.A.*, 873 F. Supp. 2d 582, 590-91 (S.D.N.Y. 2012). This makes sense,

because a clarifying amendment "does not change the law, but restates what the law . . . is and

has always been." *Pope v. Shalala*, 998 F.2d 473, 483 (7th Cir. 1993), *overruled on other*

*grounds, Johnson v. Apfel,* 189 F.3d 561, 563 (7th Cir.1999).

Courts ordinarily consider three factors when deciding if an amendment clarifies existing

law: "(1) whether the enacting body declared the amendment was clarifying; (2) whether a

conflict or ambiguity existed prior to the amendment; and (3) whether the amendment is

consistent with a reasonable interpretation of the prior enactment and its legislative history."

*Leshinsky*, 873 F. Supp. 2d at 591; *see Middleton v. City of Chicago*, 578 F.3d 655, 663–65 (7th

Cir. 2009).

 At least three district courts in this circuit have applied these factors to the Dodd-Frank

amendment to § 1514A. *See Leshinsky*, 873 F. Supp. 2d at 591-601; *Ashmore v. CGI Group Inc.*,

2012 WL 2148899, at *3-*4 (S.D.N.Y. 2012); *Gladitsch v. Neo@Ogilvy*, 2012 WL 1003513, at

*4 (S.D.N.Y. 2012). All three have concluded that, prior to Dodd-Frank, § 1514A was

ambiguous and that the amendment was a reasonable interpretation of previous law and applies

to pre-enactment conduct. These decisions followed the Department of Labor Administrative

Review Board's holding in *Johnson v. Siemens Building Technologies, Inc.*, 2011 WL 1431986

(A.R.B. 2011). *See also Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 220 (2d Cir. 2014) (when

interpreting Sarbanes-Oxley, ARB decisions receive at least *Skidmore* deference).

Defendants, in contrast, rely on one case that has held the other way. *See Mart v.*

*Gozdecki, Delguidice, Americus & Farkas LLP*, 910 F. Supp. 2d 1085 (N.D. Ill. 2012). The court

in *Mart* disagreed with the analysis in *Leshinsky* and *Siemens*. It held that the text of § 1514A

was clear, and that there had been minimal disputes in interpreting the language before Dodd-Frank. The *Mart* court repeatedly criticized the *Leshinsky* court for "skipping" an analysis of the statutory text, "like a batter failing to touch first base on the way to a double." *Id.* at 1094. I do not agree. The court in *Leshinsky* looked to the meaning of the statutory text several times, and found that it was ambiguous. *See Leshinsky*, 873 F. Supp. 2d at 592-93. In light of the other provisions of Sarbanes-Oxley that required parents to include information on their subsidiaries in their financial statements, it reasoned that the "company" named in the text could well refer to both the parent and subsidiaries. *Id.* at 600. I agree with this reasoning.

Contrary to the *Mart* court's contention that the meaning of § 1514A was settled, no court of appeals had ruled on this issue prior to the passage of Dodd-Frank in 2010. *Cf. Lawson v. FMR LLC*, 670 F.3d 61, 67 (1st Cir. 2012) (noting that no appeals court had ruled on the related issue of whether § 1514A applies to contractors of the parent company). As *Leshinky*'s discussion of prior district court decisions illuminates, many federal judges considered the question unsettled. *See Leshinsky*, 873 F. Supp. 2d at 596-97. Accordingly, I agree with the weight of case law in this circuit and the analysis of the ARB, the expert administrative body tasked with interpreting Sarbanes-Oxley. The Dodd-Frank amendment to § 1514A merely clarified existing law and therefore applies to past conduct consistent with well-established principles of retroactivity. UBS Realty—as well as UBS AG—was therefore subject to Sarbanes-Oxley during the events at issue.[3]

This brings me to the primary question of whether plaintiff has advanced a triable claim of retaliation against him for his whistleblowing activity. To state a *prima facie* case for retaliation under § 1514A, a plaintiff must show: (1) that he engaged in Sarbanes-Oxley-

---

[3] Even if the amendment did not apply to the relevant conduct, UBS Realty might still be liable, on the ground—as set forth by Judge Arterton in her ruling on the motion to dismiss—that UBS AG and UBS Realty are together an integrated employer. *See Trusz*, 2010 WL 1287148, at *5.

protected activity; (2) his employer knew about that activity; (3) he suffered an adverse employment action; and (4) the protected activity was a contributing factor to the adverse employment action. *See* 18 U.S.C. § 1514A; *Nielsen*, 762 F.3d at 219. If a plaintiff makes a *prima facie* case for retaliation, the defendant may still prevail if it shows by clear and convincing evidence that it would have taken the adverse employment action regardless. *See Day v. Staples*, *Inc.*, 555 F.3d 42, 53 (1st Cir. 2009).

There is no dispute that defendants knew about the relevant activity. Further, though the parties argue at length about whether several events constituted adverse employment actions, they agree that plaintiff's termination was an adverse employment action and that it occurred shortly following the activity at issue. Because of the conclusions I reach on the other § 1514A elements, there is no need at this time to resolve the dispute about whether other interactions constituted adverse employment actions.

The remaining questions then are whether plaintiff's complaints about valuation errors were protected under § 1514A and, if so, whether that protected activity contributed to his firing. Under §1514A, there are two forms of protected activity. A covered entity may not retaliate against an employee who acts either:

> (1) to provide information … regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders . . . . [or]

> (2) to file . . .  a proceeding . . .  relating to an alleged violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

18 U.S.C. § 1514A(a)(1-2). Defendants concede that plaintiff engaged in protected activity under § 1514A(a)(2) when he filed his complaints with OSHA, the EEOC, and CHRO.  For the activity to be protected under § 1514A(a)(1), plaintiff must have had both a subjectively genuine and objectively reasonable belief that the practices he was complaining about violated the provisions listed in the statute. *See Wiggins v. ING U.S., Inc.*, 2015 WL 8779559, at *4 (D. Conn. 2015); *Leshinsky*, 942 F. Supp. 2d at 444.

      First, the parties disagree about the scope of § 1514A(a)(1). Defendants argue that plaintiff, to satisfy the standard, needed to complain "definitively and specifically . . . of *shareholder fraud*." Doc. #288, at 8 (emphasis in original). Since the briefs were filed in this case, the Second Circuit has repudiated the "definitively and specifically" standard, and adopted the ARB's more lenient "reasonable belief" standard. *See Nielsen*, 762 F.3d at 221 (citing *Sylvester v. Parexel International LLC*, 2011 WL 2517148, at *21 (A.R.B. 2011)). Defendants continue to insist, however, that plaintiff's complaints needed to be about shareholder fraud specifically, and that he must have reasonably believed that all the elements of shareholder fraud were present. This contention is contrary to the ARB's view and case law from this circuit. *See Yang v. Navigators Group, Inc*., 18 F. Supp. 3d 519, 528 n. 2 (S.D.N.Y. 2014); *Sylvester*, 2011 WL 2517148, at *21. It is also contrary to the text of the statute, which states that the conduct may relate to "*any* rule or regulation of the Securities and Exchange Commission, or any provision of Federal law *relating* to fraud against shareholders." 18 U.S.C. § 1514A(a)(1) (emphasis added). The conduct must concern a rule or regulation of the SEC—regardless of whether it has to do with shareholder fraud—or any other federal law that is *related* to shareholder fraud.

Plaintiff identifies a number of such provisions the errors could have violated. For the purposes of the instant motions, it is sufficient to observe that plaintiff's allegations could have given rise to liability under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq*. UBS Realty is a registered investment adviser with the SEC, and is subject to the Act, a statutory scheme through which the SEC regulates such advisers. The Investment Advisers Act imposes a fiduciary duty "of utmost good faith, and full and fair disclosure of all material facts," and an "affirmative obligation to employ reasonable care to avoid misleading [their] clients." *S.E.C. v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963) (internal quotation marks omitted); *see S.E.C. v. DiBella*, 2007 WL 2904211, at *12 (D. Conn. 2007). Plaintiff has produced deposition testimony from clients stating that they would have considered the overvaluations important. Therefore, plaintiff's complaints that Realty needed to return the excess fees it collected from the overvaluations was related to "a rule or regulation of the Securities and Exchange Commission." In light of these statements from clients on the one hand, and, on the other hand, the testimony contending that any misvaluations were not material, triable issues of fact remain regarding the objective reasonableness of plaintiff's complaints.

Further, whatever the reasonableness of plaintiff's arguments, there are certainly genuine disputes about whether he subjectively believed in the complaints he was making. Defendants tell a plausible alternative story that plaintiff decided he wanted to leave the company and that he has employed a legally sophisticated strategy to increase his leverage in severance negotiations. Among other facts, this version of events is supported by evidence that plaintiff may have changed his view of what of valuation errors were important around the time that he threatened to resign. On the other hand, plaintiff produces more than sufficient evidence, not least his own testimony, to survive a summary judgment motion on his subjective beliefs.

The final issues under Sarbanes-Oxley are whether plaintiff's protected activity was a contributing factor to his termination, and, if so, whether defendants can nonetheless show by clear and convincing evidence that they would have fired him regardless. Under the contributing factor test, "an employee's participation in protected activity need only be one factor in the termination decision" to violate Sarbanes-Oxley. *Barker v. UBS AG*, 2011 WL 283993, at *4 (D. Conn. 2011). This standard imposes a "relatively low burden" on plaintiff. *Id.* I conclude there are genuine disputes about whether plaintiff's protected activity led to plaintiff's termination. Defendants argue that plaintiff had his responsibilities reduced for legitimate reasons and was fired as the simple result of an unrelated business decision to outsource his job. While such a narrative is plausible, there are numerous legitimate disputes about these facts. For one, plaintiff argues with some force that his job was not actually eliminated, and that, between Gould and Taylor, they now perform nearly all of his former duties. Emails from UBS officials also present the potential outsourcing as a means to reduce plaintiff's workload, and this casts some doubt on defendants' claim that they always intended to eliminate his position.

For purposes of his own motion for summary judgment, plaintiff argues that it is beyond dispute that filing the complaint contributed to his firing. In support of this argument, he points to deposition testimony from O'Shea, one of the main decision-makers about plaintiff's job, that he would not want plaintiff working on UBS Realty's accounts while the lawsuits were pending. *See* Doc. #303, ¶ 275. This is, to be sure, a strong piece of evidence. Still, defendants have ultimately produced enough evidence that a reasonable jury could find, even by the clear and convincing standard, that defendants would have undertaken the adverse employment actions regardless of whether plaintiff had filed his OSHA, EEOC and CHRO complaints.

Most notably, defendants have produced documents and testimony that support their argument that they would have fired plaintiff because of the unrelated decision to outsource the valuation review functions. Plaintiff contends the outsourcing cannot be the only explanation because he was terminated retroactively to June 30, while the other employees who were laid off were permitted to keep working until October. Assuming for the sake of argument that the retroactivity of his firing constitutes a separate employment action, defendants still could convince a rational jury they would have done so even if plaintiff had not begun legal proceedings. For instance, if defendants had made the termination retroactive because they were angry at plaintiff's repeated complaints to management and threats to inform clients, but not because of his filing with OSHA, that would not necessarily violate § 1514A(a)(2).[4]

Plaintiff also brings a claim under Conn. Gen. Stat. § 33-1336, the state law analogue to § 1514A. For the purposes of this discussion, § 33-1336 is § 1514A's functional equivalent. *See Trusz v. UBS Realty Investors*, 2010 WL 1287148, at *1 (D. Conn. 2010) (describing § 33-1336 as the state analogue of § 1514A); *Chenarides v. Bestfoods Baking*, 2005 WL 1088983, at *4 n.6 (Conn. Super. 2005) ("Section 33-1336 mirrors" § 1514A). For the same reasons plaintiff's Sarbanes-Oxley claim cannot be resolved in any litigant's favor at this stage, neither can his § 33-1336 claim.

Plaintiff's final whistleblower claim arises under Conn. Gen. Stat. § 31-51m. The statute provides, in relevant part: "No employer shall discharge, discipline or otherwise penalize any employee because (1) the employee . . . reports, verbally or in writing, a violation or a suspected violation of any state or federal law or regulation or any municipal ordinance or regulation to a public body." Conn. Gen. Stat. § 31-51m(b). Such claims are analyzed under a slightly different

---

[4] Such a course of action might violate 1514A(a)(1), but, as stated above, there are material factual disputes about whether plaintiff's statements to management were protected activity under that provision.

framework from Sarbanes-Oxley and § 33-1336. To state a *prima facie* case under § 31-51m, plaintiff must show that (1) he made a complaint to a "public body;" (2) he was discharged, disciplined or otherwise penalized; and (3) there is a causal connection between his protected activity and the adverse employment action. *See Arnone v. Enfield*, 79 Conn. App. 501, 507 (2003); *Villa v. MacDermid, Inc.*, 2010 WL 1667289, at *6 (Conn. Super. 2010). Defendants do not dispute that plaintiff satisfied the first and second prong, and the above reasoning again leads to the conclusion that there is a triable issue of fact regarding the causal connection prong.

I therefore conclude that there are triable issues of fact about all of plaintiff's whistleblower retaliation claims, such that summary judgment would not be appropriate in favor of either plaintiff or defendants.

### The Free Speech Claim

Plaintiff next brings a claim under Conn. Gen. Stat. § 31-51q, alleging that defendants retaliated against him for his engaging in protected speech. According to plaintiff, his complaints regarding staffing, "side letters," and valuation errors, as well as his OSHA complaint, were protected speech for which defendants retaliated against him.

Section 31-51q protects employees, including employees of private companies, against retaliation when speaking out about matters protected by the First Amendment to the U.S. Constitution or by the analogous provisions of the Connecticut Constitution. It provides:

> Any employer, including the state and any instrumentality or
> political subdivision thereof, who subjects any employee to
> discipline or discharge on account of the exercise by such
> employee of rights guaranteed by the first amendment to the
> United States Constitution or section 3, 4 or 14 of article first of
> the Constitution of the state, provided such activity does not
> substantially or materially interfere with the employee's bona fide
> job performance or the working relationship between the employee
> and the employer, shall be liable to such employee for damages
> caused by such discipline or discharge. . .

Conn. Gen. Stat. § 31-51q. Plaintiff brings his § 31-51q claim on the basis of alleged violations of his free speech rights under the Connecticut Constitution. To prevail on a claim for retaliation under § 31-51q, a plaintiff must show that (1) he engaged in protected speech that was (2) causally linked to (3) an adverse employment action he suffered, and (4) that the protected activity did not interfere with the central purposes of the employment relationship. *See McClain v. Pfizer, Inc.*, 692 F. Supp. 2d 229, 241 (D. Conn. 2010).

Defendants concede that plaintiff suffered an adverse employment action, and for the reasons stated above, it is clear that there are triable issues of fact regarding any causal link between plaintiff's statements about valuation errors and his termination. For many of these same reasons, I also conclude there are triable issues about whether plaintiff's speech improperly interfered with his job duties. Taking plaintiff's factual contentions as true, plaintiff's complaints did not substantially interfere with his job performance, and any breakdown in his relationship with his supervisors was because of their improper response to him raising valid concerns. *See Karagozian v. Luxottica Retail N. Am.*, 2015 WL 7451151, at *11 (D. Conn. 2015) (plaintiff satisfied fourth prong where his speech did not "interfere[] with his work performance," despite "some impact on his relationship with his supervisors").

The question I must answer then, for purposes of the § 31-51q analysis, is whether plaintiff's speech was protected. Addressing a certified question in this case, the Connecticut Supreme Court recently addressed what speech is protected in the employment context. It held that state constitutional claims under § 31-51q are analyzed under the modified *Connick/Pickering* balancing test articulated by Justice Souter in dissent in *Garcetti v. Ceballos*, 547 U.S. 410 (2006). *See Trusz v. UBS Realty Investors, LLC*, 319 Conn. 175, 210 (2015). Under the classic *Connick/Pickering* test, "employee speech in . . . [the] workplace is protected from

employer discipline if it involves a matter of public concern and if the employee's interest in the matter outweighs the employer's interest in promoting the efficient performance of . . . services." *Id.* at 184. Justice Souter, in dissent in *Garcetti*, would have applied this test to public employee's speech even when they speak pursuant to their official job duties. *Garcetti*, 547 U.S. at 434-35 (Souter, J., dissenting). He added, however, that the employer's interest would be strong in these cases, and the speech would only be protected where it constituted "comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing or threats to health and safety." *Id.* at 435. The *Trusz* court held that this standard applies to § 31-51q claims that allege that the speech was protected under the Connecticut Constitution.

In the instant case, under the standard announced by the Connecticut Supreme Court in *Trusz*, a plaintiff's workplace speech is protected only if it relates to "official dishonesty, deliberately unconstitutional action, other serious wrongdoing or threats to health and safety."[5] Defendants argue that plaintiff cannot satisfy this modified *Connick/Pickering* test, and that his free speech retaliation claim should be dismissed. They contend that plaintiff's statements about valuation errors did not relate to matters of public concern, much less to allegations of official dishonesty, deliberately unconstitutional action, other serious wrongdoing or threats to health and safety. While plaintiff must concede his statements did not relate to deliberately unconstitutional action or threats to health and safety, he does maintain that his speech related to allegations of official dishonesty and other serious wrongdoing.

Although the issue of whether speech concerns official dishonesty or serious wrongdoing is a question of law, it nonetheless requires "a fact-intensive inquiry." *See Wrobel v. County of Erie*, 692 F.3d 22, 29 (2d Cir. 2012). Where there are disputed facts that are essential to a legal

---

[5] Plaintiff argues that some of his speech fell outside his job duties, and therefore was not subject to the more stringent version of the *Connick/Pickering* test applied in those situations. Because I conclude there are triable issues of fact regarding the more stringent test, there is no need for me to resolve this question.

conclusion, summary judgment would be improper. Here, there are substantial, genuine factual disputes that preclude summary judgment. As discussed above, in plaintiff's version of events, his speech related to potentially serious violations of law, such as UBS Realty's fiduciary duty under the Investment Advisers Act. Defendants may be correct that plaintiff likely did not allege *criminal* wrongdoing, but I do not find support for their contention that the *Trusz* test requires such an allegation. At least in certain situations, regulatory or civil wrongs could constitute serious wrongdoing. *See Trusz,* 319 Conn. at 215 (complaints about illegal or dangerous workplace conditions are protected).

Nor do I agree with defendant's argument that plaintiff needed to have an objective basis for any belief that defendants were committing serious misconduct in order for his speech to be protected. Constitutional free speech rights do not stop when a speaker misapprehends the facts. *Cf. United States v. Alvarez*, 132 S. Ct. 2537 (2012) (lying about receiving military medals is protected speech under the First Amendment). By defendants' logic, a person must first make sure her suspicion is correct before she speaks out about suspected misconduct. To adopt this rule would chill speech in a fashion incompatible with either the federal or state constitution.

Further, a speaker's purpose or motive is important, though not dispositive, in assessing whether speech is protected. *See Karagozian*, 2015 WL 7451151, at *10. "[T]he court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Lewis v. Cowen*, 165 F.3d 154, 163–64 (2d Cir. 1999). As described above, there are ample genuine disputes about plaintiff's subjective motives.  Accordingly, I cannot conclude at this stage that plaintiff's statements were unprotected; because genuine fact issues remain, I will deny defendant's motion for summary judgment with respect to plaintiff's § 31-51q claim.

### The ADA Retaliation Claim

Plaintiff next contends that his employment was terminated in retaliation for engaging in protected activity under the Americans with Disabilities Act (ADA), 42 U.S.C § 12203. To prove that an employer illegally retaliated against an employee, the employee must show as a *prima facie* case that "(1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir. 2002). If the employer presents a legitimate non-retaliatory reason for acting, then "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Id.* at 721.

Defendants do not dispute that plaintiff has satisfied the first two elements of the *prima facie* case, and again—while they dispute whether any other incidents constituted adverse employment actions—they concede that plaintiff's termination satisfies the third "adverse action" element.[6] Though the parties' briefing on this issue was sparse, the Court understands the relevant protected activity to be plaintiff's complaints that the work-load in the valuation department was too demanding for his health, his decision to take a medical leave of absence, beginning February 6, 2008, and his filing of a complaint alleging disability discrimination on March 11, 2008. In light of Thomas O'Shea's admission that he would not want plaintiff working on any UBS accounts while the lawsuits were pending, plaintiff has satisfied his *prima facie* case of causation. *See* Doc. #303, ¶ 275. For the same reasons discussed above, defendants

---

[6] In their response to plaintiff's statement of undisputed facts, defendants deny "that Plaintiff met or currently meets the definition of 'disabled' for purposes of the Americans with Disabilities Act." Doc. #303 at 45. But they do not raise this or any similar argument in their briefing or cite to record evidence to support the contention. I therefore will treat any argument that plaintiff's activity was not protected under the ADA as waived for purposes of this motion.

have articulated a legitimate, non-discriminatory reason for plaintiff's termination—that they wanted to outsource the company's valuation review functions for business reasons. But O'Shea's testimony—which suggested that plaintiff's superiors did not want him to work for them after he had filed his complaints—is alone sufficient evidence for a rational jury to conclude that plaintiff was fired because of retaliation in violation of the ADA. Accordingly, I will deny defendants' motion for summary judgment with respect to the ADA claim.

### The Failure to Mitigate Defense

In their answer, defendants raise the affirmative defense that plaintiff failed to mitigate his damages by pursuing another job. Plaintiff has moved for partial summary judgment on this issue, arguing there is no genuine dispute that he has sought to find another job.

When a plaintiff has been fired because of illegal retaliation, he ordinarily must attempt to mitigate his damages by using reasonable diligence to find other suitable employment. *Greathouse v. JHS Sec. Inc.*, 2015 WL 7142850, at *3 (S.D.N.Y. 2015). No provision of Sarbanes-Oxley specifically requires a victim of retaliation to mitigate his damages.  But the ARB has consistently found such a requirement implicit in the statute, "in keeping with . . .  the parallel body of damages law developed under other anti-discrimination statutes." *Hobby v. Georgia Power Co.*, 2001 WL 168898, at *15 (ARB 2001); *see Smith v. Lake City Enterprises*, 2012 WL 6066526, at *2 (ARB 2012).

Although the burden rests with plaintiff to seek other employment, it is defendants' burden at trial to show a failure of plaintiff to mitigate his damages. *See Azkour v. Little Rest Twelve,* 2015 WL 631377, at *8 (S.D.N.Y. 2015). To prevail on the affirmative defense, a defendant generally must show that suitable employment existed in the marketplace and that the plaintiff made no reasonable efforts to find it. *See Dailey v. Societe Generale*, 108 F.3d 451, 456

(2d Cir. 1997); *Castelluccio v. International Business Machines Corp.*, 2014 WL 3696365, at *14 (D. Conn. 2014). Further, a plaintiff "need not go into another line of work, accept a demotion, or take a demeaning position." *Bergerson v. New York State Office of Mental Health, Cent. New York Psychiatric Ctr.,* 526 F. App'x 109, 111 (2d Cir. 2013).

In this case, there are material factual disputes about the reasonableness of plaintiff's efforts to find a new job. Defendants argue that plaintiff did not begin looking for work in earnest until nine months after he was terminated. *See Gueye v. Air Afrique*, 1995 WL 234711, at *9 (S.D.N.Y. 1995) (six month gap between firing and beginning of job search created triable issue of fact about failure to mitigate defense). They base this claim primarily on an absence of evidence that plaintiff began searching before then, as well as some ambiguous notes written by plaintiff's psychiatrist. Plaintiff disputes this contention, relying on an affidavit from his wife. Who is right is an issue for the jury. I therefore deny plaintiff's motion for partial summary judgment.

## CONCLUSION

For the foregoing reasons, I conclude there are triable issues of fact on all claims =. Accordingly, defendants' motion for summary judgment (Doc. #287) and plaintiff's cross motions for summary judgment (Docs. #284 and #316) are DENIED.

It is so ordered.

Dated at New Haven this 18th day of April, 2016.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge